```
                UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
                     WESTERN DIVISION

--------------------------------------------------------

UNITED STATES OF AMERICA,

                Petitioner,

     -vs-                        Case No. 5:21-HC-02164-M


JAMES KOZOHORSKY,

                Defendant.

--------------------------------------------------------

                  BENCH TRIAL - VOLUME I
                     MARCH 27, 2023
          THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
                 UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S


On Behalf of the Government

MICHAEL D. BREDENBERG and HOLLY P. PRATESI
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601


On Behalf of the Defendant

HALERI M. COSTELLO and KATHERINE E. SHEA
Federal Public Defender's Office - EDNC
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601



                 Risa Kramer, RMR, CRR
                  Official Court Reporter
                United States District Court
                Wilmington, North Carolina
```

1                    INDEX OF PROCEEDINGS

2

OPENING STATEMENTS

3
        By Ms. Pratesi................................6
4        By Ms. Costello...............................9

5

JAMES KOZOHORSKY
6
        Direct Examination by Ms. Pratesi............15
7        Cross-Examination by Ms. Costello............50
        Redirect Examination by Ms. Pratesi..........85
8

9    DR. MARK HASTINGS

10        Direct Examination by Mr. Bredenberg.........87
        Cross-Examination by Ms. Costello............142
11        Redirect Examination by Mr. Bredenberg.......154
        Recross Examination by Ms. Costello..........156
12

13    DR. DAWN GRANEY

14        Direct Examination by Ms. Pratesi............158
        Cross-Examination by Ms. Shea................191
15        Redirect Examination by Ms. Pratesi..........212

16
    THE GOVERNMENT RESTS............................213
17

18    DR. LEONARD BARD

19        Direct Examination by Ms. Costello...........215
        Cross-Examination by Mr. Bredenberg..........253
20

21    DR. JOSEPH PLAUD

22        Direct Examination by Ms. Shea...............279

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2              (Proceedings commenced at 9:33 a.m.)
 3              THE COURT:  All right.  If the clerk would
 4    please call the case.
 5              THE CLERK:  The United States versus James
 6    Kozohorsky.
 7              THE COURT:  Counsel, please state your
 8    appearance for the record.
 9              MS. PRATESI:  Good morning, Your Honor.
10    Holly Pratesi for the government.
11              MR. BREDENBERG:  And Mike Bredenberg for the
12    government.
13              MS. COSTELLO:  Haleri Costello for the
14    respondent.
15              MS. SHEA:  And Katherine Shea for the
16    respondent.
17              THE COURT:  All right.  Before we proceed,
18    there's a motion in limine.  We'll start with the motion
19    in limine.
20              MS. COSTELLO:  Your Honor, the motion in
21    limine is the government's motion to keep out a witness
22    that we actually are not going to be calling, and so I
23    think that moots the motion.
24              THE COURT:  All right.  Motion is moot.  All
25    right.  We will proceed.
```

1          All right.  The clerk has provided the Court

2     with all the trial exhibits.  I have those.  My

3     understanding is there's some motions work regarding the

4     exhibits themselves, is that correct?

5          MS. PRATESI:  Your Honor, there's no motions

6     pertaining to the exhibits, but there were some

7     objections.  Counsel and I spoke this morning, and we'd

8     like to move the entire binder into evidence, subject to

9     respondent's objection to hearsay to Government's

10    Exhibit 10 and the government's objection to

11    Respondent's Exhibit 7 for hearsay and authentication.

12         THE COURT:  All right.  So we have

13    objections to 7 and 10 regarding hearsay.

14         MS. PRATESI:  Yes.  Government Exhibit 10,

15    Respondent Exhibit 7.

16         THE COURT:  All right.  So Government's

17    Exhibit 10 has a hearsay objection.

18         MS. PRATESI:  Correct, Your Honor.

19         THE COURT:  And Respondent's Exhibit 7 has

20    hearsay and authentication?  Is that correct?

21         MS. PRATESI:  Yes, Your Honor.

22         THE COURT:  All right.  The exhibits are all

23    admitted, subject to those objections, which we will

24    hear in the course of time as it becomes clear to the

25    Court what it is we may be concerned about.

1          Anything else we need to take up pretrial?

2          MS. COSTELLO:  Your Honor, my client has a

3   documented medical history of AFib, atrial fibrillation,

4   and he informed me this morning that he believes he is

5   currently in AFib.  He says that he is fine to proceed.

6   He doesn't need medical attention.  But I did want to

7   put that on the record in case something arises during

8   the course of the proceedings, just so that the Court is

9   aware.  But we don't want a continuance at this time.

10         THE COURT:  All right.  Mr. Kozohorsky, if

11  you need anything at any time, you let your attorney

12  know and -- I want you fit and healthy, sir, so --

13         THE RESPONDENT:  Yes, sir.

14         THE COURT:  -- we will take care of anything

15  that comes up, okay?

16         THE RESPONDENT:  Yes, sir.

17         THE COURT:  All right.  All right.  Sealing

18  matters.  Anything that we need to seal?

19         MS. PRATESI:  Not that I'm aware of, Your

20  Honor.

21         MS. COSTELLO:  Not for respondent, Your

22  Honor.

23         THE COURT:  All right.  Witness

24  sequestration?  I think we have experts.  Okay.  No

25  request for sequestration --

1          MS. COSTELLO:  No, Your Honor.

2          THE COURT:  -- from either party.

3          MS. PRATESI:  No.

4          THE COURT:  I believe all of the experts --

5   there's no objection to any of the experts'

6   qualifications as experts, is that correct?

7          MS. COSTELLO:  That's correct, Your Honor.

8          MS. PRATESI:  Correct, Your Honor.

9          THE COURT:  Okay.  Ms. Pratesi, are you in

10  contact with any victims who may wish to testify today?

11         MS. PRATESI:  No, Your Honor.

12         THE COURT:  All right.  We're here today on

13  the United States's petition for the civil commitment of

14  James Kozohorsky pursuant to Title 18, United States

15  Code, Section 4248(d).  He's been certified by Jamie

16  Hersant, Ph.D., a clinical psychologist, as a sexually

17  dangerous person as defined by Title 18, United States

18  Code, Section 4247(a)(5), and sexually dangerous to

19  others as defined by Title 18, United States Code,

20  Section 4247(a)(6).  That's the allegation.  Before we

21  proceed to the evidence, does the United States wish to

22  make any opening remarks?

23         MS. PRATESI:  Yes, Your Honor, just briefly.

24         Your Honor, the evidence presented today

25  will show that the respondent, James Kozohorsky, is an

1   unrepentant, serial rapist who should be committed to

2   the custody of the Attorney General in order to protect

3   the public.

4           Your Honor, the respondent concedes that he

5   has engaged in or attempted to engage in sexually

6   violent conduct, but the evidence will show today that

7   his history of sexually violent conduct is far more

8   extensive than the one offense he admits that he

9   committed.

10          There is documented evidence that

11  Mr. Kozohorsky first attempted to rape a woman in

12  January of 1987, when he was 22 years old, by holding a

13  knife to her throat.  There is documented -- he

14  admits -- excuse me -- that only four days later he

15  vaginally raped a young woman by bending her over the

16  sink in the bathroom at her place of employment and

17  threatening to hit her if she did not shut up and

18  comply.  There's credible documented evidence that two

19  years later he raped another acquaintance, this time a

20  middle-aged woman, by coming to her home, throwing her

21  on the bed, and forcibly vaginally raping her.  There is

22  also credible documented evidence that shortly after his

23  release from prison for that offense, he anally raped a

24  woman that he knew in her home.  And finally, there is

25  credible evidence that he sexually and physically

assaulted another woman as recently as 2010.  He has
been incarcerated since 2010.

Two forensic psychologists, Dr. Dawn Graney
and Dr. Mark Hastings, have diagnosed Mr. Kozohorsky
with serious mental illnesses, abnormalities, or
disorders.  These experts have diagnosed him with other
specified paraphilic disorder (nonconsent), and other
specified personality disorder with antisocial features.
He's also diagnosed with alcohol use disorder.

These experts will credibly and persuasively
explain that Mr. Kozohorsky has a deviant sexual
interest in forced or coerced sexual acts and that he
evidences a pervasive pattern of disregard for the
rights of others.

And finally, Your Honor, the evidence will
show here today that as a result of his diagnosed mental
disorders, he will have serious difficulty refraining
from sexually violent conduct if released.  The evidence
will show presence of a combination of static and
dynamic risk factors that, taken together, lead only to
a conclusion that Mr. Kozohorsky will have serious
difficulty refraining from sexually violent conduct if
he is released.  The evidence will show a pervasive and
persistent historical pattern of sexual violence.  It
will show that he has no remorse for his past sexual

violence.  It will show that he denies or minimizes most of his criminal actions.  He blames his victims and he blames women, generally.

The evidence will show that he doesn't believe he needs sex offender treatment.  It will show that he has no respect for authority.  He has failed to follow the law, he has repeatedly failed to follow terms of supervision, and he has failed to properly register as a sex offender.

So after reviewing the exhibits and the evidence presented here today, after listening to the testimony offered, we will ask this Court to protect society from Mr. Kozohorsky's sexual violence by finding that he is sexually dangerous to others and committing him to the custody of the Attorney General.  Thank you.

THE COURT:  Thank you, counsel.

MS. COSTELLO:  Thank you, Your Honor.

Judge, the government's case suffers from three fatal flaws.  First:  The main diagnosis relied upon by the government's experts is other specified paraphilic disorder (nonconsent), which is a paraphilia or deviant sexual interest in nonconsensual sex.  You will hear evidence that the diagnosis of nonconsent paraphilia is at best questionable within the psychological community.  You will hear evidence that

1    there are jurisdictions in the United States that have

2    banned its use in civil commitment proceedings.  You

3    will hear evidence that it does not have specific

4    criteria, that it has been considered for inclusion in

5    many iterations of the DSM, which is the manual that

6    psychologists use to diagnose mental illnesses, but has

7    never been included.  There are significant questions

8    about the legitimacy of this diagnosis such that it

9    should not be relied upon to civilly commit

10   Mr. Kozohorsky.

11            We ask you to listen carefully to the

12   evidence about this diagnosis and whether it is the type

13   of diagnosis that should be relied upon in a case about

14   indefinite preventive detention, such as this one.

15            Second:  Even if you accept the diagnosis,

16   there is no compelling evidence that Mr. Kozohorsky is

17   specifically attracted to nonconsensual sex.  You will

18   hear testimony about the myriad reasons that people

19   commit the crime of rape, how rape is inherently a

20   nonconsensual act, how it is difficult to prove that a

21   person is specifically attracted to nonconsensual sex,

22   how there are no empirically validated criteria or tests

23   with which to do so.

24            You will also hear evidence that

25   Mr. Kozohorsky has had numerous consenting sexual

 1    partners, that he has used prostitutes for sex, he has

 2    specifically paid women to consent to sex with him.  You

 3    will not hear evidence that is clear and convincing that

 4    he has an abnormally persistent attraction to

 5    nonconsensual sex.

 6          You will also hear evidence from the

 7    government, as they just noted, that there are five

 8    credible allegations of rape in Mr. Kozohorsky's case;

 9    two in 1987, one in 1989, one in 2006, and one in 2010.

10    I want to specifically draw your attention to the two

11    most recent allegations, 2006 and 2010, and discuss some

12    of the evidence that you are likely to hear about those.

13          In 2006, you will hear evidence that

14    Mr. Kozohorsky, who at that time had two prior rape

15    convictions, was charged with four counts of rape of a

16    woman named Linda Burnsed.  You will hear evidence that

17    he ultimately pleaded guilty to one count, not of rape

18    but of attempted rape; that he, a twice convicted

19    rapist, got a suspended sentence.

20          You will hear evidence that Mr. Kozohorsky

21    denies this rape, that it was a consensual sexual

22    encounter that he audiotaped.  You will also hear

23    evidence that calls into question the victim's account

24    of events that night, that calls into question whether

25    her account of what happened that night can and should

1  be used as evidence of his attraction specifically to

2  nonconsent.

3          You will also hear the government discuss a

4  sexual assault claim by a Christine Harvey from 2010

5  shortly before Mr. Kozohorsky entered into his current

6  federal sentence.  You will hear evidence that there is

7  a police report that states that Ms. Harvey accused

8  Mr. Kozohorsky of, quote, "sexual assault;" that the

9  police report includes no additional details; that

10 Mr. Kozohorsky, at that time a thrice convicted rapist,

11 was never charged with an offense nor convicted of an

12 offense stemming from this incident; that in his federal

13 sex offense case, the presentence report recommended a

14 six-level enhancement for committing a sexual crime

15 while in failure to register status based on this

16 allegation, and you will hear evidence that the

17 government ultimately conceded that that enhancement did

18 not apply at his federal sentencing.

19         You will not hear clear and convincing

20 evidence that this 2010 assault happened.  And, in fact,

21 the basis of our objection -- we have an objection to

22 that actual police report, and it stems from the fact

23 that there is nothing that has ever been determined that

24 this assault happened.  There's no evidence of it.

25         And so when trying to determine whether

Mr. Kozohorsky is specifically attracted to nonconsensual sex, we ask you to keep these two incidents in mind because the specific facts are important.  The government simply can't prove that Mr. Kozohorsky is a serial rapist.  Kansas v. Crane tells us that.  They have to prove that he is something other than the dangerous but typical recidivist, someone whose behavior is driven by a serious mental illness, abnormality, or disorder -- in this case, an attraction to nonconsensual sex -- that so dominates his psyche that he would have serious difficulty controlling his sexual behavior if released.  You will not hear evidence that corroborates this.

Three.  There is no compelling evidence that he lacks volitional control.  Mr. Kozohorsky has been in federal custody for ten years.  He has excellent prison conduct; no infractions, no sexual misconduct whatsoever.  You may hear evidence that he has engaged in some behaviors in the past year while in the treatment program at Butner, which he voluntarily joined, that could have resulted in an incident report. But you will never hear that he received one, and you will also hear that these purported incidents were not sexual in nature.

You will hear evidence that he lived for

three years in the community from 2007 until 2010 with no credible allegations of sexual assault. You will hear that he has only two allegations against him in the past 34 years, that he has served much of that time in prison, but that there are female prison guards with whom he has never tried to engage in sexual behavior.

You will hear that Mr. Kozohorsky has had many consenting sexual partners over the course of his life. You will hear that his score on the lodestone actuarial instrument that predicts risk, the Static-99R, is a 4, and that when he turns 60 in 14 months it will be a 2.

You will also hear that at that time he will be on supervision. He will, in fact, be on lifetime supervision by the federal government. He will be required to do sex offender treatment. You will hear that he is in custody for failing to register as a sex offender, but for the vast majority of his history, he did, in fact, register as required by law and that he is required to do so in the future.

Judge, simply put, you will not hear evidence that any mental illness so significantly diminishes his volitional capacity that he is distinguishable from the dangerous but typical recidivist. The government cannot prove their diagnosis

1   is legitimate.  They cannot prove that even if it is

2   legitimate it applies to Mr. Kozohorsky.  And they

3   cannot prove that even if it applies it would cause him

4   serious difficulty refraining from sexually violent

5   conduct.  And so at the close of the government's case,

6   we'll come before you and ask you to deny the

7   government's motion.  Thank you.

8               THE COURT:  Thank you, counsel.

9               All right.  Ms. Pratesi, you may call your

10  first witness.

11              MS. PRATESI:  Thank you, Your Honor.  The

12  United States calls James Kozohorsky.

13              THE CLERK:  Place your left hand on the

14  Bible, raise your right hand, and state your name for

15  the record.

16              THE RESPONDENT:  James Kozohorsky.

17              (The respondent was placed under oath.)

18              THE COURT:  You may proceed, counsel.

19              MS. PRATESI:  Thank you.

20                      DIRECT EXAMINATION

21  BY MS. PRATESI:

22      Q.  Good morning, Mr. Kozohorsky.

23      A.  How you doing?

24      Q.  Good.  Thanks.  Can you please state your full

25  name for the record.

1      A.   James Daniel Kozohorsky.

2      Q.   You've also gone by other names or aliases, is

3  that correct?

4      A.   That's correct.

5      Q.   And you've used the alias James Anderson, right?

6      A.   Yes.  That's my stepdad.

7      Q.   And have you also used J.D. Anderson?

8      A.   Yes.

9      Q.   And James Knapp?

10     A.   Yes.  That was my stepdad.

11     Q.   And also James Larson.

12     A.   That was my stepdad as well.

13     Q.   You're 58 years old?  Is that correct?

14     A.   That's correct.

15     Q.   And you were born in Michigan, right?

16     A.   Yes.

17     Q.   And then at some point you moved to Arkansas?  Is

18  that correct?

19     A.   That's correct.

20     Q.   You attended some high school in Jonesboro,

21  Arkansas, right?

22     A.   Yes.

23     Q.   But you dropped out somewhere around 1979?

24     A.   That's correct.

25     Q.   And you took vocational training courses for auto

1 mechanics?

2    A.  That's correct.

3    Q.  And then also diesel mechanics?

4    A.  That's correct.

5    Q.  And ultimately HVAC, right?

6    A.  Yes, ma'am.

7    Q.  But you did earn your GED somewhere around 1981,

8 right?

9    A.  That's correct.

10    Q.  And while you were incarcerated, you took some

11 college courses?

12    A.  That's correct.

13    Q.  So, Mr. Kozohorsky, you were first arrested in

14 1980 when you were around 15 years old.  Does that sound

15 right to you?

16    A.  Yes, ma'am.

17    Q.  And you were arrested for burglary and theft of

18 property in Arkansas.

19    A.  Yes, ma'am.

20    Q.  And you were originally given a suspended

21 sentence for that offense?

22    A.  That's correct.

23    Q.  But about eight months later you were sentenced

24 to five years incarceration with two suspended.  Does

25 that sound right to you?

```
 1      A.   Yes, ma'am.

 2      Q.   So you were actually sentenced to three years in

 3  custody at that point.

 4      A.   That's correct.

 5      Q.   And you paroled somewhere around 1982?  Does that

 6  sound right to you?

 7      A.   Yes, ma'am.

 8      Q.   Within a few months of your release from custody

 9  you were arrested in June of 1982 for breaking and

10  entering, theft of property, and possession of a

11  firearm.  Do you recall that?

12      A.   Yes, ma'am.

13      Q.   And you would have been around 18 years old at

14  that time?

15      A.   That's correct.

16      Q.   And you received a seven-year sentence with two

17  and a half years suspended, correct?

18      A.   Yes, ma'am.

19      Q.   And so you were supposed to serve somewhere

20  around four, four and a half years in custody.

21           And then sometime after you are released from

22  that sentence, you were arrested in January of 1987.  Do

23  you recall that?

24      A.   Yes, ma'am.

25      Q.   And at that point, you would have been around 22
```

1  years old?

2     A.   Yes, ma'am.

3     Q.   And you were charged with aggravated assault and

4  rape.  Is that correct?

5     A.   That's correct.

6     Q.   And those charges stem from two different

7  incidents.  Does that sound right to you?

8     A.   No.

9     Q.   That the aggravated assault charge stemmed from

10 January 11th, and the rape charge stemmed from January

11 15th?  Does that sound right?

12    A.   No, ma'am.

13    Q.   Okay.

14    A.   Not to my knowledge, no.

15    Q.   Okay.  Do you recall that there were charges that

16 you went to the home of a woman named Sandra on January

17 11th, 1987?

18    A.   There was charges but, I mean, I don't know that

19 there was ever official charges, but there was a

20 accusation, but I don't think they ever did anything

21 with that.

22    Q.   Do you recall the accusation, though?

23    A.   Yes, ma'am.

24    Q.   Okay.  And do you recall that the accusation was

25 that you went to Sandra's home and attempted to have sex

1    with her?

2        A.  Yes, ma'am.

3        Q.  And do you recall that you went to her home

4    uninvited that night?

5        A.  No.

6        Q.  Okay.  Do you recall that when she opened the

7    door, you pushed your way in?

8        A.  No.

9        Q.  Do you recall that you asked to use the restroom

10   in her home?

11       A.  No, ma'am.

12       Q.  Okay.  Do you recall that after you did, you came

13   out and you opened a knife that you had brought with

14   you?

15       A.  No, ma'am.  I don't use a -- I don't have a

16   knife.

17       Q.  You've never had a knife?

18       A.  Not like -- no.

19       Q.  Okay.

20       A.  I never threatened anybody with a knife in my

21   life.

22       Q.  And so you didn't hold it to her throat?

23       A.  No.

24       Q.  And you didn't try grabbing her vagina?

25       A.  No.

```
 1    Q.  And you don't recall her biting you?

 2    A.  No.

 3    Q.  And you didn't strike her in the face?

 4    A.  No.

 5    Q.  Do you recall if you had ever been to the home

 6  before, and she or her mother asked you to leave?

 7    A.  I don't even know who them people are.

 8    Q.  Okay.  Do you recall being questioned about that

 9  incident after you were arrested on January 15th?

10    A.  I was questioned about 15 incidents, and they

11  were all proven not to have any merit or validity to

12  them.

13    Q.  How about the validity of your arrest for raping

14  Rhonda on January 15th, 1987?

15    A.  That was a true accusation.  I did that.

16    Q.  Okay.  And she was about 18 years old at the

17  time?

18    A.  18 or 19, that's correct.

19    Q.  And you were 22, right?

20    A.  Yes, ma'am.

21    Q.  And you had seen her before that date, correct?

22  You knew who she was?

23    A.  We dated for about seven months off and on.

24    Q.  But you're aware that she denies ever dating you,

25  correct?
```

1    A.   I don't know if she did or not.  She might have.
2   I'm not aware that she did, but she might have.
3    Q.   So you're not aware that she had reported to the
4   police that you asked her out several times and she
5   refused?
6    A.   To my knowledge, no.
7    Q.   Okay.  And you had never -- did you ever tell
8   your friend that Rhonda was either, I quote, "going to
9   give me some of that, or I'm going to take it"?
10    A.   No.
11    Q.   So on that day, you went to her place of
12   employment, Bargains Unlimited.  Is that correct?
13    A.   That's correct.
14    Q.   And she asked you to watch the front of the store
15   so she could use the restroom, right?
16    A.   That's correct.
17    Q.   And instead, you came to the back of the store
18   and you stopped her from exiting the restroom, right?
19    A.   That's a good possibility.
20    Q.   Okay.  And you pushed her up against the wall and
21   told her to pull her pants down?
22    A.   Yes.
23    Q.   And you said to her, and I quote, "Bitch, you've
24   got a tight ass"?
25    A.   Not that I recall, but it might have happened.

1  I'm not gonna deny that.

2     Q.  And you proceeded to have sex with her, correct?

3     A.  That's correct.

4     Q.  Even though she asked you to stop?

5     A.  I don't recall her asking me to stop, but she

6  probably did, and I will concede that point.

7     Q.  And when you asked -- when she asked you to stop

8  and she asked why you were doing this, do you recall

9  telling her that you liked her and you wanted her?

10     A.  No, I don't.

11     Q.  Do you recall drawing your fist back and

12  threatening to hit her if she didn't shut up?

13     A.  I might have done that.  I'm not gonna say I

14  didn't.

15     Q.  And you repeatedly told her, and I quote, "Shut

16  up, bitch, or I'll hit you," didn't you?

17     A.  That doesn't sound like me but it's possible.

18  I'm not gonna deny that it's not possible.

19     Q.  And finally, you threatened that if she didn't

20  shut up, you would, quote, "stick it somewhere else,"

21  quote, didn't you?

22     A.  That's a possibility.

23     Q.  And once you ejaculated, you left the store.  Is

24  that right?

25     A.  That's correct.

1    Q.  And you weren't arrested at the store, correct?

2    A.  No.

3    Q.  In fact, you left with the friend that drove you

4    there?

5    A.  Yes.

6    Q.  And you went to a woman named Barbara's house

7    that afternoon?  Is that correct?

8    A.  Barbara -- I don't recall a Barbara.

9    Q.  Do you recall --

10   A.  I went to -- I went to -- give me just a second.

11   I'll tell you exactly whose house I went to and where

12   they drove me.  It was Eddie Boone's wife, which would

13   be Charlotte Boone, and she drove me to Missouri.

14   Q.  So it's your testimony that you went to Missouri

15   that night.

16   A.  Yes.  I went to Missouri, and then she talked

17   me -- she talked to me.  She told me it'd be best if I

18   turned myself in, that the police had been to my house.

19   And we turned back around, I went back to my house.  I

20   called Joel T. Gibson [phonetic], and he come -- he's

21   the police officer there, the sergeant, and he came and

22   he did the formal arrest and took me in.

23   Q.  So you don't recall going to a woman's home and

24   pushing your way in.

25   A.  No.

1    Q.  And you don't recall telling her that you were

2  hiding from the police?

3    A.  No.

4    Q.  Or that when you were there you asked her to fool

5  around?

6    A.  No.

7    Q.  And that you exposed your penis to her?

8    A.  No.

9    Q.  And that you masturbated in front of her?

10    A.  No.

11    Q.  And that you continued to make vulgar remarks

12  until she got you to leave her house?

13    A.  No, ma'am.

14    Q.  When you were ultimately arrested that night, you

15  originally told the police that she consented to having

16  sex with you, didn't you?

17    A.  Yes.

18    Q.  And you said you didn't threaten her or

19  physically harm her?

20    A.  I probably did at the time.  That's correct.

21    Q.  So that was a lie, correct?

22    A.  Yes.

23    Q.  And you do admit, as we sit here today, that you

24  raped Rhonda, correct?

25    A.  Yes.

1    Q.   And you pleaded guilty to one count of rape?

2    A.   Yes.

3    Q.   And the assault charges that we discussed before

4    were dropped, as far as you understand.

5    A.   Yes.

6    Q.   Okay.  So you were sentenced in 1988 to ten years

7    incarceration with seven suspended.  Does that sound

8    right to you?

9    A.   Yes, ma'am.

10   Q.   So you would have been released in about March of

11   1989?

12   A.   Yes, ma'am.

13   Q.   And then about eight months later in November of

14   1989, you were arrested and charged with the rape of

15   Nadine.  Is that right?

16   A.   That's correct.

17   Q.   And you pleaded guilty to that charge, correct?

18   A.   That's correct.

19   Q.   Nadine knew you and she knew your wife, is that

20   right?

21   A.   That's right.

22   Q.   And on November 15th, 1989, you went to her home?

23   A.   Yes.

24   Q.   And you went into her bedroom, correct?

25   A.   That's correct.

 1    Q.  And when she came in to ask what you were doing,

 2   you grabbed her by her hair, is that correct?

 3    A.  No.

 4    Q.  And you choked her?

 5    A.  No.

 6    Q.  You told her you'd kill her.

 7    A.  No.

 8    Q.  And she specifically begged you, and I quote,

 9   "Please don't do this, J.D.  This is rape and you will

10   go to jail for this."  Did she say that to you?

11    A.  No.

12    Q.  And you didn't tell her, and I quote, "It will be

13   worth it to get a piece of you"?

14    A.  No.

15    Q.  And you didn't tell her that you'd wanted her for

16   years?

17    A.  No.

18    Q.  Or that if you had to rape her, you would?

19    A.  No.

20    Q.  After your arrest but before you pleaded guilty

21   or you were sentenced, you were also arrested for

22   burglary, terroristic threatening, and intimidating a

23   witness, correct?

24    A.  That's correct.

25    Q.  And that was because not long after that

incident, you went to Nadine's home with the intention

of terrorizing and threatening her, correct?

    A.  One year later I went to her home.  That's

correct.

    Q.  And as you previously testified, you pleaded

guilty to that rape, correct?

    A.  That's correct.

    Q.  And you were sentenced to 40 years with 15

suspended?

    A.  That's correct.

    Q.  And you were also sentenced to a term of

incarceration for the burglary, terroristic threats, and

intimidating a witness, correct?

    A.  That's correct.

    Q.  And those sentences ran concurrently.

    A.  Yes, ma'am.

    Q.  So you got released in December of 2003.  Is that

right?

    A.  Yes, ma'am.

    Q.  Okay.  And in January of 2006, you were arrested

for four counts of rape, correct?

    A.  That's correct.

    Q.  And you were charged with anally raping a woman

named Linda?

    A.  Yes, ma'am.

```
 1      Q.  And you had dated her casually before your

 2   arrest.  Is that correct?

 3      A.  Excuse me?

 4      Q.  You had dated Linda before you were arrested?

 5      A.  Yes.

 6      Q.  But in January, you engaged in anal sex with her

 7   against her will.

 8      A.  No.

 9      Q.  You didn't tell her, I quote, "I'm gonna give it

10   in your cute little ass," quote, throw her on the bed,

11   and insert your penis into her anus?

12      A.  No, ma'am.

13      Q.  And you didn't change condoms multiple times?

14      A.  Yes, I changed condoms multiple times.

15      Q.  And did you use Biofreeze or Icy Hot as a

16   lubricant?

17      A.  That is correct.

18      Q.  And you told her, and I quote, "You're either

19   going to take it in your ass or I'm gonna pull out and

20   put it in your mouth," quote?

21      A.  No, ma'am.

22      Q.  Did you insert your fist into her vagina?

23      A.  No, ma'am.

24      Q.  Did you hold her down while you had sex with her?

25      A.  No, ma'am.
```

1    Q.  Before you left, did you tell her -- did you grab

2    her vagina and tell her, quote, "You shouldn't be

3    needing any sex for a while," quote, because she, and

4    again I quote, "should be fixed up for a while"?

5    A.  No, ma'am.

6    Q.  But you did plead guilty in that case to one

7    count of attempted rape, is that correct?

8    A.  That's correct.

9    Q.  And you were sentenced to a 120-month suspended

10   sentence in 2007?

11   A.  That's correct.

12   Q.  And so since your sentence was suspended, you

13   were still in the community in 2007, right?

14   A.  Yes, ma'am.

15   Q.  And you were on probation?

16   A.  On supervised, that's correct.

17   Q.  And so while you were on probation, you were

18   required to register as a sex offender.

19   A.  That's correct.

20   Q.  And that applied whether you lived in Arkansas or

21   another state, like Missouri, correct?

22   A.  Yes, ma'am.

23   Q.  And you were required to obey all state and

24   federal laws?

25   A.  Yes, ma'am.

Q. But you were arrested in February of 2008 for driving while intoxicated, correct?

A. That's correct.

Q. And this arrest was in Arkansas?

A. Yes.

Q. And the following year in April of 2009, you were arrested for driving while intoxicated again, correct?

A. That's correct.

Q. And that was in Missouri.

A. Yes, ma'am.

Q. And in September of 2009, you were arrested in Butler County, Missouri, for failure of a sex offender to report. Do you recall that?

A. Yes, ma'am.

Q. And that was because you resided in Butler County but you failed to report to the chief law enforcement officer within 90 days of your registration. Does that sound right?

A. Yes, ma'am.

Q. And in October of 2009, you were arrested and charged by Poplar Bluff Missouri Police with failure to comply with Halloween-related restrictions for sex offenders, is that correct?

A. Yes and no.

Q. You were arrested for -- you were arrested and

1   charged --

2       A.  No, ma'am.  I was taken in protective custody.  I

3   wasn't arrested.  They took me into protected custody

4   hours before that law went into effect.

5       Q.  Did you fail to properly register as a sex

6   offender in the state of Arkansas from March 2010 to

7   September of 2010?

8       A.  To my knowledge at the time, I didn't think so,

9   no.

10      Q.  But did that lead to your federal charges of

11  failure to register?

12      A.  Yes.

13      Q.  And while you were in failure to register status,

14  you were accused of physical and sexual assault by a

15  woman named Christine.  Does that sound right?

16      A.  Yes.  I found out about that later.

17      Q.  And that would have been for a period of time

18  between August 19th to August 24th in 2010.

19      A.  I'm not for sure of the dates but that's

20  possible.

21      Q.  Okay.  And you had dated Christine in the past,

22  is that correct?

23      A.  That's correct.

24      Q.  But that August, you sexually assaulted her over

25  a period of several days, didn't you?

1    A.  No.

2    Q.  You also physically assaulted her during that

3  period?  Do you recall that?

4    A.  I did physically assault her.

5    Q.  And you've admitted to slapping her?

6    A.  I slapped her one time, that's correct.  And I

7  held -- she tried to hit me with a 40 ounce, and I held

8  a jack handle lumber block [ph.] to...

9    Q.  And when you used that -- what did you call it?

10  A jack what?

11    A.  It was a jack handle.  She was trying to hit me

12  with a 40-ounce bottle of beer, and I held it up so she

13  couldn't hit me in the head with it.

14    Q.  And that jack handle fractured her arm, correct?

15    A.  That's a good possibility.

16    Q.  So in January of 2012, you pleaded guilty in the

17  United States District Court for the Eastern District of

18  Missouri to one count of failure to register as a sex

19  offender, correct?

20    A.  That's correct.

21    Q.  And you were sentenced to ten years in prison?

22    A.  That's correct.

23    Q.  Mr. Kozohorsky, let me try to summarize a bit

24  here for you.  You would agree that at least five women,

25  Sandra, Rhonda, Nadine, Linda, and Christine, have

 1    accused you of rape, attempted rape, or other physical

 2    or sexual assault.  Correct?

 3       A.  That's correct --

 4              MS. COSTELLO:  Objection; compound question.

 5              THE COURT:  The objection is overruled.  He

 6    understood the question and answered it.

 7    BY MS. PRATESI:

 8       Q.  Mr. Kozohorsky, you've previously admitted to

 9    engaging in forced sexual intercourse with your wife,

10    Mary, is that correct?

11       A.  That's incorrect.

12       Q.  Are there any other instances in which a woman

13    accused you of rape or other sexual physical assault?

14       A.  No.

15       Q.  Is your testimony today that you only raped one

16    woman?

17       A.  That's correct.

18       Q.  And that was Rhonda in 1987?

19       A.  That is correct.

20       Q.  You're only sexually attracted to adult women, is

21    that correct?

22       A.  That's correct.

23       Q.  And you prefer, and I quote, bubble butt blondes?

24    Is that correct?

25       A.  No.  That was a joke between me and a AG, but I

```
 1   guess -- and I said that during the deposition, but I
 2   guess he didn't get that part.  I guess they failed to
 3   register that part.
 4      Q.  You didn't say --
 5      A.  But I do like bubble butt blondes.
 6      Q.  And you said that you liked bubble butt blondes
 7   at least four times during that deposition, correct?
 8      A.  Yes.
 9      Q.  You're not sexually attracted to children, are
10   you?
11      A.  No.
12      Q.  And you're not sexually attracted to men, are
13   you?
14      A.  No.
15      Q.  You haven't really participated in monogamous
16   romantic relationships, have you?
17      A.  Yes, I have.
18      Q.  You were married once, correct?
19      A.  That's right.
20      Q.  To a woman named Mary?
21      A.  That's correct.
22      Q.  And you began dating her in about 1982?
23      A.  That'd be correct.
24      Q.  And you were married from maybe 1987 to 1994?
25      A.  That's correct.
```

1    Q.  But you raped Rhonda while you were dating Mary,

2  correct?

3    A.  That's correct.

4    Q.  And you were convicted of the rape of Nadine

5  while you were still married to your wife, correct?

6    A.  That's correct.

7    Q.  And you were in an open relationship with a woman

8  named Margaret for 30 years until she died in 2015?

9    A.  That's correct.

10   Q.  And so when you were convicted of the attempted

11  rape of Linda, you were in an open relationship with

12  Margaret, correct?

13   A.  Yes.

14   Q.  And at the time of your attempted rape

15  conviction, you were also having an affair with your

16  landlady, Jeannette?

17   A.  That's correct.

18   Q.  And at the same time, you were also seeing a

19  woman named Cathy, is that right?

20   A.  That's correct as well.

21   Q.  And when you dated Christine, you impregnated a

22  woman named Precious, is that right?

23   A.  That's correct.

24   Q.  But it's your understanding that she miscarried

25  the pregnancy.

1      A.  That's correct.

2      Q.  So you haven't fathered any children that you're

3  aware of, right?

4      A.  That's correct.

5      Q.  After you were convicted of attempted rape, other

6  than Cathy and Christine, you almost exclusively had sex

7  with prostitutes.  Is that correct?

8      A.  Say that one more time.

9      Q.  After you were convicted of attempted rape, other

10  than Cathy and Christine, you exclusively had sex with

11  prostitutes.  Is that right?

12      A.  That's pretty well correct, besides Margaret

13  Richmond.

14      Q.  So Margaret, Cathy, and Christine were the only

15  women who were not prostitutes that you had sex with

16  after 2006?

17      A.  Jeannette.

18      Q.  Jeannette.  You've had sex with somewhere between

19  25 and 30 prostitutes?  Does that sound right?

20      A.  That's sounds about right.

21      Q.  Now, since you've been in custody, you haven't

22  engaged in sexual intercourse with other inmates, have

23  you?

24      A.  No.

25      Q.  But you are capable of achieving and maintaining

1   erection, correct?

2       A.  That's correct.

3       Q.  And you are capable of masturbation?

4       A.  That's correct.

5       Q.  And you do, in fact, masturbate, correct?

6       A.  A lot less than I used to.

7       Q.  But at least several times a month?

8       A.  I don't know about several but maybe a couple.  I

9   don't know if I got energy for several.

10      Q.  Do you recall testifying in your deposition when

11  asked if you masturbate, you said, "With myself?  I love

12  me.  I have sex with me three times a month."  Do you

13  recall that?

14      A.  Probably.

15      Q.  And you can masturbate to completion, is that

16  correct?

17      A.  That's correct.

18      Q.  Now, Mr. Kozohorsky, if you were released from

19  FCI Butner, would you continue to have sex with

20  prostitutes?

21      A.  You know, here's the thing.  I thought about

22  that, and I thought about ways to protect myself, and

23  with -- even with the audiotape, that didn't protect me

24  as well as I should have been protected, and I shouldn't

25  have done a year in jail before they released me.  And

so I was considering different ways, and prostitutes,
they only care about the money.  But it was pointed out
to me that if you're on federal probation, committing
another crime is not a good idea, so you have to figure
out other options.

So at that time, I probably would have thought
about that, and I considered that as well as I did body
cams or audio or video.  But at this time I had to
rethink that, and I would say no.

Q.  Because you believe you need to protect yourself,
correct?

A.  I believe that I need to -- yes.  Absolutely.

Q.  When you were initially considering having sex
with prostitutes, is that because you believe you're
paying for their consent?

A.  Yes.

Q.  And they don't want to cause you a headache or
get in a relationship with you, is that right?

A.  Yes.

Q.  And as long as you pay them --

A.  If you'll pardon me for a second, I got a little
bit of tone deafness, it's in my files as well, so if I
ask you to repeat something, it's because I didn't
understand the question.  Sometimes the words cancel
theirself out.

1    Q.  That's fine.  If you can't understand me, please

2    tell me.

3    A.  Okay.

4    Q.  So is it also true that, in your opinion, as long

5    as you pay a prostitute, they won't be jealous?

6    A.  Yes.

7    Q.  And we just briefly discussed this, but before

8    you were to have sex with any woman again, you've

9    indicated you would ask her to sign a consent form?

10   A.  Yes, I have considered that.  I don't know where

11   that would go.  I don't know how that would work out,

12   but I have considered that, yes.

13   Q.  And you've also considered visually recording any

14   future sexual encounters?

15   A.  Yes.  I've looked into the body cam and

16   everything else and the laws about recording, video and

17   audio, so I have considered that, yes.

18   Q.  And you've considered ensuring that any footage

19   would go to the Cloud so it couldn't be deleted by

20   destroying the camera?

21   A.  That's correct.

22   Q.  Because you believe that might be the best way to

23   protect yourself from false accusations, is that right?

24   A.  That's correct.

25   Q.  But you would agree that videotaping an encounter

1  wouldn't -- that alone wouldn't prevent a woman from

2  being raped, correct?

3      A.  Yes.

4      Q.  Mr. Kozohorsky, your conviction for failure to

5  register, that led to your first time in federal

6  custody.  Do I have that right?

7      A.  That's correct.

8      Q.  And you've remained in Bureau of Prisons custody

9  since your 2012 conviction?

10     A.  The U.S. Marshals picked me up in 2010.

11     Q.  But after 2012 when you were convicted in federal

12 court, you've been in federal custody, correct?

13     A.  Yes.

14     Q.  And while you were serving your sentence, you

15 refused to participate in sex offender treatment, is

16 that correct?

17     A.  That's correct.

18     Q.  But you were often housed in institutions with

19 sex offender management programs.  Does that sound right

20 to you?

21     A.  One, as far as I know.

22     Q.  In 2016, you were housed at FCI Marianna in

23 Florida.  Do you recall that?

24     A.  That's correct.

25     Q.  And in January of '16, you were not permitted to

1  receive an order of pictures because it contained
2  risk-relevant material, right?
3     A.  Yes, ma'am.
4     Q.  And a few months later, in May of the same year,
5  you were notified that you were not permitted to receive
6  picture brochures that were sent to you?
7     A.  Yes, ma'am.
8     Q.  And they contained pictures depicting models
9  posing as adolescent females and/or bondage, correct?
10    A.  No, ma'am.
11    Q.  But do you recall that that's what your rejection
12 notice said?
13    A.  No, ma'am.  I was called down to psychology, and
14 they just told me that some pictures had been rejected.
15    Q.  You completed your criminal sentence in March of
16 2022, correct?
17    A.  Yes, ma'am.
18    Q.  And again, to be clear for the record, while you
19 were serving your criminal sentence, you did not
20 participate in sex offender treatment.
21    A.  That's correct.
22    Q.  And you never previously participated in sex
23 offender treatment in the community?
24    A.  In the community?
25    Q.  Correct.  While you were released, had you ever

1  participated?

2     A.  No.

3     Q.  And you've never participated in sex offender

4  treatment in state prison, correct?

5     A.  No.

6     Q.  You began participating in the Commitment and

7  Treatment Program, though, at Butner, correct?

8     A.  That's correct.

9     Q.  And you're in the first phase of treatment?

10     A.  Completed first phase.

11     Q.  When did you complete that?

12     A.  Months ago.

13     Q.  Was that the pretreatment program or the --

14     A.  No, that was the phase 1.  I did the P3, and they

15  discontinued P3 and said it was irrelevant to the

16  program.  I completed phase 1, and they're now talking

17  about taking phase 1 out and saying that it's irrelevant

18  to the program and just going straight to phase 2.

19     Q.  So is it your understanding right now that you

20  are in phase 2 of treatment?

21     A.  That's correct.

22     Q.  Okay.  But you would agree that you have not

23  completed the treatment program, correct?

24     A.  That's correct.

25     Q.  And, in fact, you don't believe that you need to

1   complete sex offender treatment, do you?

2       A.  No, ma'am.

3       Q.  Because you deny that you've raped any woman

4   other than Rhonda, correct?

5       A.  That's correct.

6       Q.  And you deny that you're aroused by the concept

7   of nonconsensual sex?

8       A.  That's correct.

9       Q.  If you were released, Mr. Kozohorsky, you have a

10  lifetime term of supervised release.  Is that correct?

11      A.  That's correct.

12      Q.  And that's in the Eastern District of Missouri,

13  right?

14      A.  No, ma'am.  That would be the Eastern District of

15  Arkansas.

16      Q.  So you didn't plead guilty in the United States

17  District Court for the Eastern District of Missouri?

18      A.  Yes, ma'am, I did.

19      Q.  And has your probation supervision actually been

20  transferred to any other district?

21      A.  It's supposed to have been transferred to

22  Arkansas.  I mean, my whole release plan was gone over

23  with the federal BOP and it was for Jonesboro, Arkansas.

24      Q.  Are you aware of whether that was approved?

25      A.  As far as I know, it was.

Q.  If you were to relocate to Arkansas, if it was
approved, your plan is to resume the exact type of work
you were doing before you were incarcerated, correct?

A.  Yes, ma'am.

Q.  And the type of work that would allow you into
other people's homes or motel rooms?

A.  No, ma'am.  I don't go into people's houses.  I
don't go into people's motel rooms.  I would do
commercial heating and air for hotels, motels, and
restaurants, gas stations.  I don't go in anybody's
room.  I go into the equipment rooms, which are big
equipment rooms about the size of this room right here,
with a large equipment in it.  When I work in
convenience stores, I work in the kitchen area, the
coolers, that type of stuff.

Q.  You don't have any family support in the
community, do you?

A.  No, ma'am.

Q.  And you've been divorced since 1994, correct?

A.  That's correct.

Q.  And your parents are deceased?

A.  That's correct.

Q.  And you have no contact with your sisters.

A.  That is also correct.

Q.  You have one friend that you remain in contact

1  with, though?

2      A.  A business partner, yes, and friend.

3      Q.  And you were friends with this man while you were

4  engaging in criminal sexual activity, correct?

5      A.  I was -- yes, you could say that, but I wasn't --

6  no -- actually, can't say that.  No.  I misunderstood

7  what you were saying, but the answer is no.

8      Q.  When did you become friends with him?

9      A.  2005 or '6, we became business partners -- or not

10  really business partners.  I did some work for him.  We

11  became friends probably in 2008 or '9.

12      Q.  So, Mr. Kozohorsky, since you were about 15 years

13  old, you have not been in the community for more than

14  three years without some criminal offense.  Is that

15  correct?

16      A.  No, ma'am.

17      Q.  It's not correct?

18      A.  No, ma'am.  I've had charges.  I mean, you can

19  say that it was -- you could say about your opinion that

20  it was a criminal charge, but I had audiotape to prove

21  otherwise, so I don't know.

22      Q.  Is it accurate that you have not been in the

23  community for more than three years at any time since

24  age 15 without being arrested?

25      A.  Yes, ma'am.  That's accurate.

1    Q.  And when you received a suspended sentence in

2    2006 for the attempted rape of Linda, you were arrested

3    at least four times for criminal offenses.  Correct?

4    A.  Yes, ma'am.

5    Q.  And that would include two DUIs?

6    A.  Yes, ma'am.

7    Q.  And failure to register as a sex offender?

8    A.  That's correct.

9    Q.  And that was failure to register in two states

10   and federally, correct?

11   A.  No, ma'am, not to my knowledge.  I was only

12   indicted for Missouri.

13   Q.  You weren't arrested for failure to register in

14   Arkansas as well?

15   A.  No, ma'am.

16   Q.  Mr. Kozohorsky, you don't believe in following

17   rules you don't agree with, do you?

18   A.  I follow every rule that was given to me, as far

19   as I know.

20   Q.  You don't respond well to being ordered to do

21   something you don't agree with, do you?

22   A.  Can you repeat that one more time?

23   Q.  You don't respond well to being ordered to do

24   something you don't agree with, do you?

25   A.  I do everything that people ask me to do.  How

1  did I stay disciplinary-free for 13 years if I didn't?

2      Q.  And if your probation officer were to be pushy or

3  nosy, you wouldn't like that, would you?

4      A.  I wouldn't have no problem with that.

5      Q.  So you didn't testify in your deposition, and I

6  quote, "If you push me, I'm not gonna accept that"?

7      A.  I don't understand what context that would have

8  been under.  So, I mean, if you can give more context to

9  it, that might have been something I answered to like

10  that.

11      Q.  Okay.  The question was, "Do you remember telling

12  anybody you didn't want to talk about your tattoos?"

13      A.  Right.

14      Q.  And your answer was, "If they were nosy, I might

15  have."

16      A.  That's correct.

17      Q.  And then you said, "If you push me, I'm not going

18  to accept that.  You know what I mean?  That's like

19  ordering me.  I have absolutely nothing to do with the

20  Department of Corrections, and you send me a paper

21  saying the Department of Corrections" --

22      A.  Yes, ma'am.

23      Q.  You recall saying --

24      A.  That was in that context right there?  Yes,

25  ma'am.  I did say that.

1    Q.  And in that same context, you said, "I don't do

2 good under those situations, I don't deal with it well."

3    A.  That's correct.

4    Q.  And you said, "Because at that point it's no

5 longer an agreement.  You are being abusive."

6    A.  That's correct.  But if we go all the way back,

7 let's go back to the fact that I was a free man at the

8 time and I had no legal obligation to go there until

9 they just absolutely passed that and demanded I show up,

10 not participate, just be there.  So under them

11 circumstances, that's correct.

12    Q.  Mr. Kozohorsky, as we sit here today, do you

13 consider yourself sexually dangerous to others?

14    A.  No, ma'am.

15    Q.  And how does it make you feel that the government

16 is trying to keep you civilly committed because you

17 would have serious difficulty refraining from future

18 sexual violence?

19    A.  I have mixed feelings on that.  Personally, it's

20 taken a year of my life.  But at the same time, looking

21 from society's point of view, you can understand that

22 they have a right to keep society safe.  So they have to

23 look at it from society's point.

24    Q.  And have you always -- have you maintained that

25 opinion?

 1    A.  Most of the time, yes, because...

 2    Q.  Do you recall saying something different at your

 3 deposition?

 4    A.  I know that personally, I don't feel like that it

 5 should take place.

 6    Q.  And did you -- would you agree today with what

 7 you said then, and I quote, "It's absolutely bullshit.

 8 I committed one rape.  I have paid for that rape so many

 9 fucking times in my life it's unreal.  Today I am

10 sitting here paying for that.  To sit here and use

11 pseudoscience to try to hold me here any longer is

12 nuts."

13    A.  I do agree with that.

14         MS. PRATESI:  Thank you, Mr. Kozohorsky.

15         THE RESPONDENT:  Yes.

16         MS. PRATESI:  I have no further questions,

17 Your Honor.

18         THE COURT:  Your witness, Ms. Costello.

19              CROSS-EXAMINATION

20 BY MS. COSTELLO:

21    Q.  Morning, J.D.

22    A.  How you doing?

23    Q.  How old are you?

24    A.  58.

25    Q.  When's your birthday?

1    A.  5/20/64.

2    Q.  So in two months you'll be how old?

3    A.  59.

4    Q.  You testified on direct examination that you grew

5  up in Michigan?  Is that right?

6    A.  Yes, ma'am.

7    Q.  Were your parents married?

8    A.  Yes, ma'am.

9    Q.  Did you have any siblings?

10    A.  Yes.  I had two sisters and a half-sister later

11  on.

12    Q.  Were you the oldest or the youngest of your

13  biological full siblings?

14    A.  I was the youngest of my biological full

15  siblings.

16    Q.  And were you the only boy?

17    A.  Yes.

18    Q.  Would you say that you had a good family?

19    A.  Yes.

20    Q.  Did your father treat your mother well?

21    A.  Yes.

22    Q.  Did your parents treat the kids well?

23    A.  Yes.

24    Q.  Were you ever abused at all?

25    A.  No.

1    Q.   What did your dad do for work?

2    A.   He worked for General Motors on experimental

3  carburetors.

4    Q.   And where did he do that?

5    A.   A lot of times, he had a lab out back of our

6  house.

7    Q.   And where was that house?  What --

8    A.   Chicago, Illinois, but we were living in Benton

9  Harbor, Michigan.

10    Q.   Okay.  So he had a house in a different place.

11    A.   Right, by his parents.

12    Q.   Is he still living?

13    A.   No.

14    Q.   How did he pass away?

15    A.   He died from carbon monoxide poisoning, from what

16  I understand.

17    Q.   And was that --

18    A.   Working, work-related.

19    Q.   How old were you when that happened?

20    A.   I would say between 9 to 10.

21    Q.   And after that, who raised you?

22    A.   My mother.

23    Q.   Did she ever remarry?

24    A.   Yes.  She remarried within about a year.

25    Q.   And did your stepfather play a big role in

1  raising you?

2    A.  Not really.  He was there, but he was not like

3  the authority figure at the time.  My mother was.

4    Q.  And did your mother work?

5    A.  Yes.  She had a -- she didn't work like a regular

6  job.  She owned different businesses.  She owned a

7  roofing company.  She owned a TV repair shop.  She owned

8  a dog training school where they train canines and

9  stuff.

10    Q.  Would you say that your parents installed a good

11  work ethic in you?

12    A.  Yes.

13    Q.  How old were you when you first started working?

14    A.  11.

15    Q.  And what were you doing?

16    A.  Driving a tractor on a farm.

17    Q.  Were you also going to school at that time?

18    A.  Yes.

19    Q.  How did that work?  Did you work after school?

20    A.  Yes.  I worked in the mechanics shop, the diesel

21  shop after school.  I drove a tractor on weekends.  They

22  give you two days off during -- or two weeks off during

23  planting season and two weeks off during harvest season

24  with excused absences from school.

25    Q.  And what decade was this in?

1      A.   That was 1970s.

2      Q.   Okay.  Now, how far did you go in school?  What

3   was the last grade you completed?

4      A.   The eighth grade.

5      Q.   And did your mom allow you to drop out?

6      A.   Yes, with the understanding I get a GED within

7   the year, and with the understanding that I enter into a

8   trade school, which is vo-tech.

9      Q.   Did you do that?

10     A.   Yes, I did.

11     Q.   And around that same time, did you move out of

12  your mother's house?

13     A.   15.  Yes, ma'am.

14     Q.   Where did you move?

15     A.   I moved to a apartment about two miles away.

16     Q.   Why did you move out at such a young age?

17     A.   It was the '70s.  You -- it was -- you wanted to

18  -- back then, kids became more adult than nowadays.  You

19  went out on your own at a earlier age.  And I wanted to

20  explore the world.  I wanted to see the world.  I wanted

21  to grow up, and so I moved into my own apartment.

22     Q.   Was it because you didn't want to follow your

23  mother's rules?

24     A.   No.  My mother was fine.  I was the boy of the

25  family.

1    Q.  And how did you support yourself?

2    A.  I worked as a automotive mechanic, and I also ran

3    a little small motorcycle repair shop.

4    Q.  And you testified to this on direct examination.

5    You were arrested for burglary.  What age were you when

6    that happened?

7    A.  15.

8    Q.  And why did you -- what did you burglarize?

9    A.  I burglarized a store that was actually three

10   stores in one, and they gave me three burglary and

11   thefts, but it was actually just one building.  And I

12   burglarized the store to come up with money so I could

13   put my sisters through vocational training schools.

14   Q.  And so you did a sentence on that, is that right?

15   A.  Yes, ma'am.

16   Q.  Where did you go when you were released?

17   A.  I went to Osceola, Arkansas.

18   Q.  Okay.  So how many separate burglary convictions

19   did you have?

20   A.  Two.  When I got out I got another burglary at a

21   Magic Mart, which is like a WalMart Supercenter, and

22   that was like 28 days after I was released.  I went and

23   burglarized the store and got caught in the store, and I

24   did four and a half years at it.

25   Q.  Have you burglarized any place since then?

1     A.   No, ma'am.

2     Q.   And how old were you when you caught that second

3 burglary charge?

4     A.   I believe I was about 17.

5     Q.   Okay.  Generally speaking, how would you describe

6 your work history?

7     A.   I have a good work history, a great work history.

8     Q.   Do you like to work?

9     A.   Yes.

10     Q.   When you were living in the community, what kind

11 of hours do you generally work?

12     A.   Anywhere from 14 to 18 hours a day, seven days a

13 week.

14     Q.   Now, when you were in custody on that burglary

15 sentence, that second one, did you meet Mary Elizabeth?

16     A.   Yes.  I was at a work release center and I met

17 her at J.T. Purse and Cabinet Factory [ph.], which is

18 where I believe about 22 of the 28 inmate work release

19 guys worked.

20     Q.   And did you have a sexual relationship with her?

21     A.   Yes.

22     Q.   Was the sex consensual?

23     A.   That's correct.

24     Q.   And when you were -- at some point did y'all move

25 in together?

1    A.   Yes.  When I was released, she already had a

2  apartment, and I moved straight into the apartment.

3    Q.   How often did you have sex with her when y'all

4  were living together?

5    A.   I'd say 10 times a week to 12 times a week.  I

6  was like 18 years old at the time.

7    Q.   Did she ever accuse you of rape?

8    A.   No.

9    Q.   Did you ever rape her?

10   A.   No.

11   Q.   Have you ever told anyone that you raped your

12  wife?

13   A.   No.

14   Q.   Now, you testified on direct examination that in

15  1987 you were charged with the rape of Rhonda Horner.

16   A.   That's correct.

17   Q.   How did you know her at that time?

18   A.   I met Rhonda Horner when I was working for her

19  boss.  I forget his name.  He had asthma.  Anyway, I did

20  some work for him, and I had a working relationship with

21  her boss.

22   Q.   And you had testified on direct examination that

23  you committed that rape, right?

24   A.   That's correct.

25   Q.   Why did you do it?

1    A.  I was stupid.  I asked her for sex and she told

2    me no, and I really thought that once we got started, it

3    would be like all the other times and she would enjoy

4    it.  And so when she told me no -- it was a different

5    era back then.  I was raised in the '70s.  So we were

6    kind of taught that we're the men of the family and

7    we're the big boss with the big pants on, and so I

8    thought I had an entitlement because we dated.  I

9    thought that once we got started she would like it like

10   any other time, and I was incorrect on both accounts.

11   Q.  Was the fact that she did not like it arousing to

12   you?

13   A.  No.

14   Q.  Now, what year did that happen?

15   A.  That was in '87.

16   Q.  The prosecutor asked you a number of questions

17   about the specific details of that offense.  Do you

18   remember exactly what happened back in 1987?

19   A.  Yes, ma'am.

20   Q.  Okay.  Have you always admitted that you

21   committed that rape, or did you deny it at first?

22   A.  I denied it when I was first arrested.

23   Q.  And how do you feel looking back on it about your

24   behavior?

25   A.  I probably ruined her life.

1    Q.  What kind of impact do you think your actions

2  might have had on her?

3    A.  She probably never trusted nobody again.  I

4  definitely hurt her.  And I just can't imagine all the

5  stuff that she might have went through.

6    Q.  And how old were you at the time?

7    A.  22.

8    Q.  Okay.  Do you recall at the time you were

9  arrested for that rape other accusations of raping made

10  against you?

11    A.  Yes, ma'am.

12    Q.  Did you ever plead guilty to any charges of rape

13  or sexual assault in 1987 other than that of Rhonda

14  Horner?

15    A.  No, ma'am.

16    Q.  Now, you testified that while you were serving

17  your burglary work release sentence, you met a woman

18  named Nadine Davis -- or -- I'm sorry.  You testified

19  you met your wife, whose name was Mary Elizabeth.  Do

20  you --

21    A.  That's correct.

22    Q.  -- recall that?  Did you meet anyone else?

23    A.  Yes.  I met Nadine Davis first and started dating

24  Nadine Davis before I dated my wife.

25    Q.  Did you say before you dated your wife?

1     A.   Yes.   That's correct.

2     Q.   Did you have a sexual relationship with Nadine?

3     A.   Yes.   We went on four-hour furlough twice, and we

4  left at lunch, maybe six or eight times.

5     Q.   And what would you do when you left at lunch?

6     A.   We had sexual relations.

7     Q.   Was it a more casual relationship or more of a

8  committed relationship?

9     A.   I don't --

10    Q.   Was it more of a casual relationship or was it

11 more of like a monogamous, committed relationship?

12    A.   No, it was just casual; more or less a casual

13 type.

14    Q.   Did you continue to date Nadine after you met

15 your wife?

16    A.   At first, no.   When I was released from work

17 release, I quit dating Nadine and started dating my wife

18 because Nadine seemed a little materialistic, and I was

19 in a work release center.   I didn't have any material

20 anything, so I shot away from her.   And my wife had good

21 work ethics.   She wasn't greedy.   She wasn't money

22 hungry, nothing like that.   She was a very well put

23 together lady.

24         I started dating her and I cut off all

25 relationships with Nadine Davis.   When I was released

1   from work release, I moved in with Mary Elizabeth.

2   Within two months of me moving in, Nadine Davis moved

3   right across the street into a house directly across

4   from our apartment and she best-friended my wife, which

5   was then my girlfriend, and she would come over every

6   day for coffee and play footsies under the table and

7   everything else.  Then about two, three months later, I

8   got stupid and started seeing her again on the sly.

9       Q.  And was that a consensual relationship?

10      A.  Yes.

11      Q.  At some point, you testified that you found out

12  that she accused you of rape, right?

13      A.  Yes.

14      Q.  What was your understanding of the possible

15  penalty if you went to trial on that rape?

16      A.  That I would get a life sentence and never see

17  daylight again.

18      Q.  And how old were you at that time?

19      A.  24.

20      Q.  And what was your understanding of the sentence

21  you would serve if you pleaded guilty?

22      A.  They did two months and twelve days per year in

23  the state of Arkansas.  So my understanding was I would

24  do approximately five years to five and a half years and

25  be released.

1    Q.  And did you talk to your -- the possibility of

2    plea versus trial with your lawyer?  Did you talk about

3    that with your lawyer at the time?

4    A.  Yes.

5    Q.  Ultimately, what did she advise you to do?

6    A.  To take the five years and go.

7    Q.  And did you talk to your wife about what to do?

8    A.  Yes.

9    Q.  What did she advise you to do?

10   A.  To take the five years and go.

11   Q.  Did their advice impact you?

12   A.  Yes, and I talked to Margaret Richmond as well.

13   Q.  And just for the purposes of the record, who was

14   Margaret Richmond?

15   A.  Margaret Richmond is the lady I dated for about

16   30 years on and off.  We had a open relationship.  She's

17   also known as Miss Pumpkin.

18   Q.  So you took the -- so you ended up pleading

19   guilty to the rape of Nadine Davis, correct?

20   A.  Yes.  That's correct.

21   Q.  And how long were you actually in custody on

22   those charges?

23   A.  11 months, 29 days.  In the state of Arkansas if

24   you're held over 11-29, they have to release you if they

25   haven't taken you to trial.

1    Q.  And so did they release you after 11 months and

2  29 days?

3    A.  Yes, ma'am.

4    Q.  Ultimately, did you receive an active sentence?

5  Did you receive a sentence on those charges?

6    A.  Yes, ma'am.

7    Q.  And how much time did you do?

8    A.  I ended up doing about 14 and a half years.

9    Q.  During that time, did you divorce your wife?

10    A.  Yes.

11    Q.  Why?

12    A.  I wanted my wife to be able to go on with her

13  life.  I wanted her -- at the time, she was 21 years

14  older than I was.  So at the time I was incarcerated,

15  she would have been 45.  Everybody in her family had

16  heart problems and didn't live very long.  I wanted her

17  to have a chance at life without me tying her down or

18  being an anchor to her.

19    Q.  And during that sentence, did you also lose your

20  mother?

21    A.  Yes.

22    Q.  What happened?

23    A.  She shot herself twice in the heart with a

24  .38-caliber pistol.

25    Q.  Do you know why she did that?

```
 1      A.   Yes.   She had a -- her ankles had an operation
 2  done on them and she was basically gonna be in a
 3  wheelchair for the rest of her life, and she didn't want
 4  to live that way.
 5      Q.   How did that affect you?
 6      A.   That affected me like it'd affect anybody,
 7  especially a mother to a son.   That affected me greatly.
 8      Q.   Do you recall when she passed away?
 9      A.   That would have been 1994.
10      Q.   Now, during that sentence, did you get in fights
11  with other inmates at times?
12      A.   Yes, ma'am.
13      Q.   And what year were you released?
14      A.   Excuse me?
15      Q.   What year were you released from that sentence?
16      A.   2003.
17      Q.   Where did you go upon your release?
18      A.   Wisconsin; Milwaukee, Wisconsin.   Oak Creek, to
19  my grandmother's.
20      Q.   How long did you stay there?
21      A.   I'd say seven, eight months.
22      Q.   Why did you leave?
23      A.   Because there was no employment there.   I did
24  heat, air and electrical, and there was hardly any call
25  for any air conditioning there.
```

1  Q. So where did you go?

2  A. I went to Arkansas.

3  Q. And what did you do for work there?

4  A. I went to work for Swindles Appliance on Gee

5 Street, and I brought in all the commercial customers

6 that they ever had in the history of the place.

7  Q. And during that time period, did you meet

8 Marshall Ghant?

9  A. Yes.

10  Q. So you were out in 2003.  Were you out in the

11 community roughly until 2006 during that time?

12  A. That's correct.

13  Q. Did you register as a sex offender during those

14 times?

15  A. Yes, ma'am.

16  Q. Were you ever accused of failing to register?

17  A. No, ma'am.

18  Q. Were you having sex with women during that time

19 frame?

20  A. Yes, ma'am.

21  Q. Was the sex consensual?

22  A. Yes, ma'am.

23  Q. Other than Linda Burnsed, who we'll get to in a

24 minute, did anyone accuse you of rape during that time

25 frame?

1      A.   No, ma'am.

2      Q.   How many women do you think you had a sexual

3   relationship with between 2003 and 2006?

4      A.   I'd say maybe 20.

5      Q.   And so did you take any precautions during that

6   time period to protect yourself against future rape

7   charges after being released from that 12 and a half or

8   14 and a half year sentence?

9      A.   Yes, ma'am.  I recorded every sexual encounter I

10  had on audiotape.  I kept the audiotape for six months,

11  and if nothing came up, I burned it in a burn barrel.

12         I time-dated the tapes by the radio station that

13  was on.  I used to do work at radio stations, and so I

14  knew that they have a specific time slot.  And this time

15  slot tells you, like, Joe's Plumbing, Mike's Heating and

16  Air, and what songs play between.  No two days are alike

17  because they don't advertise the same time slots.  So I

18  took these time slots and I knew where they played, so I

19  would mention what radio station was playing; and then

20  once it did a advertising and a song, it set the time

21  exactly for that time frame.

22         And so that's how I would time-date all the tapes

23  where it could be traced and tracked because they keep a

24  record of who pays what advertising, and the advertising

25  absolutely locks in the time.

```
 1      Q.  And so --

 2      A.  And the date.

 3      Q.  I'm sorry.  Continue.

 4      A.  Go ahead.

 5      Q.  No, I'm sorry.  I cut you off.  Continue.

 6      A.  No, that's fine.

 7      Q.  In 2006 were you accused of rape again?

 8      A.  Yes, ma'am.

 9      Q.  And what was the victim's name?

10      A.  Linda Burnsed.

11      Q.  Had you been sleeping with her prior to this rape

12   accusation?

13      A.  Yes, ma'am.

14      Q.  Had you had -- why did you go over to her house

15   the night that she accused you of rape?

16      A.  I was going over to break up with her.  This is

17   gonna be a little bit detailed.

18          But basically what had happened was the Jonesboro

19   Police Department came to my place of business, which

20   was Swindles Appliance, and they told the owner that

21   they were gonna post my picture in the newspaper and his

22   business and list it as me being a sex offender working

23   for him, that he had two weeks to fire me or to get rid

24   of me and it wouldn't take place.  So he fired me.  And

25   they posted it in the newspaper, and they posted it on
```

the courthouse window, and they posted it around for
like four city blocks around my apartment house.  This
was a new policy that they just put into law in effect.

So Linda Burnsed seen the picture that was on the
courthouse window of my picture.  So she came over like
three or four days later and she said, "Hey, we don't
have a problem with this.  I understand you had a past.
We don't have a problem with this.  We can continue to
date."  However, the relationship turned to the point
where she felt like she had something over my head, and
it became to the point where she was kind of -- kind of
-- that the balance was no longer a balance.  The
relationship had turned toxic.

And so me and my landlady talked about it, and
she told my landlady that -- she thought she was my
sister, my landlady -- Linda Burnsed thought my landlady
was my sister, so she knitted her daughter a shawl for
Christmas that year and gave it to her.  And she told
her during that time that me and her were getting
married.  Me and her had never talked about marriage.
Me and her had never talked about anything besides being
sexual friends, and that was it.

And so Jeannette told me, that's the landlady,
she told me, she said, "Hey, you need to break up with
her because it's getting toxic."  I said, "I know, I

1  know, that's what I've been telling you."  She said,

2  "But don't do it before the holidays."  She said, "Wait

3  until after the holidays."

4      So she went to a spy shop in Memphis, Tennessee,

5  and got me a ink pen that digitally recorded for four

6  hours and told me to carry it with me for protection,

7  but I was afraid that a digital recording couldn't be

8  checked and verified, so I didn't want to take a digital

9  recording, and I took a magnetic one that was 90 minutes

10  long.

11      So I went over there to break up with her, and I

12  said on the tape, I'm on the back side of Harrisburg,

13  Arkansas, this is January whatever it was, 6 or

14  whatever, and I'm going here to break up with Linda

15  Burnsed.  I have this tape for my protection.  I kept

16  the recorder on.  I went into her house and -- I said

17  hey, I'm listening to Magic 105 radio station, this

18  currently what's playing on the radio.  You can hear me

19  walking through the gravel.

20      She opens the door.  She has the exact same radio

21  station on with the exact same everything.  That's how

22  the Arkansas State Crime Lab was able to certify it as

23  unaltered, original, and time and date stamp the tape.

24  So they verified all that.

25      So I told her I was breaking up with her, and she

1   said, "Well, can we still be 'F' buddies?"  And I said,

2   "No, I don't think that'd be a good idea."  I told her I

3   was entering into a relationship with another woman,

4   which wasn't true.  I was just telling her that so that

5   we could break it off and I'd have a reason why we

6   needed to break it off.  I didn't want to go in and say,

7   "Hey, I feel like this is becoming toxic," or anything

8   else.  I was trying not to upset her.

9          And she said, "Well, can we be 'F' buddies?"  And

10  I was like, "No, no, that wouldn't work out, that

11  wouldn't give this a chance."  She said, "Well, can we

12  have sex one more time?"

13         The idiot that I am, I got the recorder there and

14  I figured this is for my protection.  I had been smoking

15  weed and I'd been drinking alcohol and I didn't have a

16  good sense, and I agreed to have sex with her.

17         During the sex -- do I need to go forward or do

18  you want to...

19     Q.  I was just gonna ask if the sex was consensual.

20     A.  That's -- it was absolutely consensual.

21     Q.  And you were arrested, right?  After that?

22     A.  That's correct.

23     Q.  Did you ultimately plead guilty to that -- to a

24  charge --

25     A.  Yes, ma'am.

1    Q.   -- in that case?  Do you recall if you pled

2  guilty to rape or attempted rape?

3    A.   Attempted rape.

4    Q.   And what was the plea deal that was offered?

5    A.   Unsupervised probation for ten years.  As long as

6  I didn't get a felony within ten years, I had nothing to

7  worry about, I can walk out the door.

8    Q.   Did you talk to your family at the time about --

9    A.   Yes.  My sister was there, my nephew was there.

10 And Kevin Jester, which was a customer of mine that owns

11 the bee company, the largest bee company in the state of

12 Arkansas, was there.

13   Q.   So did you have to do any time with that plea

14 deal?

15   A.   No, ma'am, other than what I'd done before they

16 released me, which was the waiting for a hearing, which

17 was 11-29.

18   Q.   So you had done 11 months and --

19   A.   Yes, ma'am.

20   Q.   -- 29 days on that charge?  If the deal that was

21 on the table involved additional prison time, would you

22 have taken it?

23   A.   No, ma'am.  They offered that and I turned it

24 down flat.

25   Q.   And so you had 120 months of unsupervised

1    probation.  Is that what your understanding was?

2        A.  Yes, ma'am.

3        Q.  And you stayed in the community, right?  From --

4        A.  Yes, ma'am.

5        Q.  -- 2007 until 2010?  What sentence were you

6    serving when the Adam Walsh 4248 certificate was filed?

7        A.  I was serving failure to comply -- failure to

8    update a registry.

9        Q.  And is that a federal charge?

10       A.  Yes, ma'am.

11       Q.  What state were you charged in?

12       A.  The state of Missouri.

13       Q.  And did you go to trial?

14       A.  Yes, ma'am.

15       Q.  Why did you go to trial?

16       A.  Because it was my understanding I didn't have to

17   deregister when I left Missouri.  It was also my

18   understanding that I didn't have to register if I didn't

19   stay anywhere over 72 hours.  And anyplace that I ever

20   worked that I had to stay over 72 hours, I always

21   notified the local law enforcement -- Mississippi

22   County, Craighead County, Poinsett County -- where I

23   was, where I was gonna be working, and how long I

24   expected to be there.  And if anything changed, I'd

25   notify them.

1      Q.  So between 2007 and 2010, did you register?

2      A.  Yes, ma'am --

3      Q.  Up until your charge that you failed to register?

4      A.  Yes, ma'am.

5      Q.  And were you ever charged in Arkansas with

6      failure to register?

7      A.  No, ma'am.

8                  THE COURT:  I want to be clear, make sure I

9      understand that.  So you were charged with leaving

10     Missouri and not stating that you were leaving, but you

11     did register in Arkansas when you moved there?

12                 THE WITNESS:  No, I did not register in

13     Arkansas when I moved there because my understanding was

14     as long as I didn't stay in that one spot for 72 hours,

15     I didn't have to register.  And that's what Arkansas law

16     reads, is if I'm not there 72 hours I don't have to

17     register.  And I worked commercial heating and air in

18     four states, so I was never in one spot.  Most service

19     calls last less than a day.

20                 THE COURT:  So you didn't have a home?  You

21     were moving from place to place --

22                 THE WITNESS:  Yes, that's correct --

23                 THE COURT:  -- to do the work?  Where were

24     you living?

25                 THE WITNESS:  At hotels -- the Jester Bee

Company kept a apartment that I could use.  The Super 8,

which was Mr. Patel, kept a room for me at all times.

Even if I wasn't working I could stop by and stay in.

The Garden Inn there in Blytheville kept a

room for me at all times anytime I was there.  Lucky's

Market had four apartments in the back that any one of

his workers or anybody could use at any time.  I could

also use his home anytime I wanted to.

Larry's Grocery, Danny and them would take

me to their house.  I'd spend a night over at their

house.  Customers, they cut down on the cost because I

didn't have to charge them for the housing to run the

service calls.

Marshall Ghant kept three or four houses for

me I could use wherever I was at, which was Marked Tree,

Jonesboro, Harrisburg, wherever.  They had a lot of real

estate property around there, so I could stay there as

well.

THE COURT:  So you kept most of your stuff

in the car and you were moving from place to place --

THE WITNESS:  Yeah, trucks.  I had a big

service truck with utility bed on it with all the

toolboxes built on.  So, I mean, it was -- and it had a

front and back seat.  It was a king cab, so the back

seat was made into like a -- basically like a semitruck

sleeper, is what it was made into. The back seat was
taken out and the bed was put in there, which was a twin
bed.

THE COURT: Okay. Thank you, sir.

BY MS. COSTELLO:

Q. Mr. Kozohorsky, you also had a 2009 charge, I
believe, for failure to report. Do you recall that?

A. Yes, ma'am.

Q. Were you charged with failure to register there
or was it that you didn't show up to -- within the time
frame in order to report where you were living?

A. Yes, I didn't show up within the frame. What
they did is I would pay 30 days rent for a place where I
did four of their clubs, and I did their heating and
air, four clubs, and they had apartment houses. And
they had by the week and they had by the month. I paid
them for a month, and he only counted it for four weeks.
And Detective Sutton charged me on the 28th day, which
would have been -- he started charging me, I guess, on
the 29th day. After the 28th day was over with, he put
a charge on me immediately that I was no longer living
there.

When I called my landlord about it, he told me
that I was still there, so I don't know what the
contention was there.

1      But then when I got ready to go to court on it,

2 they just ran it all together and they got me for the

3 one that was previous.  So they never brought that one

4 back up.

5      Q.  So how long have you been in custody,

6 continuously?

7      A.  Thirteen years.

8      Q.  And how many write-ups have you had during that

9 time period?

10      A.  Absolutely none.

11      Q.  There was some testimony on your direct

12 examination about some pictures that you received.

13      A.  Yes, ma'am.

14      Q.  If I could ask you to turn in the exhibit binder

15 in front of you to No. 21, and I'll ask you to turn to

16 the third page.  It says BOP_KOZO_1224 on the bottom.

17 Let me know when you're there.

18      A.  Okay.

19      Q.  Where it says "Comments," it starts "The

20 mailroom."  Can you read that?

21      A.  The mailroom received a envelope with pictures in

22 it for Mr. Kozohorsky and requested that SOMP review the

23 pictures.  Seven of the pictures were depicted models

24 posing as adolescent female and depicted nudity.  These

25 pictures were confiscated and will be sent to property.

1    Q.  And what is the date up there on that?

2    A.  5/17/2016.

3    Q.  Do you recall this incident?

4    A.  Yes, ma'am.  Absolutely.

5    Q.  And did you request those pictures?

6    A.  No, ma'am.

7    Q.  And does that note say anything about bondage?

8    A.  About what?

9    Q.  Bondage.

10   A.  No, ma'am.  What had happened was -- I got his

11   address over there, right there, if you'd like to have

12   it.  Mr. Price that run a company that's called "For

13   Your Eyes Only" took and -- he got upset with the BOP

14   for some censorship that they had done to his company.

15   So everybody on his mailing list he decided to send

16   these photographs to.  Well, there's about 60 of us on

17   the Marianna compound or complex, whatever you want to

18   call it, that received these photographs from Mr. Price,

19   unsolicited, unasked for, unpaid for, everything.  He

20   just sent them in.  His address is right over there with

21   his e-mail address.

22        He later gave a public apology in the prison

23   resource book, or whatever.  He gave a public apology,

24   and I don't know if he started back working

25   relationships with the BOP or not.  But I never ordered

1    any pictures from that company.

2        Q.    And you never got written up for this.

3        A.    No.

4        Q.    Okay.  Now, you were in state custody in Arkansas

5    between 1991 and 2003.  Right?

6        A.    Yes, ma'am.

7        Q.    Did they have female guards in the state of

8    Arkansas?

9        A.    Oh, yes, ma'am.  Their percentage is probably 60,

10   70 percent female to about 30 to 40 percent males.

11       Q.    So were you around female guards during that

12   prison sentence?

13       A.    Continuously.

14       Q.    And did it ever cross your mind to rape one of

15   them?

16       A.    No.

17       Q.    Did you ever fantasize about raping one of them?

18       A.    No.

19       Q.    What about this current federal sentence?  Have

20   there been any female guards at any of the facilities

21   that you've been at?

22       A.    At every one of them.

23       Q.    And did you ever try to rape any of those female

24   guards --

25       A.    No, ma'am.

1    Q.   Did it ever cross your mind?

2    A.   No, ma'am.

3    Q.   Did you ever fantasize about it?

4    A.   No, ma'am.

5    Q.   When did your federal sentence expire?

6    A.   Which one?  Did two separate ones.  My first

7    release date was in 2020.  And then, all of a sudden,

8    they took 27 months from me without a hearing or

9    anything and extended it to 2022 of March.

10   Q.   So March of 2022?

11   A.   Yes, ma'am.

12   Q.   So at that point, where did you go once your

13   sentence expired?

14   A.   To Maryland Unit.

15   Q.   And what's the Maryland Unit?

16   A.   It's a sex offender civil commitment unit.

17   Q.   And what prison is it at?

18   A.   Butner, North Carolina.

19   Q.   So you've been in the civil commitment unit since

20   March of 2022?

21   A.   Yes, ma'am.

22   Q.   Did you join the treatment program?

23   A.   Yes, ma'am.

24   Q.   Are you presently in it?

25   A.   Yes, ma'am.

1    Q.  Why did you join it before you --

2    A.  To show the Court that I'm willing to do whatever

3    needs to be done.  I have treatment that's assigned to

4    me when I'm released, so I was gonna show the Court that

5    I'm willing to, you know, go to sex offender treatment,

6    whatever it takes.

7    Q.  So if you're released, where do you plan to live?

8    A.  In Jonesboro, Arkansas.

9    Q.  And do you have a term of supervised release from

10   your --

11   A.  Yes.  It's a lifetime supervision.

12   Q.  Do you know any of the terms?

13   A.  Yes.  In our area they -- you have to have a

14   phone with you at all times, and they track you through

15   this phone.  If they call you, you have one hour to show

16   up for a UA, or whatever, and if they tell you -- if

17   they call you and they say activate your camera, you

18   have to activate your camera.  They tell you to do a

19   walk-through, you have to do a walk-through.  They tell

20   you to turn right, you turn right.  They tell you to

21   turn left, you turn left.  They tell you to go outside

22   and put it on the yard, you do whatever they tell you to

23   do.

24   Q.  Do you know if you have to do sex offender

25   treatment?

1    A.   Yes, ma'am.

2    Q.   Do you know if you're required to register?

3    A.   Yes, ma'am.

4    Q.   Do you plan to comply with the terms?

5    A.   Yes, ma'am.

6    Q.   So you talked about how you're currently serving

7    a sentence for failure to register.  Do you plan to

8    register in the future?

9    A.   Yes, ma'am.

10   Q.   You had previously said that you didn't believe

11   you had to register if you were in a place less than 72

12   hours.

13   A.   That's correct, ma'am.

14   Q.   What is your plan in the future if you're in a

15   place less than 72 hours?  Do you believe that you would

16   need to register?

17   A.   If I -- if I move there.  But if I was -- I don't

18   know how that would work.  I'm expecting my federal

19   probation officer to explain that to me.  But if I'm

20   registered, let's say, Jonesboro, Arkansas, and I went

21   to, say, Blytheville, which is Mississippi County, and I

22   was only gonna work for a day or two, by state and

23   federal law, I wouldn't have to register.  So I don't

24   know.  I mean, if that was a condition of my, you know,

25   my probation parole and they said hey, even if you're

1  there for ten hours you need to -- then I would do so,
2  if that's what they tell me I need to do.
3      Q.  So are you saying you're gonna check with your
4  probation officer?
5      A.  Right.  Whatever he says to do, I'm gonna follow
6  his instructions.
7      Q.  And what do you plan to do for work?
8      A.  I do heat and air and electrical.  I plan to go
9  to work for Marshall Ghant and his son.  They own quite
10 a bit of real estate.
11     Q.  Has he said that he will employ you?
12     A.  Absolutely.
13     Q.  Have you maintained contact with him during your
14 prison sentence?
15     A.  Weekly.
16     Q.  And when was the last time you talked to him?
17     A.  Wednesday.
18     Q.  Has he offered you a place to stay if you're
19 released?
20     A.  Absolutely.
21     Q.  The government asked you some questions about
22 using different names.  Do you recall that?
23     A.  Yes, ma'am.
24     Q.  Have you previously -- what's your given name?
25 What's your biological name?

1    A.   James Daniel Kozohorsky.

2    Q.   And what do most people call you?

3    A.   J.D.

4    Q.   The government said that you've also used the
5 last name of Anderson.

6    A.   That's correct.

7    Q.   Who's Anderson?

8    A.   That is my stepfather.

9    Q.   And did you ever adopt his name for a period of
10 time?

11    A.   No, but when I went to school I had to use his
12 name.

13    Q.   Okay.  The government also asked you about the
14 last name of Larson.

15    A.   Yes.  That was my stepdad as well.  When I went
16 to school I used his name.

17    Q.   And so were these aliases that you used to try to
18 avoid detection?

19    A.   No, ma'am.  They were school names for going to
20 school.  They were what were on the school registry and
21 what I was told by my mother to use.

22    Q.   Okay.  Just a few more questions, J.D.  Is a
23 woman refusing to have sexual intercourse with you
24 arousing to you?

25    A.   No, ma'am.

1   Q.  Now, you testified on direct examination and in

2   your deposition that you masturbate maybe a couple or a

3   few times a month.

4   A.  Yes, ma'am.

5   Q.  Is that a change from the past?

6   A.  Yes, ma'am.  It would have been like three, maybe

7   four times a week.

8   Q.  And when did the change sort of happen?

9   A.  Probably in my late 40s.

10  Q.  When you do masturbate, what do you think about?

11  A.  With me it's more mechanical than it is thoughts,

12  and it always has been my entire life.  It's more

13  mechanical and the feeling.  It's not actually the

14  thoughts.

15  Q.  Are you ever gonna rape another woman?

16  A.  No, ma'am.

17  Q.  Why not?

18  A.  Because that's just not who I am.

19  Q.  Do you believe that it's acceptable to rape a

20  woman?

21  A.  No, ma'am, not under any circumstances.  I ruined

22  one life doing that.

23            MS. COSTELLO:  Nothing further, Your Honor.

24            THE COURT:  Redirect, counsel.

25            MS. PRATESI:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. PRATESI:

Q.  Mr. Kozohorsky, you talked about your wife, Mary Elizabeth, correct?

A.  That's correct.

Q.  Did she have any nicknames?

A.  Libby.

Q.  Okay.  And I believe you mentioned another name for Margaret as well.

A.  Yes.

Q.  And can you remind me what that was?

A.  Pumpkin.

Q.  Thank you.  And you testified about the state of Arkansas having a policy that you can only be held in custody for 11 months and 29 days.  Is that right?

A.  That's correct.

Q.  And that's because the prosecution theoretically would have had enough time within that year to prosecute you, right?

A.  That's correct.

Q.  So with your case where you were accused of the rape of Linda, you were held for almost a year.  Is that correct?

A.  That's correct.

Q.  And is it your understanding that the prosecution

1   was gonna have to release you or do something at that

2   time?

3       A.  Yes.

4       Q.  And that's why they give you a plea deal,

5   correct?

6       A.  No, ma'am.

7               MS. PRATESI:  Nothing further, Your Honor.

8               THE WITNESS:  They release you to the

9   public.  They don't have to give you any type of deal.

10  I was still scheduled for jury trial.  It was on the

11  morning they decided to pick the jury when I played the

12  tape from a two-story window that -- the prosecutor

13  heard the tape as clear as day from a block and a half

14  away and came straight up there and tried to make a

15  deal, multiple deals.

16              MS. PRATESI:  I have nothing further, Your

17  Honor.

18              THE COURT:  Thank you.

19              MS. COSTELLO:  Nothing further, Your Honor.

20              THE COURT:  Thank you, Mr. Kozohorsky.  You

21  may step down.

22              MS. COSTELLO:  May we just have a brief

23  minute to make sure that Mr. Kozohorsky's feeling all

24  right?  Thank you.

25              THE COURT:  We can take a ten-minute recess

```
 1    for everybody's comfort.  It's midmorning.  We'll come
 2    back.
 3                (Proceedings recessed at 11:02 a.m.)
 4                (Proceedings recommenced at 11:13 a.m.)
 5                THE COURT:  All right.  Back on the record.
 6    United States may call its next witness.
 7                MR. BREDENBERG:  Thank you, Your Honor.  The
 8    United States calls Dr. Mark Hastings.
 9                THE COURT:  Good morning, Dr. Hastings.
10                THE WITNESS:  Good morning.
11                THE CLERK:  Please place your left hand on
12    the Bible, raise your right hand, and state your name
13    for the record.
14                THE WITNESS:  Dr. Mark Hastings.
15                (The witness was placed under oath.)
16                MR. BREDENBERG:  Thank you, Your Honor.
17                       DIRECT EXAMINATION
18    BY MR. BREDENBERG:
19        Q.  Good morning, Dr. Hastings.
20        A.  Good morning.
21        Q.  Please state and spell your name for the record.
22        A.  Mark Hastings.  M-A-R-K, H-A-S-T-I-N-G-S.
23        Q.  And where are you currently employed?
24        A.  Employed full-time as a court psychologist in the
25    county of Loudoun.  I also have a private practice doing
```

 1    forensic evaluations around the mid-Atlantic, primarily

 2    sex offender work.

 3        Q.   And your Loudoun County job, is that also

 4    conducting forensic evaluations?

 5        A.   Yes, of all kinds.  I'd say probably 50 percent

 6    sex offender, 50 percent competency/sanity/risk

 7    assessment.

 8        Q.   Okay.  And I may ask you to flip through the

 9    binder a few times during your testimony, so if you can

10    kind of get that in a place that you can do that.  Can

11    you flip to tab 5, please?

12        A.   Yes.

13        Q.   That's your CV, right?

14        A.   Correct.

15        Q.   All right.  And does that appear to you to be

16    accurate?

17        A.   Yes.

18        Q.   Okay.  And then if you flip back one to

19    Government Exhibit 4, what is that?

20        A.   A copy of my report in this case.

21        Q.   Okay.  So you are, then, familiar with

22    Mr. Kozohorsky, correct?

23        A.   I am.

24        Q.   And that's because you were appointed by the

25    Court to conduct a forensic evaluation?

```
 1      A.  Correct.

 2      Q.  And what was it your understanding that you were

 3   to look at in the course of your evaluation?

 4      A.  For these it's usually the same.  Review all the

 5   records that are available; meet with the inmate;

 6   interview the inmate; if testing is needed, do

 7   psychological testing; score actuarial instruments;

 8   consider relevant risk factors, protective factors, and

 9   then wind up with an opinion about sexual dangerousness.

10      Q.  Okay.  I'm just gonna elaborate on a few of those

11   things.  So you did have an in-person interview with

12   Mr. Kozohorsky?

13      A.  I did a video interview with him.  At the time,

14   it was still COVID days.

15      Q.  Okay.  And was it just one?

16      A.  Yes.

17      Q.  And how long was that interview?

18      A.  Approximately four hours on September 13th, 2021.

19      Q.  Okay.  And did you then ultimately prepare a

20   report?

21      A.  I did.

22      Q.  And that's Government Exhibit 4?

23      A.  Yes.

24      Q.  And that report was completed on September 20th,

25   2021?
```

1    A.   Yes.

2    Q.   Okay.

3    A.   Actually, there are two different interview dates

4    here.  I'm pretty sure it's September 8th, actually, is

5    the correct date, on the front.

6    Q.   Okay.  Okay.  So the other one was --

7    A.   On the second page it's listed again with, for

8    some reason, a date five days later, which is not

9    correct.

10   Q.   Okay.  Now, you mentioned that you normally

11   review all documents that are available.  Did you have

12   certain documents that were available for you in this

13   case?

14   A.   Yes.

15   Q.   And did that include his criminal history

16   documents?

17   A.   It did.

18   Q.   Okay.  And did it also include BOP records?

19   A.   It did.

20   Q.   And then you said that you usually do tests or

21   score things.  Did you score actuarials in this case?

22   A.   I did score actuarial instruments, yes.

23   Q.   And what were those?

24   A.   The Static-99 and the Static-2002R.

25   Q.   Okay, and we'll talk about those in a little bit

1    more detail later.  And then did you look at dynamic

2    risk factors here?

3        A.  I did.

4        Q.  And did you consider protective risk factors?

5        A.  I did.

6        Q.  Since the time that you prepared your report, did

7    you get any additional information that you were able to

8    consider?

9        A.  Yes.

10        Q.  And what was that?

11        A.  Well, I got new records in 2022 and some more

12    records in 2023 and more records just a few days ago

13    when it was apparent that I didn't have a couple of the

14    experts' reports.

15            The main records in those were updated BOP

16    records, some things from the CTP program involvement,

17    the two other experts' from the defense side reports,

18    and more detailed police reporting of some of the

19    offenses in this case, and some letters written -- or at

20    least one letter written by Mr. Kozohorsky to a woman on

21    the outside.

22        Q.  Okay.  And did you also get to review -- did you

23    have an opportunity to review his deposition --

24        A.  I did.

25        Q.  -- transcript?

```
1     A.  Yes.  That was also one of the records I think I
2   got in 2022.
3     Q.  Okay.  All right.  And we'll kind of get to those
4   during some of the questioning here.
5         In the course of your evaluation, did you
6   determine whether Mr. Kozohorsky actually has either
7   committed or attempted to commit sexually violent
8   conduct in his history?
9     A.  Yes.
10    Q.  And what was your conclusion?
11    A.  Yes.  He has been convicted of and charged with
12  and alleged to have committed a range of sexually
13  violent offenses.
14    Q.  Okay.  And can you kind of summarize those
15  offenses for the Court, please.
16    A.  Yes.  In 1987, when he was 22 years old, he had
17  an aggravated assault against Sandra L. that we heard
18  about this morning.  That charge, it looks like, was
19  nol-prossed and a deal to plead guilty to a rape charge
20  in January 15th of '87, which was four days after the
21  other offense, that was of Rhonda H., the gas station
22  offense.
23        In '89 November, there was another rape charge
24  against Nadine.  This is the one who is a friend of his
25  wife.  That was a guilty conviction.
```

        In 2006 there was the four rape charges and
attempted rape charges that he talked about just
recently in his testimony.  And then when he came back
on the -- or when he came to the federal system on the
failure to register, there were allegations of another
physical sexual assault that did not lead to charges.

        Q.  And that was Christine?

        A.  Yes.

        Q.  Okay.  And so based on your tally, did you
determine that there were five different victims?

        A.  Yes, at least.

        Q.  Okay.  And what do you mean by "at least"?

        A.  There were other references in the record to past
credible allegations of additional sex offenses beyond
what was available at that time in the records.
Specifically, there was a mention that several of his
victims were teenagers, or in the teen range.  And at
the time of that report, there really was only this --
the 18-year-old victim at the gas station.  So if there
were other teen victims, they were not formal charging
events that are available in these records.

        Q.  Now, in your report, you detail those offenses.
Was that based on the information in the presentence
investigation report and other records, or what?

        A.  Yes, either presentence report or police reports

1   or both.

2      Q.   Okay.  Now, to be clear, with regard to the first

3   offense, the first, kind of, conviction, you said there

4   were two victims connected with that?  Is that right?

5      A.   Yes.

6      Q.   Okay.  One was January 11th, 1987?

7      A.   Yes.

8      Q.   That was a person by the name of Sandra?  Is that

9   right?

10            MS. COSTELLO:  Objection; leading.

11            THE COURT:  It's in the report.  This is a

12   bench trial.  I'll be permissive on leading, for keeping

13   things moving in the right direction.  If it gets out of

14   hand, we'll stop it.  Thank you, counsel.

15            THE WITNESS:  Yes.

16   BY MR. BREDENBERG:

17      Q.   So Sandra was the first victim.  And based on the

18   records, was that allegation nol-prossed by the

19   government?

20      A.   Yes.  That's my understanding.

21      Q.   And is it your understanding -- what was your

22   reason -- your understanding that the reason that it was

23   nol-prossed?

24      A.   It was because there was a plea of guilty to the

25   second charge four days later.

1    Q.  So they were combined together --

2    A.  Yes.

3    Q.  -- essentially.  Okay.  And the second -- well,

4    with regard to the Sandra allegation, what happened

5    there?

6    A.  The account is actually split up into two

7    sections, which is partly confusing and part based on

8    what the mother says in between the two descriptions.

9        But essentially, he showed up at the house --

10   this was the daughter, I guess, of the mother -- came

11   in, asked to use the bathroom, essentially came out of

12   the bathroom, had a knife, put that to her neck, was

13   cursing at her.  There was a struggle.  She grabbed a

14   Coke bottle to try to defend herself.  At some point he

15   had her in a headlock, they struggled, she bit him, he

16   hit her in the face, put his hand over her mouth.  She

17   was later able to get her mouth free and scream, at

18   which point he backed away, and there was a back and

19   forth of him calling her crazy and her calling -- him

20   calling her crazy and vice versa.

21       In between there, the mother interjected and had

22   stated that there had been a -- he had come over a

23   couple of months earlier and had -- and tried to come on

24   to her.  And so it wasn't clear to me if that was some

25   reference to a separate offense on the mother or a

separate attempt to try to have some sexual relations

with her daughter. But based on the time frame she

gave, it would have actually been, like, November of

'86.

Q. Okay. Now, moving on to the next one, what was

the next rape that he was charged with and convicted of?

A. The next one would have been November of '85 --

or '89.

Q. I'm sorry. Let's go back. Was Rhonda the second

person?

A. Yes.

Q. Okay. And what happened with the Rhonda

situation?

A. Rhonda was somebody he knew from the gas station.

He'd done some, I guess, HVAC work there and had spoken

with her on several occasions, tried to ask her out,

according to her, and she had rebuffed that.

     At some point he came back to the -- he'd been

there, it looks like from reading her written account of

things, that he had been to the store a couple of times

that day, came back later. At some point when she went

to the bathroom, he went and locked the front door to

the gas station. When she was about to come out of the

gas station -- or out of the bathroom, he was standing

there and pushed her back into the bathroom, began

cursing at her, threatened to punch her in the face,
said he had his fist up towards her when she was
resisting, commented that he was doing this because he
liked her, and then apparently threatened to anally
sodomize her if she didn't stay quiet and quit resisting
the vaginal assault.

Q.  And was that description of the assault and the
rape based on information in police reports?

A.  Yes.

Q.  Okay.  And could I direct you to Government's
Exhibit No. 16, please.

A.  Yes.

Q.  Okay.  And is that one of the police reports that
you are referencing with regard to Rhonda?

A.  Yes.

Q.  Okay.  And in that, do you recall that the victim
had indicated that he had sort of asked her for sex on
previous occasions and she refused him several times?

A.  Yes.  I do recall there was references of him
making sexual propositions previously.

Q.  And also just for the record, you're calling this
a gas station.  In looking at that, is it possible that
this is a store called Bargains Unlimited?

A.  That's the name.  My memory is that when we spoke
about this, he kind of presented it as a gas station

1   type facility.

2       Q.  All right.  And then you heard his testimony

3   today, correct?

4       A.  Yes.

5       Q.  And he did, in fact, admit that he did --

6   essentially either admitted or acknowledged that he most

7   likely did all of the stuff that was alleged against him

8   in that case, correct?

9       A.  Yes.

10      Q.  Okay.  All right.  Moving on to the next

11  conviction, that one was November 15th, 1989?

12      A.  Yes.

13      Q.  Okay.  And do you know who the victim was in that

14  case?

15      A.  Yes.  This was the friend of his wife, Nadine.

16      Q.  Okay.  And how long, if you know, was it after he

17  got out of prison before he was involved in this rape?

18      A.  Approximately eight months.  He was released on

19  March 17th, '89, and this offense was November 15th,

20  '89.

21      Q.  Okay.  And what was the sort of setting situation

22  involving this rape?

23      A.  She came to his --

24          MS. COSTELLO:  Judge, I'm just gonna object

25  to an expert testifying about the facts of the offense

which are -- the records of which are in evidence.  He's

not being asked about his opinion about the meaning of

the facts.  He's just being asked to recount the facts.

He's testifying as if they are facts, and I'm just

objecting to that.

THE COURT:  I understand the objection.  I'm

also going to note that they're hearsay, and I

understand that they're hearsay.  The expert's allowed

to evaluate hearsay.  And if the expert's opinion is

based on the fact that the hearsay must be true, that

does go to the weight of his opinion, one way or the

other.  If it turns out the judge doesn't find them to

have been established and his expert opinion is based on

them as if they are true, that's to the detriment of the

opinion as opposed to making the opinion more credible.

So I understand.  So it's helpful to the

Court to understand the basis for his opinion.  You may

continue, counsel.

MR. BREDENBERG:  Thank you, Your Honor.

BY MR. BREDENBERG:

Q.  So what is it your understanding that the

circumstances surrounding the Nadine rape were?

A.  The understanding I got from the police report

and the presentence report was that he went to the

victim's house, knocked on the door, she let him in, he

asked for a cup of coffee.  At one point he got up, walked to the bathroom.  The victim got up, followed him, asked him what he was doing.  He then grabbed her by the hair, choked her, said he would kill her.  There was some struggle, she said, "Please don't do this, this is rape, you'll go to jail for this."  He responded with "It will be worth it to get a piece of you," quotes.

He also said that he had been wanting her for a number of years and if he had to rape her to get her, he would.  He threw her on the bed and then had vaginal intercourse with her.

Q.  And that information that you're relying on, was that based on official law enforcement records, as far as you know?

A.  Yeah, it was an Osceola Police Department report of the account.

Q.  Okay.  Okay.  Moving on to the next conviction, what was that one, if you recall?

A.  It was the attempted rape conviction.

Q.  Is that -- the victim's name Linda?

A.  Yes.

Q.  Okay.  And that occurred when?

A.  January of 2006.

Q.  Okay.  And what did you base your facts on for that particular charge?

1    A.   There was minimal detailed information at the

2    time I did the report on this offense.  It was primarily

3    the presentence report and then Mr. Kozohorsky's account

4    of the offense.

5    Q.   Did you subsequently come to some additional

6    information in your review of your records that gave

7    more details --

8    A.   Yes.

9    Q.   -- into the -- okay.  And as a result of your

10   review of all of that, what was your understanding of

11   what happened there?

12   A.   He went to the woman's home.  At some point he

13   said trying to break up with her.  That wasn't clear to

14   me from the police report.  But engaged in sexual

15   intercourse with her, or tried to engage in sexual

16   intercourse with her, and then began to anally assault

17   her.

18        His version of the offense was very lengthy,

19   involved multiple breakings and fixings of the bed and

20   multiple changes of condoms.  But essentially the

21   victim's account was that he anally raped her and

22   stopped it several times and replaced the condom and

23   continued to do that, and then at one point used Icy Hot

24   as well -- as a lubricant -- and inserted his fist into

25   her vagina during the assault.

1    Q.  And he had a different story, right?

2    A.  Yes.

3    Q.  And he testified to a little bit of that today?

4    A.  Yes.

5    Q.  Okay.  Moving on to the last allegation that we

6    have or that has been talked about so far.  That was

7    Christine I'm referring to.  Do you know when that

8    allegation occurred?

9    A.  It would have been in -- it was August 25th.  She

10   made the allegation that from the 19th to the 24th of

11   August that he had physically and sexually assaulted

12   her.

13              MS. COSTELLO:  And, Judge, this is the

14   document that we've objected to as hearsay.

15              THE COURT:  It's Government Exhibit 10.

16              MS. COSTELLO:  Yes.

17              THE COURT:  Okay.

18              MS. COSTELLO:  And I'm happy to explain the

19   basis, if the Court would like to hear it at this time.

20              THE COURT:  Go ahead.  This is the one --

21   first, the witness's testimony is based on the review of

22   the Exhibit 10.  Is that correct?

23              THE WITNESS:  Yes.

24              THE COURT:  Okay.  I'll hear your objection.

25              MS. COSTELLO:  So, Your Honor, many years

ago in the case of United States versus Vernon Wood, the
Fourth Circuit upheld over a respondent's objection the
inclusion of documents, police reports that contained
hearsay.  The respondent objected they were hearsay, and
the Fourth Circuit said, you know, "These were in the
presentence report, the presentence report is admissible
as an official record, and so we're gonna allow the
police reports in."

    But this incident, Government Exhibit 10, it
is not something that was -- that had already happened
and been determined to be reliable in the presentence
report.  In fact, Mr. Kozohorsky objected to the use of
this conviction to enhance -- I'm sorry -- this
allegation to enhance his sentence at the sentencing
hearing, and the government conceded that the
enhancement didn't apply.  And so to rely on this and to
allow this -- not just to rely on it but to allow it
into evidence, where it is hearsay that has never been
found to be true by any sort of judicial body, does
violate the hearsay rule because it is not based on the
same argument that the Fourth Circuit upheld in the Wood
case.

    THE COURT:  All right.  Thank you, counsel.
I understand the objection.  The rules of evidence are
relaxed in a proceeding of this kind that's taking place

before the Court, not before a jury.  I understand the
hearsay objection as an admissibility objection but also
as a weight objection.  It goes to weight, not to
admissibility.  It's properly admitted before this
Court.  The Court will hear all appropriate argument
regarding weight at the appropriate time.  You may
proceed.

THE WITNESS:  Just to clarify, Your Honor, I
assumed that Exhibit 10 was in reference to the
presentence report that's in my report.  It turns out
Exhibit 10 is the police report.

THE COURT:  Right, it's the police report --

THE WITNESS:  I didn't have the police
report --

THE COURT:  Okay.

THE WITNESS:  -- at the time that I wrote
the report.  I just had the presentence report.  So I
have since reviewed it; but at the time I wrote the
report, it was not actually based on Exhibit 10.

THE COURT:  Okay.  That's helpful in terms
of understanding it.  Were you aware that he had
successfully objected to and had that excluded from his
presentence report at the time, or were you taking that
as an admission on his part?

THE WITNESS:  No, I didn't -- I didn't know

1    that he had successfully gotten that thrown out in some

2    way.  But at the same time, he didn't admit to the

3    offense, so I didn't --

4                THE COURT:  Right.  So he denied it when he

5    spoke to you.

6                THE WITNESS:  Yes.

7                THE COURT:  But the Court that had heard it

8    before had also previously found it not to be credible.

9    Does that make any difference to your opinion?

10               THE WITNESS:  They found it not to be

11   credible to what?

12               THE COURT:  As a basis for enhancing his

13   sentence in his prior proceeding.  He objected to it.

14   The Court that he was before at that time found it to be

15   not established by a preponderance, and therefore not

16   properly a part of his presentence investigation report

17   and not to be used against him.

18               MS. COSTELLO:  To be clear, Your Honor, the

19   government conceded that it didn't apply.

20               THE COURT:  Okay.  They conceded --

21               MS. COSTELLO:  That the enhancement did not

22   apply.

23               THE COURT:  So they conceded prior to any

24   factual argument regarding it.

25               MS. COSTELLO:  Correct.

                    THE COURT:  All right.

                    MS. COSTELLO:  I mean, the Statement of
Reasons says that the government conceded that the
enhancement did not apply.

                    THE COURT:  I'll take that as a concession
that they didn't think they could make their factual
basis at the time.  And so I'll ask the witness again,
does knowing that make any difference -- you're treating
this as if it is a fact in the universe that it in fact
happened.  Is that correct?

                    THE WITNESS:  I could not testify that this
actually happened.  I considered it clinically.

                    THE COURT:  Okay.  So I want to be sure I
understand that.  So your position is if this is, in
fact, true, it's significant.  But that's not the same
thing as saying "I believe it to be true and therefore
it is significant."

                    THE WITNESS:  Correct.

                    THE COURT:  Okay.  Thank you.

                    THE WITNESS:  I think there's some
consistency with the history.  But if Your Honor asked
me "Are you telling me this definitively happened," I
would obviously not be able to say that I know with any
certainty that that occurred.

                    THE COURT:  Okay.  All right.  Thank you,

1    counsel.

2    BY MR. BREDENBERG:

3        Q.   Just one follow-up on that issue.  Is it your

4    understanding that the allegations made by Christine

5    were what prompted Mr. Kozohorsky to be arrested for the

6    failure to register charge?

7        A.   I don't know what came first in that situation.

8        Q.   Okay.  That's fine.

9        A.   I know they were looking at him for that as well,

10   so.

11       Q.   That's fine.  Moving on.  As a result of your

12   review of the deposition, your interview with him, and

13   his testimony today, what is it your understanding of

14   which alleged crimes he actually admitted to?

15       A.   The only one that he admitted to in terms of the

16   sexually violent behavior is the January 15th, '87, rape

17   of Rhonda.  He clearly still has sort of a distorted

18   picture of his involvement with the victim.  But he did

19   acknowledge the sex was nonconsensual.

20       Q.   Okay.  And then every other allegation or

21   conviction he has denied since then, correct?

22       A.   Denied either outright or said some version of

23   behavior happened but it was consensual.

24       Q.   Okay.  And at this point, I guess, what do those

25   denials mean to you, if anything?

1    A.  Well, I mean, the failure to accept

2 responsibility for his actions is relevant in terms of

3 diagnostic considerations.  One factor of antisociality

4 is difficulty accepting responsibility for one's

5 actions.

6        It can complicate treatment if a person is not

7 willing to admit to anything.  Now, he's acknowledged

8 one; but clearly, with an offender like him, we're gonna

9 want to look at patterns across behavior, across

10 offenses, and that may be more difficult for him.  And I

11 know a denial of the offenses or consequences is one of

12 the things that the federal register has said we should

13 consider in terms of serious difficulty controlling.

14    Q.  So with regard to patterns, since we're talking

15 about the convictions, did you see a pattern with his

16 convictions?

17    A.  There's -- yeah, I mean, there has been multiple

18 references to knife, multiple instances of threatening

19 to kill.  There's comments in at least a letter that I

20 recently read to a woman, this concept about having a

21 cute little ass.  That has come up in one of the other

22 offenses, commenting on the victim's butt.  Anal sex has

23 been a threat or a behavior in some of the offenses.  So

24 there's some similarities there.  And again, there's

25 records that talk about other offenses that kind of fit

1   a pattern of similar modus operandi, as they said.

2       Q.   Okay.  Now we'll move on to what we call prong 2

3   and the diagnoses.  Did you diagnose Mr. Kozohorsky with

4   any mental disorders?

5       A.   I did.

6       Q.   And what were those?

7       A.   I diagnosed other specified paraphilic disorder

8   (nonconsent), other specified personality disorder

9   (antisocial), and alcohol use disorder.

10      Q.   Okay.  So let's talk about the first one.  Is it

11  paraphilic disorder not otherwise specified (nonconsent)

12  or...

13      A.   It used to be paraphilia NOS, not otherwise

14  specified.  With DSM-5 they switched all the NOS to

15  "other specified paraphilic disorder."

16      Q.   Okay.  And explain what that is.

17      A.   A paraphilic disorder is a pattern of recurrent,

18  intense, sexually arousing fantasies, urges, or

19  behaviors, involving either a deviant activity, so

20  sadism, exposing yourself, peeping into windows, or

21  targets, so prepubescent children, animals.

22           So all of the paraphilic disorders have that sort

23  of diagnostic criteria of recurrent urges, fantasies,

24  behaviors, that drive them to want to engage in conduct

25  with these deviant targets or deviant behaviors, and

1   that has to persist for a period of at least six months.

2      Q.   Okay.

3      A.   In this case we're talking about nonconsensual

4   sex is the deviant activity.  And given his three

5   convictions for sexual assault and other allegations, I

6   considered those in making this diagnosis.

7      Q.   Now, just to be clear, are all rapists -- do all

8   rapists have this diagnosis?

9      A.   No.  So I don't make this diagnosis very often.

10  The people who have talked about ways to diagnose it and

11  the criteria over the years have suggested that perhaps

12  we're talking about maybe 20 to 30 percent of rapists,

13  repeat rapists, might meet criteria for this disorder.

14  So lots of people rape for lots of reasons, but there

15  does seem to be a smaller subset of rapists who are

16  driven by this arousal to nonconsensual sex.

17         I know one of the main meta-analysis that's

18  looked at this kind of deviant arousal pattern in the

19  penile plethysmograph testing basically looked at -- so

20  it's in 2003 looking at arousal patterns to coercive sex

21  and normal, or consensual sex, in a group of rapists and

22  in a group of controls.  And in the rapist category,

23  about 50 percent showed a stronger arousal pattern to

24  coercive sex than to consensual sex.  Amongst the

25  normative group, or the nonoffending group, it was only

1   10 percent showed that same pattern.

2        Now, they updated that analysis later on and also

3   included a group of nonsexual violent offenders, so

4   again, men in prison for violent offenses but not sex

5   offenses, and tested them under the same scenario, and

6   they showed a pattern that was similar to the controls.

7   So what that suggested is that it isn't just

8   antisociality or violent criminality that might be

9   causing this interest in forced or coerced sex.  It

10  seems to be specific to a group of men who do sex

11  offenses and are into that -- that type of arousal

12  compared to normal men, and even other inmates in

13  general, but who don't commit sex offenses.

14     Q.  Okay.  So in your opinion, is Mr. Kozohorsky one

15  of those people that is the 20 percent that are

16  specifically aroused to nonconsent?

17     A.  This offense pattern and history, to me, is -- I

18  believe that does fit for him.  It's, again, one of the

19  few times I've made this diagnosis.

20     Q.  Okay.  And what is that based on with regard to

21  Mr. Kozohorsky specifically?

22     A.  Well, when you look at the specifics of the

23  offense, right, so all of these offenses involved clear

24  signs of nonconsent by the victim, them saying no, them

25  resisting.  All of them -- some of them had sort of a

sadistic kind of component to them, fisting, threatened
to kill, anal sex, using a knife, using Icy Hot as a
lubricant.  Those are all things that are extremely
frightening or pain inducing.

He's been convicted of or charged or alleged of
new sex offenses.  He's been released three times after
some sort of sexually violent charge or conviction or
offense, and in every time he's been reconvicted or
recharged or realleged with a new sexually violent
offense within either eight to three years.

The one time we have allegations or reports that
he committed two sexually violent offenses within or
attempted two sexually violent offenses within a very
short time, a few days of one another.  Those would be
the kind of things we're looking at.  He's able to
maintain an erection and ejaculate during rape, which
most normal men are not wired to do that.  We're not
wired to see signs of struggle and suffering and people
crying to stop and still be sexually aroused by that.
He's able to do that.

There's some kind of repetitiveness to some of
the behaviors he does, some of the things he says, that
suggest maybe there's kind of a fantasy or script to
what he does.  He's raped under circumstances where
there's a high likelihood of getting caught, so he's --

some of these women he knows, he's known well.  Other

ones he's raping at their home or at their job.  These

are not places where one would expect to be able to get

away with a rape as easily.

He's had access to consensual partners during

some of these, right?  So he was married during the

first three offenses yet he's still needing to go out

and rape people, which would suggest that consensual sex

alone isn't enough for him or isn't as interesting to

him.

He's got victims across different age ranges.  So

some of them are teens, some of them are young adults.

Then we've got middle-aged women.

So all of those factors, to me, indicate somebody

who is aroused by nonconsensual sex, and it doesn't have

to be 100 percent.  It doesn't mean that people that

have this disorder only rape, they never have normal

sex.  A lot of the serial killers that we know of on

this planet have been married at the time they're out

doing serial killing.  So the fact that, yes, he's had

some consensual sex partners doesn't rule this out as a

diagnosis.

Q.  Now, you heard him testify just a bit ago, right?

A.  Yes.

Q.  And it's pretty clear that he claims or he says

1  that he's not aroused to nonconsent, correct?

2     A.  Yes.

3     Q.  In fact, he even kind of laughed, right?

4     A.  Yes.

5     Q.  So putting that with, you know, the other things

6  that you said, how does that kind of inform or affect

7  your opinion on what he is saying about what he's

8  aroused to?

9     A.  Well, at this stage of the proceedings, it's

10  pretty rare that I've had people acknowledge that they

11  are sexually aroused by raping people.  I mean, this is

12  a high stakes -- it could mean commitment for an

13  indefinite period, potentially for the rest of his life.

14  So the typical profile for these kind of civil

15  commitment, even presentence evaluations, is to deny

16  that this is a problem:  It's something that happened

17  then, it's something that was an isolated incident, but

18  it's not an ongoing issue, it's not something I'm really

19  interested in.

20        So we have to take a look at what does the data

21  say.  If this was one rape, okay, well, then we're not

22  gonna be able to make this diagnosis.  If it's two rapes

23  and it's under much lengthier time frames and different

24  circumstances than I've testified to, probably wouldn't

25  diagnose that either.

1          But we've got at least three and a couple more

2     allegations and then records that suggest there's even

3     more, and the details of it, to me, fit more with

4     somebody who is aroused by nonconsensual sex than

5     somebody who just accidentally finds himself raping

6     people every two or three years after he gets out of

7     prison.

8          Q.   You mentioned that some of his offenses had I

9     think what you called a sadistic element.  Is that

10    right?

11         A.   Yes.

12         Q.   So did you consider a sexual sadism diagnosis?

13         A.   I considered it.  It's very pejorative, and I

14    would want more than just this.  Part of the difficulty

15    with this diagnosis has been how to separate it from

16    sexual sadism.  And, kind of, one of the more respected

17    researchers has proposed a continuum, sort of an

18    agonistic continuum from normal sex to kind of coerced

19    to psychological suffering to physical brutality, kind

20    of along that dimension.  So this disorder would kind of

21    fit in that middle profile.  But he has -- you know,

22    using Icy Hot during a forced anal sex is gonna cause

23    pain.  That's -- I've had that substance on my skin

24    before.  It does come across as burning, and having that

25    on a mucous membrane inside your anus would be very

1    uncomfortable.

2         Fisting people is typically not something you do

3    easily with someone.  That's gonna cause some pain.

4         Threatening to kill people is gonna put an

5    extreme degree of fear in the person.  And so those kind

6    of three behaviors are a little bit beyond simply "I'm

7    just forcing sex."  There seems to be some degree of

8    wanting to cause some severe fear and/or at least a

9    little bit of pain as part of the sexual process but not

10   enough that I would diagnose sadism.

11        Q.  Can I refer you to Government Exhibit No. 22?

12        A.  Yes.

13        Q.  Do you recognize that?  Did you review that in

14   the course of your evaluation?

15        A.  Yeah.  This is one of the things I just received

16   in the last few days.  I did read through this letter as

17   best I could.  In some spots on the copy I had on the

18   computer were not as clear as some of this.

19        Q.  What is this letter?  What does it appear to you

20   to be?

21        A.  It looked like a very lengthy graphic sexual

22   letter to pumping -- I can't -- "Pumping back Pumpkin"?

23   "Punkin"?  Which I believe he testified to this morning

24   was -- I don't recall if it was Margaret or one of the

25   other women he had been with.

1    Q.  Now, did you say it was a graphic letter?  Is

2    that how you defined it -- described it?

3    A.  Yes, just lots of repeated commentary about sex

4    and what he's gonna do and...

5    Q.  Now, did you see any sadistic elements in this

6    letter?

7    A.  My recollection is there was -- I thought there

8    was a reference in this letter somewhere to having used

9    the Bengay or the Icy Hot before on someone else, lots

10   of comments about forcing and anal and...

11   Q.  Was there references to whippings or sodomy that

12   you remember?

13   A.  Yes.  I don't remember exactly where they were.

14   Q.  Maybe turn to page -- the bottom of the page

15   2191.  See that?

16   A.  2191?

17   Q.  The top of that page.

18   A.  Oh, on the top, okay.  Yes, spanked with leather

19   thin belt, wire cord, heated curling irons pushed up

20   into her -- I'll say "vagina."

21   Q.  Okay.  Let's see.  I'll ask you to turn to 2194.

22   A.  Yes.

23   Q.  And, you know, we don't need to talk about all of

24   the graphic language, but in the middle there, it

25   appeared -- does it appear to you that he's talking

1   about having sex with someone's daughter and then having

2   the mother essentially give him oral sex after?

3       A.  Yes.

4       Q.  And talking at the bottom of that page about

5   tearing the rectum to the point that it needs

6   stitches --

7       A.  Needing stitches, yes.

8       Q.  All right.  Are those kind of the things that

9   you're referring to when you're talking about some of

10  the sadistic elements?

11      A.  Yes.  And if this is all we had, I'd still say

12  it's pretty graphic, but this could just be somebody's

13  fantasy life.  But in conjunction with the history here,

14  again, it kind of fits with some of the things he's

15  already done and some of these offenses.

16      Q.  So in other words, you've seen -- outside of this

17  letter, you've seen references to similar behavior from

18  Mr. Kozohorsky and other situations.

19      A.  Yes, not all of those specific things --

20      Q.  Right.

21      A.  -- but this focus on sort of punishing, punishing

22  the anus, that kind of thing has been in some of his

23  other offenses.

24      Q.  Okay.  Now, considering that diagnosis, the not

25  otherwise specified paraphilic disorder of nonconsent,

1  did you determine whether you thought that diagnosis is

2  a serious mental illness, abnormality, or disorder?

3      A.  Yes.

4      Q.  And why is it serious, in your opinion?

5      A.  It's serious because of the impact it has on his

6  victims, for one, and serious for the impact that it's

7  had on him.  He's been incarcerated for much of his

8  life.  He's not able to stay out of prison very long

9  before he gets new sex-related charges or allegations

10  and goes back.  That has put him on the registry which

11  has impacted his work and employment and finances.  So

12  that disorder has had significant negative impact on him

13  and obviously significant negative impact on the

14  victims.

15      Q.  And what about the strength of his disorder?  Has

16  he continued to offend after sort of being punished for

17  some of the offenses?

18      A.  Yes, and that would be one thing you'd consider

19  for somebody's ability to control.  So if you have an

20  interest that you try once and it's illegal and you get

21  punished and you stop, never do it again, then maybe you

22  have control.  In his case he always finds a way to get

23  back in trouble in some way for another sexually violent

24  incident, which would suggest he doesn't have control

25  over that very well, because surely he wants to avoid

1  imprisonment.

2    Q.  Okay.  All right.  Moving on to your second

3  diagnosis, it was other specified personality disorder

4  with antisocial features?  Is that accurate?

5    A.  Yes.

6    Q.  Okay.  And what information supports that

7  disorder?

8    A.  So these are -- a personality disorder is an

9  entrenched pattern of maladaptive thinking and behaving

10 that causes the person difficulty functioning within

11 normal culture.  So usually personality disorders are

12 characterized by at least two of the following four:

13 problems with cognition, problems with affect, problems

14 with interpersonal relationships, or impulsivity or

15 impulse control.

16      And Mr. Kozohorsky has some problems in all of

17 those areas.  They're primarily antisocial in nature.

18 So again, he has a long history of repeatedly failing to

19 conform to social norms, breaking laws.  I know in other

20 reports some people pointed out that not all of his

21 crimes were definitively against others.  That isn't the

22 diagnosis for the disorder.  It doesn't have to only be

23 interpersonal crimes.  It's somebody who breaks laws in

24 general.  Mr. Kozohorsky has done them both ways, both

25 burglaries and DUIs and resisting supervision but then,

1    yes, also sexual assaults.

2         He has had some deceitfulness.  Obviously his

3    take on his offenses -- if you look at the records

4    there's inconsistencies around when he knew his father,

5    when he left home.  My memory of reading some of the

6    more recent police reports that came out was that he did

7    use different names when he was in Wisconsin as an

8    adult, in part to help try to find work, so that these

9    weren't all just used as a juvenile trying to be in

10   school, because he really wasn't in school after age 15

11   other than in prison.

12        He has some impulsiveness.  Clearly there's

13   irritability, aggressiveness about him in his history of

14   offending.  He also described himself to me as having an

15   abrasive personality disorder.  He doesn't take any

16   crap, as he put it, from anyone.

17        Obviously these offenses, the rapes are clear

18   disregard for the safety of other people.  There are

19   references to lack of remorse in his accounting in the

20   past.  He has some lack of remorse in his accounting now

21   as well.  The diagnosis was made back in 1990 the first

22   time by Dr. Long who diagnosed a personality disorder

23   (antisocial type).  In 2004 Dr. Simon in Arkansas DOC

24   referenced psychopathic antisocial and sadistic

25   personality traits in combination with a rape paraphilia

1   that made him at risk for continuing sexually assaultive

2   conduct.  So it's all of those factors.

3         He would meet criteria for antisocial personality

4   disorder except there just isn't enough evidence of

5   conduct disorder, which you can think of as sort of

6   antisocial personality disorder as a juvenile.  There's

7   a requirement that that have an age of onset prior to

8   15.  Most of his stuff from the records that we know of

9   started at 15.  However, with me, he did tell me,

10  surprisingly, that he was arrested at 12 or 13 for grand

11  theft auto.  That doesn't appear anywhere in any of his

12  records.  And I took him at his word for that both

13  because it would be unusual to report something like

14  that for no reason, and he also seemed to know -- he

15  said he'd been put in a youth home for a period of three

16  months as well, so he recalled the actual disposition of

17  that.

18        So there may be some, and if his earlier report

19  of having left home at age 11 is correct, it may be that

20  there is a greater history of juvenile conduct problems

21  that we just don't know about fully.

22  Q.   Okay.  Even not knowing that, if he did have that

23  conduct disorder, if there was something that showed

24  that he did have that prior to 15, would he then, in

25  your opinion, meet the full diagnosis for antisocial

personality disorder?

A. Yes.

Q. Okay. And for the same reasons you just explained with the features?

A. Yes.

Q. Okay. And when you were describing the features, I may have missed it. Did you mention whether he blames other people?

A. Yes, he does not accept responsibility for not just his offenses but he also has -- sometimes blaming takes of other things that have happened to him that aren't crimes.

Q. Did you get the sense that he felt like he was a victim?

A. Yes, very much so.

Q. In what way?

A. A victim of not just these vindictive women but in general, his position is that most women use rape against a man, can cry "rape," and that's why he's had to go to these exhaustive efforts to audiotape and videotape and consider consent signings.

The prosecutors in some of his crimes were either corrupt or it was their last case and they wanted to, you know, make a point. His initial charges, he said the sheriff or somebody in town was trying to hang a

1  bunch of rapes on him as a serial rapist.  And even some

2  of the records from CTP of late, he's doing it but he's

3  also been writing letters furiously to various

4  government officials complaining about various things

5  that he doesn't have access to that he should have

6  access to, or he believes he should access to.  So he is

7  kind of a grievance thinking individual.  When things go

8  wrong in his life, I think he tends to look elsewhere

9  first before considering that he might have some

10  significant role in that.

11     Q.  Is that something that some sort of mental health

12  or sex offender treatment at some point could

13  potentially assist him with?

14     A.  I mean, that would be one of the things you would

15  do in sex offender treatment, is try to break down some

16  of that denial, try to get him to look at is there any

17  way that you played any role in some part of these

18  offenses and start working there little by little to

19  chip down at that.  Because at this point everything

20  that's really gone wrong in his life, other than this

21  one rape of Rhonda, has been the fault of someone or

22  something else.  He's perfectly fine; it's the system,

23  it's the women, it's the police, it's the prosecutor

24  that's caused all this.

25     Q.  Now, with regard -- so let me try to ask it this

1  way.  Do you see the diagnosis of personality disorder

2  being a standalone diagnosis, or does it somehow combine

3  or have sort of a synergistic effect with the other

4  diagnosis, the paraphilia?

5      A.  Well, they are separate conditions.  I mean, in

6  terms of thinking about difficulty controlling and

7  sexual dangerousness, clearly the two would play a role

8  because if you have a disorder that sort of predisposes

9  you to have interest in raping people, and on top of

10  that you have a personality disorder that says, you

11  know, rules and laws don't apply to you, you can do what

12  you want -- he talked about entitlement this morning,

13  and you can see some of that in his deposition

14  statements.  That makes it maybe more likely that this

15  is an individual who may act on those deviant interests

16  if they're somebody who is a rule breaker in general.

17      Q.  So I think what I'm trying to get to is -- and so

18  with that answer, are you saying that they kind of work

19  together -- I'm gonna ask you two questions and you can

20  answer them both.

21          Is it your opinion that the personality disorder

22  is serious standing alone?  And is it serious combined

23  with the paraphilic disorder?

24      A.  Yes.  They're both serious disorders for similar

25  reasons.  They have impacts on their victims that are

substantial, and that disorder negatively impacts him in various ways.

In terms of the sexual dangerousness question, they -- I mean, I want to say they -- they are synergistic in a sense that neither one makes the other better. In fact, being antisocial on top of having a deviant sexual interest makes you probably more likely to act on them than somebody who is not antisocial.

Q. Your last diagnosis is the alcohol use disorder, is that right?

A. Yes.

Q. And what is that based on?

A. He's had multiple DUIs. He's had violations of probation in part due to alcohol-related offenses. He's been under the influence of alcohol during some of these assaults, at least once, by his own admission. I think he minimizes his use some because he told me he only uses four to six times a year, that he used to drink that much. And I know some of the records, one of the more recent police reports where the victim gave a more detailed account talked about he was already drinking heavily early in the morning. That's not usually a behavior you see in casual users.

And he came up, and I believe in 2013, in BOP screening as having self-reported both alcohol and

1    marijuana use -- abuse, but identifying alcohol abuse as

2    the more primary.

3        Q.   And how, if at all, does that alcohol use

4    disorder play into his psychological makeup with the

5    other two diagnoses?

6        A.   I mean, alcohol obviously is a CNS depressant and

7    it can take the brakes off.  Without it here I would

8    still have the same conclusion of sexual dangerousness.

9    But again, if this is somebody who is aroused by rape,

10   antisocial, and then around a woman while intoxicated,

11   that's a bad recipe.

12       Q.   Okay.  Thank you.  We'll move on now to prong 3,

13   and have you formulated an opinion as to whether you

14   think Mr. Kozohorsky would have serious difficulty

15   refraining from sexually violent conduct as a result of

16   his disorders that you've diagnosed?

17       A.   Yes.

18       Q.   And what is your opinion on that?

19       A.   I believe he would have serious difficulty

20   refraining from sexual violence or sexually violent

21   conduct as a result of primarily the other specified

22   paraphilic disorder and the other specified personality

23   disorder.

24       Q.   Okay.  And in forming that opinion regarding the

25   third prong, you mentioned earlier that you considered

1  two actuarial scores, the Static-99R and the 2002R?  Is

2  that right?

3      A.  Yes.

4      Q.  And briefly describe what those showed you.

5      A.  They're both multi-item actuarial instruments.

6  They get totaled.  He scored a 4 on the Static-99R,

7  falls in the above average category, 79th percentile,

8  roughly twice the odds of sexual reconviction compared

9  to the average sex offender on that instrument.

10         Has five-year recidivism risks of roughly 11 to

11  17 percent and a ten-year risk of 27 percent.

12         On the 2002R, which has a few more items, he

13  scored a 6.  That's also in the above average range;

14  similar percentile, 88th, about two and a half percent

15  -- or two and a half times more likely than the average

16  offender, average sex offender to reoffend based on that

17  score, and sort of 19 to 22 percent risk or reconviction

18  rate within five years.

19      Q.  Why is it that you use two actuarial scores

20  instead of one?

21      A.  Originally the plan was that the 2002 was

22  hopefully going to somehow overtake the 99R and just

23  become the one you use.  I think people have tended to

24  use more than one, sometimes other instruments when they

25  were as well validated at the time, just because you

1    want to see are the instruments providing a consistent

2    picture.

3           So if you get one that shows kind of below

4    average risk and the other one was above average risk,

5    the recommendation at the time was to sort of average

6    them.  Hopefully they come out very clearly and

7    consistent and you can say, "Okay, I feel reliable that

8    this is the right risk picture based on actuarials

9    because the two I used are very similar in what their

10   results were."  And that's what the case was here.  They

11   both come up above average risk, about the same

12   percentile rank.

13       Q.  And do both of these actuarial tools take into

14   consideration age?

15       A.  Yes.

16       Q.  And how does that work?

17       A.  It's the only item for which you can get a point

18   decrease of more than one point.  So usually they're all

19   one, zero, one, and the age one is stratified.  And

20   they're stratified differently.  So on the Static-99R,

21   you get minus 3 if you're over 60.  You get minus 1 if

22   you're, I think, 41 to 59.  And then there's a zero

23   level and then there's an age below, I believe it's 35,

24   where you get two points added.

25           So in his case, he was 57, I believe, at the time

1 I saw him, so he gets one point off his score.

2     Q.  Okay.  And did you hear him testify earlier today

3 that he's still interested in sex if he were to get out?

4     A.  Yes.

5     Q.  Okay.  And that he's still able to perform,

6 essentially?

7     A.  Yes.

8     Q.  Other than the actuarial tools, did you consider

9 other risk factors?

10     A.  I did.

11     Q.  And what were those?

12     A.  I considered a list of dynamic risk factors that

13 were from a meta-analysis that look at multiple studies

14 that have looked at dynamic risk factors and identify

15 which ones are most significant across the studies.  And

16 in that case, there's nine that I considered, and he has

17 six of them.

18         So the first one was any deviant sexual interest.

19 So obviously there's an interest and a long history of

20 committing sexually violent offenses.  I diagnosed him

21 with a paraphilic disorder that would qualify for that.

22 One of the other ones -- you want me to just run down

23 them all or --

24     Q.  Sure, I may -- yeah -- I may come back --

25 actually, you know what?  Maybe the better way to do it

1    is you can identify what they are, and I just want to

2    make sure that I'm getting from your opinion what you

3    believe he has that supports that.

4        A.  Okay.

5        Q.  So with regard to the deviant sexual interest,

6    you mentioned the diagnosis.  Is there anything else

7    that you saw that supports that?

8        A.  Well, the obvious, which is the repeated charges

9    and convictions for sexually violent conduct, but that's

10   what the diagnosis is based on, so.  That's the

11   definition of that particular risk factor, is is there a

12   DSM diagnosis of a paraphilic disorder or multiple

13   paraphilic disorders.

14       Q.  What was another one of the dynamic risk factors

15   that you found?

16       A.  Lack of emotionally intimate relationships with

17   adults.

18       Q.  Okay.  And what is that based on?

19       A.  So this is a fact that looks at is this somebody

20   who can have a healthy, longstanding relationship with a

21   person.  So he has been married.  However, he was

22   unfaithful during that marriage.  There is records that

23   say he has admitted previously to having forced his wife

24   to have sex with him during that marriage when she

25   didn't want to.

1    And he was actually in jail or prison for a big

2  chunk of that time they were married.  So that would not

3  necessarily be a relationship we would consider an

4  emotionally intimate, stable, long-term relationship for

5  those reasons.

6    And then ever since then, his relationships, by

7  his own admission, have been mostly casual, either these

8  open relationships with a few women he talked about this

9  morning or 50-something prostitutes since 2007.  So he's

10  primarily somebody who doesn't have sexual relations

11  within a committed, intimate bond relationship.

12    Q.  Did you hear him testify that he doesn't trust

13  women?

14    A.  Yes.

15    Q.  And that, in fact, he recommended or -- he had a

16  plan to kind of protect himself from women that he

17  didn't trust.  Is that -- did you understand that?

18    A.  Yes.  It's increasingly gotten more and more

19  sophisticated over time from minimal things to taping to

20  consideration of video to now essentially a consent

21  agreement to have sex.

22    Q.  What's the next dynamic risk factor you

23  considered?

24    A.  Lifestyle impulsivity.

25    Q.  Okay.  And what is that based on?

1    A.  So one of the ways to measure that is poor

2  self-control or self-regulation difficulties.  He's

3  obviously had difficulty regulating his sexual impulses,

4  some around his alcohol use.  Irresponsibility is

5  another factor that loads on there, and he's had some

6  difficulty in that in terms of cooperating with

7  supervision and registration.

8        Housing and employment instability is on there,

9  and he has had some of that, although I put in my report

10  it seems to be more a function of a side effect of his

11  being on the sex offender registry than somebody who

12  really kind of just jumps from job to job or home to

13  home, so I don't ding him for that particular component.

14  But the other two things are there.

15    Q.  What's the next factor you considered?

16    A.  Poor problem-solving.

17    Q.  What's that based on?

18    A.  Denial, minimization of offenses, blaming others,

19  blaming the women for these offenses, failing to notice

20  you have a problem, failing to seek treatment for a

21  problem; in this case, failing to accept treatment when

22  it's offered to you.  Those would all be things that

23  would kind of fall under the poor problem-solving

24  rubric.

25    Q.  Okay.  And what's the next one?

1    A.  Resistance to rules and supervision.

2    Q.  And how does that -- how does that exhibit itself

3 with Mr. Kozohorsky?

4    A.  So one part of that was does the person have,

5 sort of, juvenile delinquency, and there is some

6 evidence of that; the two arrests we know of, the one he

7 self-reported.  And then he's -- again, some difficulty

8 complying with supervision or registration when he has

9 been in the community under supervised or unsupervised

10 probation.

11    Q.  And I think you had already mentioned in the area

12 of the diagnosis, but grievance thinking or hostility

13 and --

14    A.  Yes, hostility and grievance thinking, and that's

15 based on this sort of -- presents himself as a victim of

16 lying women and vindictive prosecutors and an unfair

17 system and a poorly run, constitutionally-violating CTP

18 program; reports of, sort of, harassment and physical

19 aggression and sexual aggression towards women.  There

20 is this sort of underlying hostility or grievance about

21 Mr. Kozohorsky, so he has that factor.

22    Q.  Now, you just mentioned a little bit ago, just a

23 moment ago, actually, about his sort of defense

24 mechanism, kind of, of the audio recording, and you said

25 that it keeps kind of progressing, kind of escalating,

1   let's call it.  What does that mean to you from a

2   psychological perspective in someone that's looking at

3   risk?

4       A.  Well, there's his version of it, which is he's

5   using it as a way to genuinely try to protect himself

6   from false allegations, although I've been doing this

7   for 30 years and I've never met anybody who's been

8   accused of this many false offenses.  But that's one way

9   to look at it.

10          The other one, to me, is that it's also possible

11  that he's taping some of these encounters to use for

12  later on with masturbation or blackmail.  I mean, this

13  is -- I don't know this to be true, but in terms of

14  considering the range of alternatives here, there

15  definitely is -- he could be genuinely doing this to

16  make sure that he's never accused of a sex offense, but

17  it's also possible that he's kind of keeping these as

18  trophies or tapes to go over in the future for sexual

19  stimulus.

20      Q.  To that point, he testified that -- he said that

21  masturbation itself was mechanical to him.  Did you hear

22  that testimony?

23      A.  Yes.

24      Q.  But then at the same time, we were looking at

25  that letter that he wrote that had all of that -- I

1    think what you called fantasies.  Do those two things

2    kind of jive together?

3         A.   No.  I mean, I've met very few sex offenders of

4    the thousands I've met who tell me they don't have any

5    sexual thoughts when they masturbate.  Usually there's

6    some sexual thought of something, if it's a past partner

7    or celebrity from television, something.  And yeah, the

8    detailed and graphic and on and on and on lengthy letter

9    about all these different sexual things that he wants to

10   do suggest that there is an inner sexual fantasy life,

11   an inner -- this is not something -- I don't think any

12   one of us could write this letter on our own today.

13   This requires you to have thought about this.  This has

14   been in his mind in some way to be able to create eight

15   or nine pages of all of this different, highly graphic,

16   violent stuff.

17        I don't -- even me working with men like this my

18   whole career, I don't know if I could just sit down and

19   pen this out myself to this degree.

20        Q.   Moving on, did you consider protective factors as

21   well?

22        A.   I did.

23        Q.   And what did you find -- what did you consider,

24   first?

25        A.   I considered the five kind of main factors.  One

is has the person ever completed sex offender treatment.
That's a no. The other one is any physical problems or
medical problems that really impact his sexual arousal
or functioning. That's a no. He's testified as such.

And then the other one would be supervision, and
the other one is older age. So clearly he's at an age
where sexual recidivism is less common, and so he's
gotten credit for that on his actuarial scores. And as
a group, supervision does seem to hold some protective
value from sex offenders who are released compared to
those who don't get supervision.

Now, you do have to take into account the
individual sex offender's history. If this is somebody
who's been on probation before and he's reoffended, then
it may be for this individual that supervision isn't
protective, or at the very least we can say we don't
have good evidence that it will be protective for him.

And he has been in the community on release and
reoffended in ways or been realleged to have committed
new offenses. So it makes you question will lifetime
supervision in this case be sufficient alone to keep him
on the straight and narrow.

And the last one I considered is offense-free
time in the community, which has to do with how long has
somebody been living in the community not committing

offenses of any kind after they've been released from a
sex offense.  We have the allegations in August of 2010,
but considering them as not knowing them to be true, if
we go back, he's released on that sex offense in March
of '07.  He's in the community until August of 2010.  So
that's a two and a half year period where he hasn't
offended sexually but he has been offending in other
ways.  And that means you don't get the same level of
protection.  He's had two DUIs in that time frame.  He's
had a theft charge in that time frame, a failure to
register, a failure to comply with sex offender
restrictions.  So this is not an offender who has really
toed the line and has been completely offense-free.  He
just, that we know of, hasn't done a sex offense; and,
in fact, lo and behold, in August there is an allegation
that he has done a sex offense.  So I can't give him
full credit for time in the community as a protective
factor, given that history.

    Q.  I want to follow up on one of those protective
factors that you mentioned, and that's not completing
sex offender treatment, right?

    A.  Yes.

    Q.  At the time you interviewed him, he wasn't
involved in treatment at all, right?

    A.  Correct.

1    Q.  And, in fact -- well, did he tell you what his

2    interest in treatment was?

3    A.  Primarily, that he would cooperate with whatever

4    they told him to when he was released but that he didn't

5    have a problem, he didn't need treatment; and he's

6    declined to be involved in treatment, sex offender

7    treatment, prior to when I saw him.

8    Q.  And then subsequently, did you see more BOP

9    records that suggested to you whether he was actually

10   interested in treatment?

11   A.  I know he ended up enrolling in the CTP and

12   beginning that coursework.  At the same time, I also saw

13   comments about his -- there's -- you have to do kind of

14   a readiness for treatment statement.  That was done by

15   him.  That was judged quite poorly, that he wasn't fully

16   accountable.  And so I think they had some sense of how

17   much was he really invested versus he just wanted to be

18   in the program, but nonetheless, they put him in the

19   program.

20        And at the same time, then, he's been having some

21   conflict around what the program lets him do and doesn't

22   let him do and seeking out government officials to try

23   to get that changed and to file complaints.

24        So he's in the program and he seems to be doing

25   some of it.  At the same time, I'm not sure how much of

1    it is fully self-motivated as it is, as he said this

2    morning, just to show the Court that he's willing to do

3    it if someone makes him.

4        Q.  You've been involved in sex offender treatment as

5    well in your career, right?

6        A.  Yes.

7        Q.  Do you have an opinion as to how effective sex

8    offender treatment is for a person who doesn't think he

9    needs it?

10       A.  This has been debated for a while, you know, can

11   you do treatment with people who are in denial.  I don't

12   want to say no, but it's very difficult because, again,

13   we're trying to look at patterns of behavior and

14   patterns of thinking error, and when somebody doesn't

15   admit to any or only one, it's more difficult to do

16   that.

17            Treatment in general has shown to be effective,

18   at least in meta-analysis.  So it seems like people that

19   complete treatment have somewhere between a 25 or 33

20   percent reduction in recidivism compared to those that

21   don't.

22            At the same time, some of the gold standard

23   studies have suggested that maybe treatment's not as

24   effective as we think.

25       Q.  Now, you heard him testify earlier.  Did you hear

1  him say anything about a release plan?

2      A.  Yes.  We talked about where he was -- where he

3  would go and what he'd be doing if he was released.

4      Q.  Did that seem sufficient to you, in your

5  professional opinion?

6      A.  Well, at the time I met him, it was just

7  primarily the basics because he said, "I'm gonna go back

8  to Jonesboro, I'm gonna work, basically, for the same

9  people I've always worked for, and I'll do whatever they

10  tell me."  That was kind of the gist of it.

11      Q.  Okay.  Dr. Hastings, for the record, what is your

12  opinion as to whether Mr. Kozohorsky, as a result of his

13  mental disorder, would have serious difficulty

14  refraining from sexually violent conduct?

15      A.  It is my opinion that I think the totality of the

16  data indicates he would have serious difficulty

17  refraining from sexually violent conduct at this time.

18              MR. BREDENBERG:  Thank you.  No further

19  questions, Your Honor.

20              THE COURT:  Cross-examination, counsel.

21              MS. COSTELLO:  Thank you, Your Honor.

22              THE COURT:  Actually, it's 12:22.  Why don't

23  we take a lunch break of 45 minutes.  We'll come back

24  and we'll proceed to cross-examination.  Let's call it

25  12:25.  We'll come back at 10 after 1:00.

```
 1                  (Proceedings recessed at 12:24 p.m.)

 2                  (Proceedings recommenced at 1:12 p.m.)

 3                  THE COURT:  All right.  Back on the record

 4       after the lunch break.  I'll remind the witness he's

 5       currently under oath and turn him over to

 6       cross-examination.

 7                            CROSS-EXAMINATION

 8       BY MS. COSTELLO:

 9          Q.  Good afternoon, Dr. Hastings.

10          A.  Good afternoon.

11          Q.  So your report -- if you could turn to

12       Government's Exhibit 4, page 15.

13          A.  Okay.

14          Q.  The last few sentences there, you write that he

15       appears to be in denial about all but one of his sex

16       offenses, and he may have minimized his alcohol use

17       history.  Do you see that?

18          A.  Yes.

19          Q.  And you say his main psychological defenses

20       include denial and blaming, right?

21          A.  Yes.

22          Q.  And I think you testified on direct examination

23       that denial can be problematic in sex offender

24       treatment, correct?

25          A.  Yes.
```

1    Q.  Would you agree that denial is not an empirically

2    validated risk factor for reoffense?

3    A.  Yeah, not a direct relationship.  If it's

4    related, it's through people who are in denial are more

5    likely to fail out or quit treatment, and that is

6    related to risk for recidivism.

7    Q.  So there's no specific study on the relationship

8    between denial and risk of reoffense, correct?

9    A.  There is.  It just hasn't shown that direct

10    relationship.

11    Q.  Okay.  I want to move on to your diagnoses.  You

12    gave the diagnosis of other specified personality

13    disorder with antisocial features, right?

14    A.  Yes.

15    Q.  You would agree, would you not, that generally,

16    antisocial behavior decreases with age, right?

17    A.  Yes, for personality disorders, there's a general

18    trajectory as a group that that can fade out over time.

19    Q.  Now, I want to talk about your diagnosis of other

20    specified paraphilic disorder (nonconsent).  Would you

21    agree that various iterations of a nonconsent paraphilia

22    have been considered for inclusion in many different

23    iterations of the DSM?

24    A.  Say the first part again.

25    Q.  Various iterations of a nonconsent paraphilia,

1  they may have had different names, but the idea of a

2  paraphilia related to nonconsent has been considered for

3  inclusion in many different versions of the DSM.

4      A.  Yes.

5      Q.  And it has never been included in a prior

6  version, correct?

7      A.  Never has the specific diagnosis, no.

8      Q.  And it was specifically considered for inclusion

9  in the current version, correct?

10     A.  Yes, under paraphilic course or disorder.

11     Q.  And it was not included, correct?

12     A.  Correct.

13     Q.  And would you agree that there are many reasons

14 that people commit the crime of rape?

15     A.  Yes.  I think I've testified to that.

16     Q.  Would you agree that many of those reasons have

17 nothing to do with attraction to nonconsent?

18     A.  Yes.

19     Q.  So in order to make the nonconsent diagnosis, you

20 need to be able to demonstrate that the person is

21 actually attracted to nonconsensual sex, right?

22     A.  More often than not, we have to infer it through

23 the factors that I described earlier on direct.

24     Q.  And those factors, you discussed them in your

25 report.  I believe it's on page 16, the bottom of your

1    report -- or the bottom of page 16 in your report?

2        A.   Yes.

3        Q.   And those factors you cite for the -- do those

4    factors come from a book by a man named Doren?

5        A.   They do.

6        Q.   Would you agree that there are no tools like, for

7    example, the Static-99, that are available to make the

8    determination of whether a person is attracted

9    specifically to nonconsent?

10       A.   Yeah, there are no actuarial tools, psychological

11   tests, other than PPG.

12       Q.   And you don't -- you've never seen a PPG that was

13   conducted on Mr. Kozohorsky, correct?

14       A.   Correct.

15       Q.   You testified about something called the

16   agnostic [sic] continuum on direct examination.

17       A.   Yes.

18       Q.   Who is responsible for that idea?  Do you know

19   whose research is responsible --

20       A.   Raymond Knight.

21       Q.   I'm sorry.  Can you say that again?

22       A.   Raymond Knight.

23       Q.   I want to talk about the 1987 allegation for

24   which Mr. Kozohorsky was charged with aggravated

25   assault.  Do you recall testifying about that on direct

1  examination?

2      A.  Yes.

3      Q.  Did you rely on that allegation when formulating

4  your opinion?

5      A.  I considered all of the charges and allegations

6  in making my opinion, yes.

7      Q.  And you're aware that it was nol-prossed, right?

8      A.  Yes.

9      Q.  You also testified that Mr. Kozohorsky has an MO

10  in some of his offenses, right?  Do you remember that

11  line of -- that testimony?

12      A.  Yes.  That was taken from a record that said that

13  specifically.

14      Q.  Okay.  At the time that you wrote your report,

15  had you seen that record?

16      A.  Yes.  I believe it's quoted in the report.

17      Q.  So you testified, I believe, that multiple of his

18  offenses involved a knife, right?

19      A.  I think there was two, or at least allegations of

20  two.

21      Q.  Which allegations were those?

22      A.  The one in '87.

23      Q.  The one that was nol-prossed, right?

24      A.  Yes.  I guess that was the only one for that

25  offense that I can locate at the moment.  I had

recollection there was another reference to a knife on
one of the allegations or crimes, but I can't find it in
those official five I've listed.

Q. You also testified that he -- many of his
offenses or multiple of his offenses involved anal rape.
Do you remember that?

A. Yes. There's suggestions of threats of anal rape
or anal rape.

Q. In which cases?

A. The offense against Rhonda, I believe, at the gas
station was a threat of anal rape if she didn't comply,
and then the attempted rapes in '06. Two.

Q. And what are you relying on to determine that the
anal rape -- are you relying on the phrase that he said
he would stick his penis somewhere else if she did not
comply?

A. Yes. I was saying that there was either anal
rape or threat of anal rape in those two offenses, and
then in this new letter, fantasy letter, of lots of
stuff about anal sex.

Q. And that fantasy letter, I did want to direct
your attention to it. I believe it's at Government's
Exhibit 22. Is that right?

A. You would know better than I. Yes.

Q. Okay. Now, I'd ask you to turn to page 2190.

1 It's Bates 2190 on the bottom there.

2    A.   Yes.

3    Q.   And in the middle it says, "Libby loved Icy Hot."

4 Do you see that?

5    A.   Okay, yes.

6    Q.   Okay.  And then at the bottom, the last two words

7 are "She loved," and then if you go on to 2191, it says,

8 "to be spanked with a leather thin belt or a wire cord."

9 Do you see that?

10    A.   Yes.

11    Q.   Okay.  And then I'm gonna ask you to turn to

12 2194.

13    A.   Yes.

14    Q.   The last full sentence there.  I'm gonna ask the

15 Court to excuse any profanity.  "She wanted ass, legs,

16 and back whipped with extension cords."  Do you see

17 that?

18    A.   Yes.

19    Q.   All of those statements that we just discussed

20 describe someone who is enjoying the behavior, correct?

21    A.   They suggest that he wrote she wanted the

22 behavior, yes.

23    Q.   Not that she didn't want it, correct?

24    A.   Correct.

25    Q.   Now, you talked about the attempted rape

1   conviction in 2006 on direct examination.  Do you recall

2   that?

3       A.  Yes.

4       Q.  You've evaluated a lot of sex offenders, right?

5       A.  Yes.

6       Q.  A lot of rapists?

7       A.  Yes.

8       Q.  And as part of your job as a forensic

9   psychologist, you read documents related to their

10  criminal records, right?

11      A.  Yes.

12      Q.  Like judgments?

13      A.  Yes.

14      Q.  In your experience, is it common for a third-time

15  rapist to get a noncustodial sentence?

16      A.  In general it seems unlikely.  But again, I can't

17  think of any specific cases I've had where this has been

18  the case.

19      Q.  You'd agree that he was charged with four counts

20  of attempt- -- of actual rape, right?

21      A.  Yes.

22      Q.  But he ultimately pled to attempted rape,

23  correct?

24      A.  Yes.

25      Q.  In your report, you reference -- you reference

1    this in your testimony as well -- other credible

2    evidence of sexual assaults.  Do you recall that?

3        A.  Yes.  I was quoting what was said in another

4    record.

5        Q.  And was that record the presentence report?

6        A.  It was from another document, but I think that

7    document was commented in the presentence report.  But

8    if you give me a second I can hopefully find it.

9            Yes.  It was in the presentence report, quoting a

10   report or assessment done in 2004 by Dr. Simon.

11       Q.  If you turn to Government's Exhibit 7, is that

12   the presentence report?

13       A.  Yes.

14       Q.  Can you turn, if you would, to page 12?

15       A.  Yes.

16       Q.  Paragraph 50.  It says, "According to a Sex

17   Offender Screening and Risk Assessment conducted on

18   September 20th, 2004, by George K. Simon, Ph.D."  Do you

19   see that?

20       A.  Yes.

21       Q.  Is that what you were relying on when you

22   referenced in your report other credible allegations of

23   sexual assault?

24       A.  Yes.  That's what it says a few sentences down.

25       Q.  And is that also what you relied upon when you

1  mentioned in your report that Mr. Kozohorsky had

2  admitted to forcing his wife to have sex with him

3  against her will?

4      A.  Yes.

5      Q.  And at the time that you wrote your report, you

6  had not seen any of this, quote, credible documentation,

7  correct?

8      A.  Correct.

9      Q.  You just relied on what was written in the

10 report, right?

11     A.  Yes.

12     Q.  Have you since had occasion to see any

13 documentation that corroborates this account?  Let me

14 actually strike that question and ask you to turn, if

15 you would, to Government's Exhibit 20.

16     A.  Twenty?

17     Q.  Yes.

18     A.  Okay.  Yes.

19     Q.  That document says at the top, right beneath the

20 exhibit sticker, "Sex Offender Screening and risk

21 assessment," correct?

22     A.  Yes.

23     Q.  And the date of assessment is on the left-hand

24 side there.  What date does it say?

25     A.  September 20th, 2004.

1    Q.   And the bottom, there's a signature block on the

2    right side.  Whose signature block is that?

3    A.   There's no signature here.

4    Q.   And what does it say underneath the signature

5    line?

6    A.   You mean the --

7    Q.   Does it say George K. Simon, Jr., Ph.D.?

8    A.   Oh, yes.  I was about to read the whole lengthy

9    legalese below it.

10   Q.   No, we don't need that.  It says George Simon,

11   right?

12   A.   Yes.

13   Q.   Now, I'm gonna draw your attention to some of the

14   information in this -- so you would agree that this is a

15   sex offender screening and risk assessment from

16   September 20th, 2004, right?

17   A.   That's what it says.

18   Q.   And it says in it -- it's the one, two, three,

19   four, five -- sixth sentence from the top, "He has at

20   least two other similar sexual assault charges that were

21   not successfully prosecuted," right?

22   A.   Which paragraph are you in?

23   Q.   The first one.

24   A.   Yes.

25   Q.   Doesn't give you any description about those

1  charges, right?

2      A.  No.

3      Q.  Doesn't tell you what kind of sexual assault it

4  was, right?

5      A.  Correct.

6      Q.  Doesn't tell you when it was, right?

7      A.  Correct.

8      Q.  Doesn't tell you who it involved, correct?

9      A.  Correct.

10     Q.  And then further down in the paragraph titled

11  "Aggravating/Mitigating Factors Affecting Presumptive

12  Risk Level," the second full paragraph says, "The

13  offender has convictions for two violent rapes of

14  similar character, and there's ample credible

15  documentation he has committed even more such acts than

16  his official conviction record reflects."  Do you see

17  that?

18     A.  Under aggravating and mit- -- I only have one

19  paragraph on that one.

20     Q.  The second sentence.

21     A.  Second sentence.  Okay.

22     Q.  I'm sorry.  Says, "The offender has convictions

23  for two violent rapes of similar character, and there is

24  ample credible documentation he has committed even more

25  such acts than his official conviction record reflects,"

1  right?

2     A.  Yes.

3     Q.  It doesn't say what that credible documentation

4  is, right?

5     A.  It does not.

6     Q.  It doesn't say who the person is relying on,

7  correct?

8     A.  Correct.

9     Q.  Or whether any fact finder has made a

10  determination about it, correct?

11     A.  Correct.

12     Q.  And you've not spoken with anyone who wrote this

13  document, correct?

14     A.  No.

15     Q.  If you take a minute, if you would, and see where

16  in that record it mentions marital rape, if you could,

17  if it mentions marital rape at all.

18     A.  It does not.

19           MS. COSTELLO:  Nothing further, Your Honor.

20           THE COURT:  Redirect, counsel?

21           MR. BREDENBERG:  Thank you, Your Honor.

22                  REDIRECT EXAMINATION

23  BY MR. BREDENBERG:

24     Q.  Dr. Hastings, with regard to the allegation

25  against Sandra that was nol-prossed, is it your

 1   understanding that that was nol-prossed in connection

 2   with a plea in the connected case of Rhonda?

 3       A.   Yes.

 4       Q.   Okay.  Can I turn you to Government Exhibit 17,

 5   please?

 6       A.   Okay.

 7       Q.   Do you know what this is?  Can you identify that?

 8       A.   Statement taken from Sandra.

 9       Q.   Is this something that you considered in the

10   course of your evaluation?

11       A.   I did not have this at the time.

12       Q.   Did you see it after --

13       A.   I did.

14       Q.   Okay.  And is it something you considered in your

15   opinion that you testified to today?

16       A.   Yes.

17       Q.   Okay.  And could you just summarize what you took

18   from this statement?

19       A.   I mean, it's -- it's very consistent with the one

20   that was from the presentence report, and then -- yeah,

21   there's some returning to the home and some issues

22   couple days before.  I do not remember all of the

23   specifics of this.

24       Q.   That's okay.  The point is that this appears to

25   be a statement from the victim describing what happened.

1    A.  Yes.  It's very consistent with what I had quoted

2    in the report, just a little more detailed.

3              MR. BREDENBERG:  Okay.  I have no further

4    questions, Your Honor.

5              MS. COSTELLO:  May I have a brief recross,

6    Your Honor?

7              THE COURT:  Yes, within the scope.

8                    RECROSS EXAMINATION

9    BY MS. COSTELLO:

10   Q.  That statement was written by someone named

11   Sandra Lancaster, right?  Government Exhibit 17?

12   A.  I'm sorry.  I didn't hear the first part.

13   Q.  I said Government's Exhibit 17 says it's a

14   statement taken from Sandra Lancaster, right?

15   A.  Yes.

16   Q.  Have you spoken to Sandra Lancaster?

17   A.  Of course not.

18   Q.  And you testified that the -- that aggravated

19   assault charge was nol-prossed as a result of his plea

20   to the rape, right?

21   A.  That's my understanding, yes.

22   Q.  Were you there in court?

23   A.  No.  I believe it was from -- I thought the

24   presentence report and some of the other criminal

25   records, that they were considered as one event and -- I

```
 1    mean, that's where I'm having my notes, "as part of a
 2    plea deal with second charge."
 3                    MS. COSTELLO:  Nothing further, Your Honor.
 4                    MR. BREDENBERG:  Nothing, Your Honor.
 5                    THE COURT:  Thank you, sir.  You may step
 6    down.
 7                    THE WITNESS:  Thank you.
 8                    THE COURT:  Do the parties mind if he's
 9    released from his subpoena?
10                    MS. COSTELLO:  No, Your Honor.
11                    MR. BREDENBERG:  Well, Your Honor,
12    Dr. Hastings is the court-appointed expert and...
13                    THE COURT:  I'm happy to keep him if you
14    want him to be able to comment on defense witnesses.
15                    MR. BREDENBERG:  At least for now, if
16    that's -- yeah.
17                    THE COURT:  All right.  Dr. Hastings, I'll
18    ask you to remain in court in case you're needed for
19    rebuttal.  Next witness.
20                    MS. PRATESI:  United States calls Dr. Dawn
21    Graney.
22                    THE CLERK:  Please place your left hand on
23    the Bible, raise your right hand, and state your name
24    for the record.
25                    THE WITNESS:  Dawn Graney.
```

                    (The witness was placed under oath.)

                    THE COURT:  For the record, Dr. Graney has

previously testified before this Court and accepted as

an expert.  She will so testify today.

                              DIRECT EXAMINATION

BY MS. PRATESI:

    Q.  Good afternoon, Dr. Graney.

    A.  Good afternoon.

    Q.  Are you familiar with the respondent in this

case, James Kozohorsky?

    A.  I am, yes.

    Q.  And how are you familiar, Dr. Graney?

    A.  I conducted a precertification evaluation of

Mr. Kozohorsky in early 2021.

    Q.  And as part of that precertification evaluation,

what questions were you asked to consider?

    A.  I was asked to do a diagnostic assessment and

then evaluate his risk of sexual dangerousness.

    Q.  Dr. Graney, after conducting your evaluation, did

you formulate an opinion as to whether Mr. Kozohorsky

meets criteria for civil commitment under 18 United

States Code Section 4248?

    A.  I did.

    Q.  And did you memorialize your opinion in a written

report?

 1     A.   Yes.

 2     Q.   Can you please turn your attention in that binder

 3   to Government's Exhibit 2?

 4     A.   Okay.

 5     Q.   Is that the forensic evaluation report you

 6   authored regarding Mr. Kozohorsky dated March 12th,

 7   2021?

 8     A.   Yes.

 9     Q.   And, Dr. Graney, during your evaluation, what

10   information did you consider?

11     A.   I had some records available, the PSI, some

12   police reports, and some court documents.  I had his

13   Bureau of Prisons medical and psychology records, and

14   that was primarily what I relied on.  He had declined to

15   interview with me for the evaluation.

16     Q.   And even though Mr. Kozohorsky declined to

17   interview with you, did you contact any other

18   individuals when you were conducting your assessment?

19     A.   I did reach out to an Assistant United States

20   Attorney and a U.S. Probation Officer in Missouri to try

21   to obtain some additional records.  They said most of

22   the records were now electronic files and that his case

23   was -- his cases were older, that they would have been

24   archived.  So they didn't know how quickly those could

25   maybe be accessed.

1    Q.  And, Dr. Graney, since you've conducted your

2  evaluation, have you had the opportunity to review any

3  additional documentation?

4    A.  Yes.  With the discovery materials I've received

5  some additional police reports and some letters that

6  Mr. Kozohorsky has written or exchanged with other

7  individuals, things of that nature.

8    Q.  And did you also review Mr. Kozohorsky's

9  deposition?

10   A.  I did, yes, as well as the other expert reports.

11   Q.  And has any of this additional information that's

12  been provided to you changed any of your opinions as set

13  forth in your report?

14   A.  No, it's not changed any of my opinions.

15   Q.  Dr. Graney, I'd like to start with, you know,

16  what we generally refer to as prong 1.  During the

17  course of your evaluation, did you determine whether

18  Mr. Kozohorsky engaged in or attempted to engage in

19  sexually violent conduct?

20   A.  Yes.

21   Q.  Go ahead.

22   A.  Oh.  I was gonna say, so as has been discussed,

23  he had the attempted rape, which was later listed as a

24  aggravated assault, for the January 1987 offense with

25  Sandra, and then he had the rape conviction for the 1987

offense with Rhonda as well as the conviction in, I

believe, '89 for Nadine and then later 2006 for Linda

Burnsed.

Q.  And, Dr. Graney, we've heard some extensive

testimony today about those offenses and the conduct

that was alleged for each of them.  I just want to start

with the 1987 offense.  Was there any information that

you considered that we haven't really already discussed

today?

A.  Well, not at the time I did my evaluation, but

information that I've received with the discovery

materials for me has added support to my opinion.

Particularly, there is information that showed

that just hours after his sexual assault to Rhonda,

which is the one rape he does admit to, there was a

woman named Barbara, who was either the wife or live-in

girlfriend of one of his friends, and, in fact, that

friend was with him at the time that he raped Rhonda.

So I learned that he was with two individuals.  He said,

"I have some business to take care of at this Bargains

Unlimited store, can you drive me there?"  So they drive

him there.  They wait in the car.  That's when he rapes

Rhonda, unbeknownst to them.

But the wife of one of those men said that later

that day he came to her house, he appeared, I don't

know, anxious, said he was hiding from the police for a
DWI; asked her, basically, if she wanted to, I guess,
fool around, have sex.  She said no, so he proceeded to
pull out his penis to begin masturbating in front of her
and making vulgar remarks.

So that was significant to me, that just hours
after committing one rape, which he has acknowledged,
that he then goes on to another woman's home, and even
though he doesn't force her to engage in direct sexual
contact would, you know, proceed to masturbate in front
of her after she's not welcomed those advances.

The same woman said that he would often prior to
that come to her home when her husband wasn't there to
have coffee, and that she woke up in the middle of the
night one night to find him standing at the foot of her
bed, and there was evidence that he had broken through
the back door.  Now, when she asked him to leave, he did
leave.  But again, concerning to me that he had been
visiting this woman and broke into her home in the
middle of the night, considering his history of violent
sexual assaults.

So those records were significant in adding
further support for my opinion.

Q.  And were there any additional -- is there any
additional information that you considered or was

1  important to you from any of the other allegations or

2  convictions we've discussed today?

3     A.  One of the other things that I found significant

4  was -- I believe in his -- I don't know if it was at the

5  time of his report to the police and/or maybe at the

6  time of his deposition, but he was talking about the

7  offense involving Linda Burnsed.  And he had, of course,

8  you know, he described it as a consensual sexual act and

9  said that it was dark and he reached over off of a table

10 to grab what he thought was KY lubricant and instead

11 grabbed the Bengay.  But in reviewing that letter he

12 wrote in 1995, which was 11 years before that offense,

13 he talked about using, like, hot pepper or Icy Hot or

14 other kind of menthol ointments during sexual encounters

15 and that, you know, he had done that with his wife.  And

16 so that seemed to be something specific to him that was

17 arousing to him.  And so he had used that during the

18 offense with Linda Burnsed.

19    Q.  Dr. Graney, what, if any, significance do the

20 allegations made by Christine have towards your opinion?

21    A.  So when I was writing my evaluation, I did take

22 into account that she did allege a sexual assault.  I

23 mean, certainly this would have been the fifth

24 allegation against him by that time.  There were no

25 details, however, other than referring to it as a sexual

assault.  I had no details as to what allegedly had
happened.  I tried to get, again, some information from
the U.S. Attorneys or probation as to whether there was
a police report or anything with more details, and they
didn't have anything available.

There was discussion about her allegations being
used towards an enhancement in his sentencing.  I know
later that it appeared that did not -- that enhancement
was not added.

The U.S. Attorney I spoke to was not involved in
the original case, did have some recollection of that
case.  He said he didn't believe it was anything about
the -- about Christine's credibility, or anything like
that, that resulted in them not adding that adjustment
but, you know, he said it could have been if she changed
her mind about testifying at sentencing, or something of
that nature, that that could have also affected the
case.

So I did give it some weight.  You know, I still
don't certainly know for a fact what happened.  But
considering his history, I certainly just didn't
discount it.

Q.  And, Dr. Graney, did you hear Mr. Kozohorsky
testify today regarding his offense conduct?
A.  Yes.

1    Q.   And how many of these incidents of sexual

2  violence has he admitted to?

3    A.   Just the one with Rhonda.

4    Q.   And what, if anything, does that tell you?

5    A.   You know, it just -- I know there's been

6  discussion about denial.  You know, he's denied four of

7  the five alleged offenses.  Even though he's admitted to

8  the rape of Rhonda, I still think he minimized some of

9  that or downplayed some of that.  But I also think, you

10  know, it plays into his attitudes toward women.  He

11  describes kind of the -- that this is a thing that women

12  do if they're not happy with a man or they want to

13  retaliate, that they're very quick to allege rape.  And

14  so I think it just speaks to some of his general

15  attitudes toward women, you know, speaks to some of his

16  cognitive distortions.

17    Q.   And before we touch on some of the diagnostic

18  criteria, just to summarize, in light of

19  Mr. Kozohorsky's criminal convictions and the

20  information you've heard today, would you -- in your

21  opinion, has he engaged in or attempted to engage in

22  sexually violent conduct?

23    A.   I believe there was an attempted sexual assault

24  with Sandra in '87.  There was the rape of Rhonda with

25  '87.  I did give credit to, certainly, the conviction

1    for the rape of Nadine in '89 as well as the conviction

2    for the case with Linda in 2006.

3        Q.   And, Dr. Graney, during the course of your

4    evaluation with Mr. Kozohorsky, did you diagnose him as

5    suffering from any mental illness, abnormality, or

6    disorder?

7        A.   I did.

8        Q.   And what were those diagnoses?

9        A.   So I gave him an other specified paraphilic

10   disorder (nonconsent), other specified personality

11   disorder with antisocial features, and a mild alcohol

12   use disorder.

13       Q.   And can we sort of take those in order and start

14   with the other specified paraphilic disorder?  Can you

15   briefly describe the diagnostic criteria for a

16   paraphilic disorder, generally?

17       A.   So it's an intense and persistent interest in

18   what would generally be considered a deviant sexual

19   arousal.  You know, it's actually sexual interest in

20   general stimulation or preparatory fondling with

21   phenotypically normal, physical mature, consenting human

22   partners.  So anything that's outside of that range

23   would be considered paraphilic.

24            Paraphilic disorder, then, is a paraphilic

25   interest that is causing harm or risk of harm to others

1    or is causing significant distress or impairment in the

2    life of the individual.  Did you want me to go on about

3    the specific other specified paraphilic disorders?

4           So, you know, other specified paraphilic disorder

5    is absolutely a diagnosis in the DSM.  Is the word

6    "nonconsent" listed specifically under "other specified"

7    in the DSM?  No, it is not.  And I know there's already

8    been some testimony about this diagnosis and there's

9    controversy about it.  You know, I know there are social

10   and legal reasons why people are hesitant to identify

11   rape as a mental disorder.

12          But I don't think we can simply say that it just

13   doesn't exist, that there are, you know, no men out

14   there that have an arousal to this pattern.  I think it

15   is not something we see often, it's not something I've

16   diagnosed often as well, but I do think it does exist.

17          So then we have to look at -- if we don't have

18   specific criteria, what are some things we consider.

19   And Doren did offer in his book some things we can look

20   at kind of as guidelines to what to consider if you're

21   considering a nonconsent paraphilia.  And I think

22   they're really common sense.  I think they're things you

23   would consider when looking at other possible paraphilic

24   disorders.  So I don't think it's really all that

25   off-the-wall; just kind of seems to make sense to me.

1    And some of these were things, certainly, already

2  discussed by Dr. Hastings.  But were there signs of

3  arousal during rape?  There were indications, I think,

4  from his statements or victims' statements that he

5  ejaculated, that he completed the sexual act, so I would

6  argue that there was arousal.

7    As far as repetitive pattern, you know, there's

8  not a definite pattern across every offense but you do

9  see some different elements.  What he would tend to do

10  is kind of go to a victim uninvited or unannounced,

11  either go into their home, or with Rhonda went into the

12  store, and then when they're kind of unsuspecting, jumps

13  on them and sexually assaults them.  And there is a lot

14  of threats, threats to kill, threats to injure if they

15  don't comply, threats to engage in kind of more

16  demeaning sexual acts.  And so I do think you see

17  elements of that across his different offenses.

18    You know, looking at his criminal history, he

19  does have nonsexual offenses, certainly.  There's also a

20  significant number of his offenses that are sexual in

21  nature, and so that can be suggestive of paraphilic

22  interest.

23    Did he rape when he had a willing sexual partner?

24  You know, if you listen to him in his deposition, it

25  seems that at any given time he was dating one, two,

three different women.  So I would argue that he did have what would be consensual sexual partners and yet he would still go out and engage in these sexual assaults.

There was a short period of time after consequences when he released from prison in -- following his conviction for the '87 offenses, it was only eight months until his rape of Nadine in '89.  And then when he gets out in what, December 2003, it's about four years before then he has the rape of Linda Burnsed.  So again, you're looking from a period of eight months to about two years before he's reoffending.  For the '87 offenses he only spent a year in custody but then a much more significant time before the Linda Burnsed rape.  He's in custody for, like, 12 to 13 years and still gets out and reoffends.

Raping in circumstances where there's a high likelihood for being caught.  Again, showing up to these homes unannounced, not knowing who might be in the homes, who's gonna come by the homes, raping Rhonda in a store while it's essentially supposed to be open for business, to me are circumstances that there's a high likelihood.

So looking at these factors -- did he have various types of victims?  Certainly he had a significant age range.  I think Sandra was the youngest

1    at 17.  Rhonda was 18, but he had victims up into their

2    mid to late 40s.  So again, there's a range of victims,

3    which may also be more paraphilic in nature.

4         So looking at these factors, you know, Doren

5    identifies nine factors.  The one factor of his that he

6    suggests you could consider is maintenance of a rape

7    kit.  I did not find evidence of that, but I did find

8    some degree of evidence for the other eight.

9    Q.  And so taken together, your opinion is that he

10   suffers from this paraphilic disorder.  Is that correct?

11   A.  To me, when I look at the behaviors overall and

12   these different factors, to me, it's not -- again, there

13   are a number of reasons why somebody may rape, but it

14   felt more of a paraphilic interest to me.  This wasn't

15   just an antisocial act where in the moment he's just

16   taking it because he wants it.  I mean, he made some

17   statements of that.  But again, there's this pattern

18   that it's beyond -- it's a very planned, calculated

19   attack.  I'd argue that there's fantasy that goes into

20   that, thinking about that and that preparation.

21        And in my opinion, I think, you know, he had the

22   four days between the attempted rape on Sandra and the

23   completed rape on Rhonda.  And I think that he was not

24   able to successfully complete the rape with Sandra, I

25   would argue, led to some frustration that then resulted

1    in the rape of Rhonda just days later.

2              THE COURT:  Dr. Graney, it says -- so it's

3    other specified paraphilic disorder (nonconsent),

4    specified by whom?  By the examiners?  Specified

5    somewhere in the DSM?  The nonconsent doesn't appear

6    anywhere in the DSM, is that correct?  So when we say

7    "specified," who specifies?

8              THE WITNESS:  I would say the examiner, the

9    clinician.  And really what that is, it's just like

10   with, you know, if you have a substance use disorder or

11   a mood disorder where you have some specifier, or a

12   psychotic disorder, is this the first episode or have

13   they had multiple episodes, it's really just a language

14   for clinicians to talk to each other so we can kind of

15   be all on the same page, "Okay, this is what we're

16   dealing with."

17             And so just to say that somebody has an

18   other specified paraphilic disorder, that leaves it so

19   broad that, you know, you're not really clear what could

20   be the issue.

21             THE COURT:  So that would just be other

22   paraphilic disorder.

23             THE WITNESS:  Could be any kind of --

24             THE COURT:  So by specifying, you clarify

25   what you mean.

1          THE WITNESS:  Yeah.  It's telling other --

2     really, other providers, other evaluations, that this is

3     what I think is the problem area, this is the disorder

4     this individual's experiencing.

5          THE COURT:  So somebody could make one up

6     that day and decide "This is what's going to be my

7     specified, and I can tell you why I'm specifying it"?

8     And it would count?

9          THE WITNESS:  So make up a --

10          THE COURT:  They can say it's an other

11     paraphilic disorder specified.  I've decided that, I

12     don't know, "Marvin the Martian" is now specified.  I'm

13     specifying they have a Marvin Martian disorder.

14          THE WITNESS:  I mean, technically, could

15     they?  Yes.  If they said, "I think this person has a

16     specific, intense, problematic attraction to Marvin the

17     Martian," could they have that as a specifier?  I mean,

18     some clinician could.  But there has to be -- I mean,

19     there really has to be some support that this is a

20     persisting, problematic --

21          THE COURT:  They list why --

22          THE WITNESS:  -- deviant sexual interest --

23          THE COURT:  They list why --

24          THE WITNESS:  Yes.

25          THE COURT:  But they could.  They could just

say the first time that anybody's ever said it, but it
meets the DSM criteria to say other paraphilic disorder,
and I'm gonna specify why.

THE WITNESS:  Yeah.

THE COURT:  So it doesn't have to be
specified in the DSM.

THE WITNESS:  That's right.  It doesn't have
to be -- if it's not one of the formal diagnosis already
listed but you think, again, there's enough to say that
there is some sort of paraphilic disorder, then the
other specified can be used.  And the specifier -- I
mean, arguably, could somebody come up with their own
specifier?  Yes.

THE COURT:  Thank you.

BY MS. PRATESI:

Q.  Dr. Graney, do you consider Mr. Kozohorsky's
diagnosis of other specified paraphilic disorder
(nonconsent) to be serious?

A.  I do.

Q.  And can you just briefly explain to the Court
why?

A.  So you see a pattern of, you know, from when he
was 22 up to 41 of, again, these repeated sexual
assaults, so that's over an almost 20-year time period
where he's been in and out of prison.  You know, he

claims that these are false allegations. But it's
repeatedly created problems in his life with his
employment or housing or being labeled as a sex
offender. But you see this prolonged period of where
it's causing distress and impairment and, more
importantly, harm to others, and yet he continues to
engage in these behaviors.

Q. And, Dr. Graney, when you conducted your
evaluation, did you consider any other paraphilic
disorders?

A. I gave consideration to whether or not he had any
sadistic interests, mostly in part to the issue with the
Bengay, using the Bengay during the rape of Linda
Burnsed. He made some other threats or, you know, to
hit his victims or kill his victims. I really think
that was solely just to gain compliance. I don't know
that there was any specific arousal from those threats
or suffering that he was causing by making those
threats.

In the 1995 letter, which I've seen since the
evaluation, there were again some elements that could be
suggestive of sadistic interests. You know, one that
stood out was talking about inserting a heated curling
iron into his wife's vagina. But I agree with what
Dr. Hastings said. I don't know if these are simply

1  fantasies.  I don't know if he's actually engaged in

2  these acts, so I just didn't think there was enough to

3  make that diagnosis.

4      Q.  And, Dr. Graney, even if there was insufficient

5  information to render that diagnosis, do these sadistic

6  elements to some of his offenses still play a role in

7  your overall evaluation of his clinical presentation?

8      A.  Well, I mean, it certainly is still concerning,

9  yes, that he, you know, makes these threats toward his

10  victims and that he's, you know, he's in prison serving

11  time in '95 for a sexual offense.  He's writing this

12  woman with the intent of getting her to send him sexual

13  stories and pictures of herself and he's, you know, it's

14  this handwritten eight-page letter of this really

15  deviant sexual thoughts, attitudes, fantasies, whatever.

16          So, I mean, that does certainly play into how I

17  view him overall, his risk overall and his paraphilic

18  interests.

19      Q.  And, Dr. Graney, you also offered a diagnosis of

20  other specified personality disorder with antisocial

21  features.  Is that correct?

22      A.  Correct.

23      Q.  And can you briefly explain why you diagnosed the

24  other specified personality disorder rather than

25  antisocial personality disorder?

1      A.  So, as testified to earlier, to make the full

2   diagnosis, there has to be evidence of conduct disorder

3   prior to the age 15, and I just didn't have evidence of

4   that in the records I had at the time.  And I still

5   don't see, and even in the records I've received since,

6   enough information about what was going on at that point

7   in his life.

8          But as an adult he has clearly repeatedly, you

9   know, gotten in trouble with the law by engaging in

10   criminal behaviors or violating conditions of

11   supervision.  He's been deceitful.  He's admitted that

12   he lied about some offenses, at least, like mentioning

13   that after the rape of Rhonda, he initially lied about

14   that.  But I think there's been other instances of that

15   too.  Irritability and aggressiveness, you know, lack of

16   remorse for others, he tends to see people as a means of

17   just getting his wants or needs met, you know, that kind

18   of conning or manipulative presentation.

19          He has had some consistent employment.  But other

20   areas of his life he's not been, you know, real

21   consistent or had episodes of irresponsibility of kind

22   of just bouncing around place to place while looking for

23   work and not registering, and things of that nature.

24          I will say that while he's been in the Bureau of

25   Prisons I know, you know, it's been mentioned that he's

had no write-ups.  Antisocial personality features can

diminish with age.  I mean, that could be a factor.  But

you also see guys in the community where it's a less

confined, you know, controlled environment, the

antisocial features are more prominent.  And then when

they're in that highly controlled prison environment, it

can be a little muted.

So not really prevalent in the time that he's

been in prison, but definitely notable in his time in

the community.

Q.  And, Dr. Graney, how, if at all, in your opinion,

did Mr. Kozohorsky's diagnoses interact with one

another?  The paraphilic disorder and the personality

disorder.

A.  So I definitely think, you know, the presence of

the antisocial traits exacerbates his risk just because

of that, you know, lack of remorse for others,

willingness to use others for his own purposes, not

learning from consequences.  So that increases,

arguably, his risk to then act on those paraphilic

interests.

Q.  Dr. Graney, lastly I just want to briefly touch

on your diagnosis of alcohol use disorder.  What

information did you utilize to render that diagnosis?

A.  So he -- he didn't describe a significant history

1   of alcohol use, based on the records, but I did note

2   that he had a few DWIs.  He violated a period of

3   probation by consuming intoxicants.  I think he had

4   mentioned when I did my report that he was under the

5   influence, at least during one offense, and then

6   there's, I think, some evidence that may have been an

7   issue at least in his rape with Linda Burnsed as well.

8        So, but anyway, at the time I did my evaluation,

9   I thought based on those elements, the DWIs, the

10   violating, the use and situations that put others at

11   harm or risk was sufficient to at least say the presence

12   of a mild alcohol use disorder.

13   Q.  And how, if at all, might such a diagnosis

14   interact with, again, the paraphilic disorder and the

15   personality disorder?

16   A.  I mean, again, just reducing inhibitions, making

17   him more likely to act on impulses or urges while under

18   the influence.

19   Q.  And so, Dr. Graney, as a whole, in your

20   professional opinion, does Mr. Kozohorsky suffer from a

21   serious mental illness, abnormality, or disorder?

22   A.  Yes, I believe he does.

23   Q.  And finally, Dr. Graney, I want to ask you some

24   questions about prong 3.  Did you form an opinion as to

25   whether Mr. Kozohorsky will have serious difficulty

refraining from child molestation or sexually violent

conduct if he's released?

    A.  I did.

    Q.  And what evidence did you rely on in arriving at

that conclusion?

    A.  So I certainly looked at his history, you know,

which we've discussed, and the fact that I diagnosed him

with having a paraphilic disorder.  You know, his Static

score was discussed.  I also came up with a score of 4,

putting him in the above average range.

        And then I looked at various dynamic risk

factors, which for him the most prevalent ones were

related to intimacy deficits, problems with sexual

self-regulation, problems complying with supervision,

and then some degree of just problems with general

self-regulation as well.

    Q.  Dr. Graney, if I can just return you briefly to

your Static score, you indicated that you gave him a

score of 4, correct?

    A.  Correct.

    Q.  And that was the above average risk category?

    A.  Yes.

    Q.  What effect, if any, does that score have on his

projected risk of sexual recidivism?

    A.  What does that score have --

1     Q.  Or what does it mean?  I'm sorry.

2     A.  Well, again, some of this I feel like is

3  repetitive, but that score would put him into the almost

4  80th percentile and twice as high likelihood of

5  recidivism as compared to the typical sex offender.

6     Q.  And do you believe that the score accurately

7  reflects his risk of reoffense?

8     A.  I would actually say that based on the other

9  factors, the dynamic risk factors, some of his attitudes

10  and beliefs and some of his cognitive distortions, that

11  his risk is a little higher than maybe the static would

12  suggest.

13     Q.  And so let's touch on some of those dynamic risk

14  factors that you mentioned.  Did you use any particular

15  assessment measure when you considered them?

16     A.  I just used factors that are identified in the

17  Stable, Stable-2007.

18     Q.  And what is the Stable-2007, just briefly?

19     A.  It's used to look at the presence of dynamic risk

20  factors often in community supervision.  But a lot of

21  the factors covered here are supported by research to --

22  not any one factor is indicative of increased risk, but

23  when you look at the factors together, are there

24  multiple factors present that would argue that overall

25  it's gonna increase the risk of sexual reoffense.

Q.   And I believe you mentioned intimacy deficits as one of the more salient factors for Mr. Kozohorsky, is that right?

A.   Yes.  So for Mr. Kozohorsky, he was -- he was involved in a relationship with Mary.  I think they stated dating around 1982, married in '87, stayed married until '94.  He had committed two of the rapes during that time that he was involved in a relationship with her.  I also did see in the record where there was statements from the 2004 report that he had admitted to acts of marital rape while he was married to her, repeated instances of infidelity, and that was throughout his relationships with other women.  Again, he was usually dating multiple women at any one time. And then he has also described -- more recently I know he's described the use of -- significant use of prostitutes in more recent years.

But just not a lot of relationship stability, not a lot of emotional intimacy there.  Women seem to be, you know, more objectified, that they were a means to satisfy his needs, and often just his sexual needs.

Q.   And what evidence did you see of problems with his sexual self-regulation?

A.   For problems with sexual self-regulation, obviously the repeated sexual assaults over a period,

1  really, of what's almost 20 years, repeating after
2  serious consequences.  He's not had issues with sexual
3  preoccupation that we've seen while he's been in
4  custody, but again, I don't think there was evidence of
5  that during his prior incarcerations, and yet he got out
6  to sexually reoffend.

7        But again, when he's in the community he's dating
8  multiple women, having sex with multiple women, having
9  sex with prostitutes, engaging in these sexual assaults,
10 even while under probation at times; so evidence of
11 problems with sexual self-regulation and of course the
12 deviant sexual interests that we already spoke about.

13       One of the other factors that kind of falls under
14 the intimacy deficits is I definitely think there's
15 hostility toward women.  You can hear that in some of
16 his statements and some of his attitudes.  You know,
17 there was a letter written by Jeannette, which was one
18 of the women he dated, and she talked about him always
19 having these attitudes that women were inferior and were
20 there just to meet the needs of men.

21       And in the 1995 letter where he's going, you
22 know, through his sexual fantasies or whatnot, he
23 repeatedly refers to women in very derogatory terms.

24       And I think even in his recent deposition there
25 was evidence of still some hostility and just

objectification of women.  He would talk about, again,

that this is kind of just what women do when they're

upset with men, they accuse them of rape, and here he is

in a deposition for possible civil commitment, and he

repeatedly made offhanded comments about the physical

appearance of women, talking about oh, that woman was

really beautiful, that woman was really attractive, and

even speaking about one of -- I think it was Christine

but, like, gave her measurements, like her waist and

buttocks measurements, which to me was odd in the course

of a deposition, you know.

So I think there's just again some evidence of

that objectifying women and some of those hostile

attitudes toward women.

Q.   Dr. Graney, can you touch on cooperation with

supervision as a dynamic risk factor?

A.   Yes.  So he's had repeated instances of violating

conditions of probation or supervision even as young as

15.  It was 1990 or 1991, I think there were two

different dates in some of the records, he was on

community release and awaiting sentence for the 1989

offense, and that's when he had the charge for burglary

and terroristic threatening which involved him returning

to the home of one of his victims, which I think was

Nadine.  And then of course he's, you know, had

1  violations for using intoxicants or driving while

2  impaired.  You know, he's had the issues with failing to

3  register.  He had another theft charge sometime around

4  2008 or so.

5      So even periods while he's on probation he's

6  either committing new offenses or violating, failing to

7  register.

8    Q.  And finally, Dr. Graney, can you touch on general

9  self-regulation, please?

10   A.  So general self-regulation was -- wasn't as

11  prominent, but you would see elements of that.  You

12  know, again, his driving while intoxicated and violating

13  conditions of supervision.  Poor cognitive

14  problem-solving I do think is an issue that you see kind

15  of throughout, you know, a span of years and is still

16  present.  You know, while he's been more recently in the

17  CTP, he's written a lot of letters to the central office

18  in the BOP and maybe different politicians, whatever,

19  complaining about the conditions of confinement, and

20  everything is very kind of externally focused, and he

21  was doing the same thing during his '95 incarceration as

22  well, writing to different politicians and whatnot,

23  complaining about the jail conditions.

24      And so even though more recently with the CTP,

25  he's been encouraged to try other more prosocial ways to

address his concerns with institutional staff and whatnot, you know, he continues to kind of write these letters and air his grievances, and I just think there's some elements of poor problem-solving that you see in those behaviors as well.

Q. And, Dr. Graney, how if at all do these dynamic risk factors weigh into your analysis of whether Mr. Kozohorsky will have serious difficulty refraining from sexually violent conduct if he's released?

A. I think these factors overall increase his risk of engaging in sexual reoffense.

Q. And, Dr. Graney, when you conducted your evaluation, did you consider whether there were any protective or mitigating factors for Mr. Kozohorsky?

A. I did, some of which, again, were already spoken to, but things like any medical conditions which would limit his ability to reoffend, or advanced age, or being in the community for a significant period of time without reoffending, but none of those factors were present, and he has no history of sex offender treatment.

Q. And just touching on sex offender treatment, you're aware that Mr. Kozohorsky has begun to participate in the CTP, correct?

A. Correct.

1    Q.  And have you had the opportunity to review the

2  psychology records from the Bureau of Prisons?

3    A.  I have, yes.

4    Q.  And what, if anything, or how if at all does that

5  information contribute to your overall opinion of his

6  volitional control or lack thereof?

7    A.  Well, I mean, I'm glad to see that he's in

8  treatment, but he certainly is not -- you know, at this

9  point, if he is in phase 2, I would argue that he's

10  certainly not received enough treatment that I'm gonna

11  say it mitigates his risk.  I don't know how recently he

12  moved into phase 2.  But the notes I saw from -- since

13  he's entered treatment -- you know, he's kind of doing

14  the basics of what's expected of him but doesn't seem to

15  be a real full commitment.  Like sometimes he's missed

16  treatment groups because he decided he'd rather stay on

17  the recreation yard, or he didn't fully complete

18  assignments.  Or for, like, community meetings, notes,

19  you know, he's very focused on the problems on the unit

20  or what other people are doing wrong.  There's not a lot

21  of really looking internally at what he needs to do for

22  himself.  He talks about wanting to make change but then

23  continues to deny most of his sexual offenses, continues

24  to minimize or blame other people, whether it's the

25  victims or law enforcement or the court system.

1      So I would say at this point it's really more of

2  a superficial level of participation, and my hope would

3  be that, you know, if he continues with treatment, that

4  they can continue to work with him on some of that and

5  kind of start breaking some of that down so he'll start

6  to get some more benefit from it.

7      Q.  And in addition to those treatment records and

8  everything that you've just discussed, did you also have

9  the opportunity to read his readiness statement?

10     A.  Yes.

11     Q.  And did you feel that that reflected a true, you

12  know, willingness to participate, or anything like that?

13     A.  No.  Again, it was really -- I mean, he

14  acknowledged the rape of Rhonda, but really, again,

15  suggested that he's had no other history of violent

16  sexual offenses.  And again, there wasn't a lot of depth

17  to it.  He says yes, I'm ready to change, but there

18  wasn't a lot beyond that statement.  And a lot of it was

19  focused -- I think he said something to the, you know,

20  extent of -- kind of like "I'm ready to make my future

21  better and do better for me," but it was all kind of

22  about him.  There was really no recognition of the harm

23  he's caused or trying to prevent future harm.  It was

24  just really what can I do to make me better, my life

25  better, but really no specific statement about the harm

1    that he's caused or, again, any future concerns about

2    maybe engaging in similar conduct.

3        Q.   And when you were reviewing the CTP records, did

4    you see any evidence that he's learned any of the tools

5    that he might, theoretically, be able to learn in sex

6    offender treatment?

7        A.   I think he had made mention that he had done some

8    rational self-analysis exercises, that he had done,

9    like, a few of those and felt a little bit better about

10   them.  So like identifying problematic situations and

11   his thoughts and subsequent behaviors that go with those

12   and kind of really focusing on those.

13        But beyond that, I don't recall anything specific

14   about specific skills that he's talked about using or

15   implementing.

16        Q.   And as he testified today, did you still see

17   evidence of cognitive distortions or thinking errors?

18        A.   I would say so, yeah.  Again, just his

19   minimization of things.  I mean, if you listen to kind

20   of his story overall, you know, he makes it sound like

21   he's just this incredibly unlucky man, right?  If you

22   think about the number of rapes that go unreported and

23   the low percentage of actually false rape allegations,

24   for him over the course of 20 years to have multiple

25   women falsely accuse him of rape, you know, again, he's

just kind of looking at the outside and blaming the
victims and blaming women's attitudes and blaming the
justice system, but doesn't look like he's ever really
taken a look at himself, like what might I be doing
wrong that all of this is happening around me.

　　　　And so, you know, that remains concerning, that
20, 30 some years later, his attitudes have really not
changed much, his views on things and some of these
distortions have not really changed much.

Q.　And finally, Dr. Graney, I just want to ask you
some questions about his supervision.　You've heard
testimony today that he has lifetime federal supervised
probation, correct?

A.　Correct.

Q.　And in your opinion, are his standard and special
conditions of supervised release sufficient to mitigate
his risk if he were released?

A.　No.

Q.　And why not?

A.　The information I saw when I completed my
evaluation is, you know, there were a few just kind of
really generic conditions mostly about, you know, not
consuming alcohol, and there may have been something in
there, I can't recall clearly, about something with
minors, but that's really not his issue, right?

1     So maybe he's used alcohol during some offenses

2 but, you know, that's not a primary issue for him with

3 his offense conduct.  He doesn't really have evidence

4 of, other than maybe the 17-year-old, of issues with

5 minors.

6     So the offense behaviors he engages in, these

7 conditions wouldn't really prevent him from being in

8 those kind of same situations.  You know, they're not

9 gonna mitigate that risk.  He's the guy that would meet

10 a lot of these women in the course of his work and then

11 show up uninvited to their homes and walk on in and then

12 suddenly engage in a sexual assault.

13     So the conditions are not something that would,

14 to me, mitigate his risk.  To me, what would mitigate

15 his risk, hopefully, is his involvement in treatment,

16 getting a better understanding of his offense behaviors,

17 and learning skills to manage those deviant sexual

18 interests and his general behavior in the community.

19  Q.  And in your opinion, would that sex offender

20 treatment need to take place in a secured environment?

21  A.  For now it does, yes, I think so.

22  Q.  And in your opinion, are there any terms of

23 supervision currently that would be sufficient to

24 mitigate his risk of sexual dangerousness?

25  A.  Not that I can think of, no.

1    Q.  Dr. Graney, what, if any, other information did

2    you consider or rely upon in forming your opinion that

3    we haven't already covered?

4    A.  I can't think of anything.  I think we've covered

5    it.

6    Q.  And so, Dr. Graney, for the record, what is your

7    ultimate opinion as to whether Mr. Kozohorsky meets

8    criteria for civil commitment?

9    A.  It is my opinion that he does meet criteria for

10   civil commitment.

11   Q.  And that's because he would have serious

12   difficulty refraining from sexually violent conduct if

13   released, correct?

14   A.  Correct, as a result of his mental disorders.

15            MS. PRATESI:  Thank you, Dr. Graney.

16            THE WITNESS:  Thank you.

17            MS. PRATESI:  I have no further questions,

18   Your Honor.

19            THE COURT:  Your witness, counsel.

20            MS. SHEA:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22   BY MS. SHEA:

23   Q.  Good afternoon, Dr. Graney.

24   A.  Good afternoon.

25   Q.  I want to ask you about a section in your report,

1  it's on page 24, called "Significant Social Influences."

2  In preparing that section of your report, you listened

3  to some of Mr. Kozohorsky's phone calls, is that right?

4     A.  Correct.

5     Q.  And they were with a man named Marshall Ghant.

6  Do you remember that?

7     A.  Yes.

8     Q.  And you wrote that there was no evidence of

9  sexual content in those conversations, right?

10     A.  Correct.

11     Q.  And that they appeared, overall, positive, right?

12     A.  Yes.

13     Q.  That that might be a supportive relationship for

14  him to have as a friend.

15     A.  Yes.

16     Q.  You also noted in your report on page 26 that his

17  prison conduct has largely been unremarkable, right?

18     A.  Yes.

19     Q.  In terms of infractions -- and you conceded in

20  your direct testimony that he has not received any

21  infractions since he's been incarcerated during the

22  federal sentence, right?

23     A.  Correct.

24     Q.  And you also just testified that he had lifetime

25  supervised release, right?

1    A.  Correct.

2    Q.  And that he has joined the CTP program, right?

3    A.  Yes.

4    Q.  So I want to ask you about your reliance on

5  Mr. Kozohorsky having allegedly committed marital rape.

6    A.  Okay.

7    Q.  You'd agree that you rely heavily on this, right?

8    A.  I don't rely heavily.  It's certainly a factor.

9    Q.  Would it surprise you that you mentioned it no

10  fewer than eight times in your report?

11    A.  That's certainly possible.  I haven't counted.

12    Q.  So I want to focus on your support for this.

13  You're aware that he's never been convicted of marital

14  rape, right?

15    A.  Yes.

16    Q.  You're aware that he's never been charged with

17  marital rape, right?

18    A.  Correct.

19    Q.  You're aware that his wife has never actually

20  accused him of marital rape, right?

21    A.  To my knowledge, yes.

22    Q.  So let's look at where that comes from.  In your

23  report on page 3 under relationship and sexual history,

24  that's the first time that you make note of this

25  allegation.

1    A.  Correct.

2    Q.  And you cite a 2004 sex offender screening and

3 risk assessment done by the Arkansas Department of

4 Corrections.  Do you see that?

5    A.  Yes.

6    Q.  And it says "where the inmate reportedly admitted

7 to 'forcing his wife to have sex with him against her

8 will.'"  Do you see that?

9    A.  Correct.

10    Q.  And for that proposition, you were relying on the

11 PSR, which is what you had at the time, right?

12    A.  I'm relying on the PSR author's scription or

13 inclusion of the 2004 screening.

14    Q.  That's right.  And so turning to the PSR, that's

15 Government Exhibit 7, and that's paragraph 50 of that

16 report which is at page 12 to 13.

17    A.  Okay.

18    Q.  And that's a summary of the September 20th, 2004,

19 risk assessment authored by George Simon.  Do you see

20 that?

21    A.  Yes.

22    Q.  And that's where you're citing it to, right?

23    A.  Yes.

24    Q.  Did you notice that Mr. Kozohorsky objected to

25 the information in Dr. Simon's report as being untrue?

```
 1    That's at page 19 of the same exhibit.  Did you notice
 2    that he objected to that?
 3              THE COURT:  It's also in the same paragraph
 4    on page 13.
 5              THE WITNESS:  Oh, okay.
 6              MS. SHEA:  Yes, Your Honor, it is.
 7    BY MS. SHEA:
 8       Q.  It's also in that same section and it's in the
 9    addendum.
10       A.  Okay, that he indicates the information in this
11    paragraph is unreliable and untrue, yes.
12       Q.  You chose not to include that in your report,
13    right?
14       A.  Clearly, I didn't.  Yes.
15       Q.  And so you actually tried to seek out the
16    documentation of this, right?
17       A.  Yes.
18       Q.  But you couldn't receive any additional records
19    when you attempted to contact the probation officer and
20    the U.S. Attorney's Office, right?
21       A.  Correct.
22       Q.  So let me bring you to Government Exhibit 20.
23       A.  Okay.
24       Q.  Have you since had a chance to review this?
25       A.  Yes.
```

1     Q.  Do you see that it's titled "Sex Offender

2   Screening and risk assessment"?  It's dated September

3   20th, 2004, and has a signature line for Dr. Simon.

4     A.  Yes.

5     Q.  Please highlight in this report where it says

6   that Mr. Kozohorsky admitted to engaging in marital

7   rape.

8     A.  I don't see it -- I don't see it listed in that

9   screening but that -- it doesn't look -- I was looking

10  to see if the information in that screening matches what

11  was listed in the PSR.  I was actually, when I saw this

12  record, surprised that it was only one page, so I didn't

13  know if there was more to it or not.

14    Q.  Have you seen any other pages?

15    A.  I have not.

16    Q.  Are you aware of any other documents with that

17  title?

18    A.  Not in the materials that I've received, no.

19    Q.  And so you don't know what the PSR is citing to,

20  do you?  Well, it's citing to a document that doesn't

21  say it, right?

22    A.  If that's what it's referring to, if it's

23  referring to this one specific page, then no, I don't

24  see it in the actual risk assessment.

25    Q.  Does that cause you to change your opinion about

 1    including that allegation?  Because the PSR is citing to

 2    an assessment that doesn't say what it purports to say?

 3        A.  I was trying to think if there was anyplace else

 4    that I remember seeing that information or cited it.  So

 5    if the information came exclusively from the PSI quoting

 6    that document, and that is the only document and it's

 7    not in there, then perhaps that is inaccurate

 8    information.  I don't -- perhaps it is.  I don't know if

 9    there's anything else that supports that.

10        Q.  Let me ask you about another quote.  This is also

11    from the PSR's summary, I guess, of this assessment, and

12    this one actually is a verbatim quote.  So it's this

13    sentence in the 2004 assessment.  I'm in Exhibit 20.

14        A.  Okay.

15        Q.  Under "Aggravating/Mitigating Factors," and so it

16    says, "There is ample credible documentation that he has

17    committed even more such acts than his official

18    conviction record reflects."  Do you see that?

19        A.  Yes.

20        Q.  And you actually quote that repeatedly in your

21    report as well.

22        A.  Yes.

23        Q.  Sitting here today, do you know what is the

24    credible ample documentation that this 2004 author is

25    relying on?

1    A.  No, I don't.

2    Q.  And in light of the fact that you don't know what

3    the author is relying on, would you like to amend your

4    opinion to not rely on it?

5    A.  So the reason I'm hesitating is because -- so I

6    get what you're saying.  Yes, I don't know for a fact

7    where they got this credible documentation from.

8    Because this was a report written by somebody in the

9    Arkansas DOC, I don't know if they had access to

10   something else that I haven't seen.

11       I would say, though, that based on the fact that

12   he's had five -- whether he calls them allegations or

13   not, and we consider the fact that most rapes go

14   unreported, I would almost argue that there's probably

15   some behaviors he's engaged in that we don't know about.

16   And he even during his deposition made a remark that --

17   I think it was when he was arrested for the offense

18   against maybe Nadine or -- but anyway, that it went out

19   on the radio that he had been arrested for this and that

20   multiple women came forward and accused him of rape.

21       So again, I know that's -- is that not -- it's

22   not credible, it's not solid, but do I take it into

23   consideration and do I take into consideration that he

24   probably has committed offenses that we don't know

25   about?  I do think that there's a good likelihood of

1  that.

2      Q.  That's pure speculation, though, right,

3  Dr. Graney?

4      A.  Based on -- well, it is, but based on the fact

5  that, again, there are a large number of sexual assaults

6  that go unreported.  I don't think every victim has come

7  forward.

8      Q.  But we're in the business of clear and convincing

9  evidence, right?  So where is the clear and convincing

10 evidence that this author in 2004 -- what is he relying

11 on?  Do you know?

12     A.  Well, so then --

13     Q.  And do you -- sorry.  I'm sorry.

14     A.  That's okay.

15     Q.  And do you choose to rely on that unknown

16 documentation, sitting here today?

17     A.  So am I assuming that -- I'm assuming if another

18 clinician puts this in their report that they have

19 credible documentation, that they've done something to

20 make sure that that is, in fact -- whether it's a police

21 report or some sort of narrative, I'd assume there's

22 something there for them to include that.

23     Q.  You assume but you don't know, right?

24     A.  I don't know.

25     Q.  And you don't know what he looked at, right?

1    A.   I don't know what he looked at.

2    Q.   And so my question is are you choosing to rely on

3    these unknown mystery documents?  Is that what you

4    choose to do today?

5    A.   I'm relying on another clinician that says they,

6    in fact, have information that says there were other

7    credible assertions, I guess, credible documentation

8    that he's committed other acts.

9    Q.   I'm gonna move on to the 2010 accusation by

10   Christine Harvey.  Would you agree that you rely heavily

11   on this accusation?

12   A.   Again, I didn't rely heavily on it because there

13   were no -- she just said she was sexually assaulted.

14   There were no details as to the sexual assault.

15   Q.   Would it surprise you if you noted that

16   accusation no fewer than 12 times in your report?

17   A.   That's possible.  I am repetitive in my reports.

18   Q.   Would it surprise you that it was in your final

19   prognosis paragraph and your penultimate serious

20   difficulty refraining paragraph?  Would that surprise

21   you?

22   A.   No, it wouldn't surprise me.  I mean, I

23   considered all factors that went into my opinion.

24   Q.   So you're aware that he was never convicted of

25   that sexual assault, right?

1    A.  Correct.

2    Q.  You're aware that he was never even charged with

3    that sexual assault, right?

4    A.  Correct.

5    Q.  And you're aware, I believe you noted it in your

6    direct testimony, that the government conceded that that

7    enhancement did not apply -- right? -- at his sentencing

8    for his SORNA offense.  There was a six-level

9    enhancement for committing a sex act while in failure to

10   register status that was withdrawn.

11   A.  Yes.  And I don't know why they conceded, but

12   yes, they conceded.

13   Q.  And you actually tried to find out why, right?

14   A.  Correct.

15   Q.  And you called the U.S. Attorney's Office, right?

16   A.  Correct.

17   Q.  And the AUSA who handled the case had become a

18   magistrate judge, right?

19   A.  Yes.

20   Q.  So you talked to someone else, right?

21   A.  Yes.

22   Q.  And he said he didn't know why -- right? -- it

23   was withdrawn.

24   A.  Correct.

25   Q.  That's what he said, right?

1      A.   Yeah.

2      Q.   So that doesn't really move the needle anyway,

3  right?

4      A.   Correct.

5      Q.   But despite the government conceding this

6  enhancement didn't apply, despite him never being

7  charged, you mentioned it 12 times in your report,

8  right?

9      A.   Mm-hmm.  He's somebody that at that point had

10  already had three convictions, and what I would argue

11  was yet another attempted assault.  So it's not like

12  this was the first woman to ever accuse him of sexual

13  assault.

14      Q.   Let me have you turn to Government Exhibit 10.  I

15  know you didn't have this at the time that you wrote

16  your report, but have you since had a chance to review

17  it?  It's the police report from 2010.

18      A.   Yes.

19      Q.   On the first page, this is in the "Incident

20  Narrative" section, it just says that she was sexually

21  assaulted and choked several times by Mr. Kozohorsky.

22  Do you see that?

23      A.   Yes.

24      Q.   And then the whole rest of the time -- the whole

25  rest of this paragraphs all talk about a physical

1  assault.  Do you see that?

2     A.  Correct.

3     Q.  You'd agree that "sexual assault" is a really

4  broad term, right?

5     A.  Correct.

6     Q.  Encompasses everything from a forceable rape to

7  an unwanted pat on the rear end, right?

8     A.  Yeah, yes.

9     Q.  So there's no details about what even was

10  alleged, right?

11     A.  Correct.

12     Q.  At all.  I want you to look at the first page of

13  this report under "Offenses."  Do you see that?

14     A.  Under what now?

15     Q.  "Offenses."

16     A.  "Offenses."

17     Q.  It's like --

18     A.  Okay.

19     Q.  -- a gray kind of section.  And it lists three

20  offenses that were being investigated:  assault,

21  unlawful use of a weapon, armed criminal action.  Do you

22  see that?

23     A.  Yes.

24     Q.  It doesn't even include sexual assault.  It

25  doesn't even include rape.  Do you see that?

1    A.  Yes.

2    Q.  Do you find it unusual that someone with three

3    rape convictions would not be charged with rape by

4    officers confronted with credible evidence of a rape?

5    A.  Can you repeat that?

6    Q.  Do you find it unusual that someone with three

7    rape convictions would not be charged with rape by

8    officers confronted with credible evidence of rape?

9    A.  Do I find that unusual?  I probably would find it

10   unusual.  I don't know all the ins and outs of how the

11   police do their business, but yes, I would say generally

12   I would find that unusual.

13   Q.  I'm gonna move to the 2006 offense.  That's the

14   offense involving a woman named Linda, right?

15   A.  Correct.

16   Q.  And you've heard Mr. Kozohorsky testify, and in

17   his interviews with the other examiners he vehemently

18   denies this offense, right?

19   A.  Correct.

20   Q.  And he claims that this was -- this encounter was

21   recorded by him, right?

22   A.  Yes.

23   Q.  And that the recording would exonerate him,

24   right?

25   A.  Yes.

1    Q.  You're aware that Linda initially claimed that

2  Mr. Kozohorsky anally raped her four times, right?

3    A.  Correct.

4    Q.  And that initially he was charged with four

5  counts of forceable rape, right?

6    A.  Yes.

7    Q.  And you're aware that Mr. Kozohorsky accepted a

8  plea agreement with a suspended sentence, right?

9    A.  Yes.

10    Q.  And that the plea agreement was to attempted rape

11  and not rape, right?

12    A.  Yes.

13    Q.  In your opinion, as someone who's evaluated a lot

14  of sex offenders, is it unusual for you to see a

15  three-time rape offender get a suspended sentence?

16    A.  You know, I really can't say.  Most of the

17  individuals I evaluate are not for sexual assaults.

18  Most of them are involving children.  So we don't see a

19  lot of these, or at least I didn't when I was in the

20  Bureau.  I can't say why that might have been pled down

21  to an attempted rape.

22       I'm looking -- I understand there are all sorts

23  of things that can happen legally with things that I'm

24  not familiar with.  But, clinically, when I'm looking at

25  a case, I'm looking at a pattern of behaviors and is it

1    reasonable to believe that this is something that I

2    should consider from a clinical point.

3        Q.  Well, let me ask you this question:  Does the

4    fact that he was able to plead it down to attempted rape

5    cause you to have any hesitation with crediting whole

6    cloth Linda's version of events?

7        A.  Does the fact that it was pled down to attempted

8    make me question her version of events?  But it was

9    still -- whether it was a rape or an attempted rape, to

10   me, doesn't make -- I mean, either -- "attempted," to

11   me, says maybe that it wasn't completed or he was

12   working up to that, but my guess, there was enough there

13   to say that that was his intention.

14       Q.  Does the fact that Mr. Kozohorsky was allowed to

15   plead to a suspended sentence with no active time rather

16   than facing the life sentences that the forceable rape

17   carried cause you to have any hesitation with accepting

18   whole cloth Linda's version of events?

19       A.  Given that -- again, given his history leading up

20   to that, I considered her credible, I guess is all I can

21   say.  I considered it a credible account, and there

22   ultimately was a conviction.

23       Q.  Would you agree that we don't know exactly what

24   happened between Linda and Mr. Kozohorsky?

25       A.  I mean, I don't know the exact series of events.

1  I know there was some degree of to what extent some of

2  it may have been consensual or if they had, you know, to

3  what degree they had a relationship up to that point.

4  But looking now at the records that I've received since,

5  I would say that some of her statements are consistent

6  with his behavior in prior sexual assaults.

7      Q.  Doesn't it matter, though, what specifically

8  happened and how it happened for the purpose of you

9  finding that Mr. Kozohorsky is specifically aroused to

10 nonconsent?

11     A.  I mean, it is important, but I have to work with

12 the information that I have.  I'm not gonna always have

13 every detail.  So I have to take the information that I

14 do have and try to make sense of it from a clinical

15 perspective.

16         Again, I would say that the information I've

17 since received I think adds further support that it was

18 a sexual assault, not to mention that he was ultimately

19 convicted of a sexual assault, or attempted, at least.

20     Q.  Let me ask you a few questions about your

21 diagnostic findings.  You did not offer a diagnosis of

22 sexual sadism, right?

23     A.  Correct.

24     Q.  You did offer a diagnosis of personality disorder

25 not otherwise specified, right?

1    A.  Correct.

2    Q.  And in page 27 of your report, you wrote

3    specifically that that was, quote, "arguably a

4    contributing factor," right?

5    A.  What paragraph are we on?

6    Q.  I think it's the last paragraph on page 27.

7    Yeah.  It's the second to last line of that page.

8    A.  Yeah.

9    Q.  The primary diagnosis that you find supports your

10   opinion is the paraphilia not otherwise specified

11   (nonconsent), right?

12   A.  Yes.

13   Q.  You'd agree that this diagnosis has been

14   specifically rejected by the DSM, right?

15   A.  Yes.

16   Q.  And you acknowledge in your report that men rape

17   for different reasons, right?

18   A.  Correct.

19   Q.  On page 17, you wrote specifically that it should

20   be emphasized that not all individuals who rape, even

21   repeatedly, are considered to have a paraphilia, right?

22   A.  Correct, yes.

23   Q.  And you outlined nine criteria to determine if

24   this applies, right?

25   A.  Guidelines or factors to consider, yes.

1     Q.  And those are from a book authored by Dennis

2  Doren, right?

3     A.  Correct.

4     Q.  Did you reread it recently?  Have you reread it

5  recently?

6     A.  Have I reread it recently?  No.

7     Q.  Would it surprise you if the opening line of that

8  chapter says "This category probably represents the most

9  controversial among the commonly diagnosed conditions

10  within the sex offender civil commitment realm"?

11    A.  No, that wouldn't surprise me.

12    Q.  Do you know of any empirical evidence to support

13  a finding that these specific factors lead to that

14  diagnosis?

15    A.  Do I know of any empirical support to say that

16  these specific factors lead to that diagnosis?  No.

17    Q.  And there's no tool that you can use to say that

18  these factors are present, right?

19    A.  Correct.

20    Q.  You testified one of the factors that you found

21  to apply to him was that he had access to consenting

22  partners, right?

23    A.  Correct.

24    Q.  And in your testimony, you are crediting his

25  deposition testimony that he had access to consenting

1 partners, right?

2    A.  Correct.

3    Q.  There's no way to truly know if he was more

4 aroused by the rapes that he committed than by sex with

5 consenting partners that he had, is there?

6    A.  Is there a way to know if he was more aroused by

7 the nonconsensual?  Well, I would argue that if he had

8 consensual sexual partners, the fact that he was going

9 out and engaging in forced, violent, clearly

10 nonconsensual sexual encounters, whether it was to a

11 greater degree than the sexual, he -- still getting some

12 satisfaction from that.

13    Q.  I guess my question is there's no way to know

14 that it was a -- that he was more aroused to

15 nonconsensual sex than he was to consensual sex.

16 There's no evidence.  There's no way to prove that.

17    A.  If not more aroused, I would argue equally

18 aroused because he was able to complete the sexual act

19 and -- so he maintained arousal, certainly.  There's no

20 evidence that it diminished his arousal.

21    Q.  One of the offense descriptions that you have in

22 here, it's on page 7.  You're quoting a police report

23 from the '89 offense.  And in that -- it's kind of like

24 the indented block quote.  It says, "He also said that

25 he had been wanting her for years, and if he had to rape

1  her, he would."  Do you see that?

2    A.  Yes.

3    Q.  Doesn't that sort of indicate that he preferred

4  not to rape her, and he would only rape her if he had

5  to?

6    A.  Well, this was one statement with this one

7  victim, but there are, again, the other sexual offenses

8  of a similar nature.

9    Q.  I was just asking about that statement, though.

10    A.  Yeah.

11        MS. SHEA:  Can I have just one moment, Your

12  Honor?

13        THE COURT:  You may.

14        MS. SHEA:  Thank you, Your Honor.  Those are

15  my questions.

16        THE COURT:  Dr. Graney, I'm gonna ask a

17  hypothetical -- there's no evidence that this Court

18  finds credible regarding the 2006 event, particularly

19  given the audiotape that's been mentioned.  If the Court

20  discounts that event, doesn't the significant additional

21  period of time without offense in the community, does

22  that make a difference to you at all?  And,

23  hypothetically, if you were to discount that, say, "I

24  just don't believe that event occurred the way it's been

25  categorized," that is I hypothetically changed it, just

1  say it doesn't exist, what effect would that have on

2  your opinion?

3            THE WITNESS:  So not -- so you're not

4  referring to the 2010, you're referring to the 2006.

5            THE COURT:  The one where -- I think it's

6  C.H. is the victim.

7            THE WITNESS:  Oh, C- -- okay.  So the

8  2010 --

9            THE COURT:  Is it 2010?  I misstated the

10  date.  I'm sorry.

11            THE WITNESS:  Yeah.  No, I just wanted to

12  make sure I understood you correctly, Your Honor.  So I

13  do cite it in the report.  If you were to remove that,

14  would it change my opinion?  It would not.  Because

15  again, prior to that, he's had these repeated incidents

16  of, again, violent sexual assaults, consequences,

17  reoffending not long after, and kind of very same

18  method, so...

19            THE COURT:  So it's additional weight but

20  not decisive.

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Thank you.  Redirect?

23            MS. PRATESI:  Just briefly, Your Honor.

24                    REDIRECT EXAMINATION

25  BY MS. PRATESI:

1    Q.  Dr. Graney, a very similar hypothetical question.

2  If there was no evidence, or if we somehow had

3  conclusive evidence that there was no marital rape,

4  would that change your opinion in this case?

5    A.  Again, no.  I mean, if it's there, that's

6  certainly, to me, a supporting factor.  But if you take

7  that out, he's had, again, still multiple victims

8  outside of that, so -- so no.  You know, he made some

9  statements in that '95 letter about his sexual

10  interactions with his wife.  To what extent those were

11  consensual or not, I have no idea.  But yes, even if you

12  remove the marital rape, I still would say there's

13  enough there to say that the diagnosis is still there

14  and the risk is still there.

15            MS. PRATESI:  Thank you, Dr. Graney.  No

16  further questions.

17            THE COURT:  Redirect?

18            MS. SHEA:  No, thank you, Your Honor.

19            THE COURT:  Thank you, Dr. Graney.

20            THE WITNESS:  Thank you.

21            MS. PRATESI:  Your Honor, the government has

22  no further witnesses.

23            THE COURT:  Okay.

24            MS. COSTELLO:  Your Honor, we call

25  Dr. Leonard Bard.

```
 1                    THE COURT:  I'll ask the parties, if they
 2       know, does anybody know if there exists a copy of that
 3       audiotape?
 4                    MS. COSTELLO:  We have no --
 5                    THE COURT:  You may step forward, Dr. Bard.
 6       I'm sorry.  I was just doing it while you were walking
 7       up.  I'm sorry.
 8                    MS. COSTELLO:  We don't have a copy of it at
 9       this time, Your Honor.
10                    THE COURT:  Okay.
11                    MR. BREDENBERG:  And, Your Honor, we were
12       unable to verify whether it actually existed.
13                    THE COURT:  Okay.
14                    THE CLERK:  Please raise your right hand and
15       state your name for the record.
16                    THE WITNESS:  Leonard Alan Bard.
17                    (The witness was placed under oath.)
18                    THE COURT:  Dr. Bard, for the record, is
19       accepted as an expert.
20                    MS. COSTELLO:  Your Honor, before I begin,
21       the Court mentioned -- there was some confusion about
22       whether the audiotape is related to '06 or 2010.  They
23       relate to the 2006 attempted rape case, not the 2010
24       incident regarding Christine Harvey --
25                    THE COURT:  Okay.  We used six different
```

kinds of names and initials and everything else.  I
thought it was the '06 incident that the audiotape
related to.  I'll go back through and reread everything.

    MS. COSTELLO:  I just wanted to make sure it
was clear.

    THE COURT:  And the 2010 incident was the
incident that resulted in the broken arm.  There's no
audiotape of those incidents.  The 2006 is the
allegation of rape that was audiotaped.  I've read the
letters that are in the defense submission sent by this
defendant to his sister and by the sister back.  So I'm
familiar with --

    MS. COSTELLO:  Thank you.

    THE COURT:  That they clearly constitute
Brady, and there appears to have been some significant
problem in state court regarding their understanding of
what constitutes Brady at the time that case was being
prosecuted.

    All right.  Your witness.

    MS. COSTELLO:  Thank you, Your Honor.

        DIRECT EXAMINATION

BY MS. COSTELLO:

  Q.  Good afternoon, Dr. Bard.

  A.  Good afternoon.

  Q.  Have you been qualified as an expert here in Adam

1    Walsh Act cases in the Eastern District of North

2    Carolina before?

3       A.  Yes, I have.

4       Q.  And are you on the court-appointed list as well?

5       A.  I am.

6       Q.  Have you also testified in state court -- I'm

7    gonna call them SVP cases?

8       A.  I have.

9       Q.  In what jurisdictions?

10      A.  Massachusetts, New York, New Hampshire, Virginia.

11   Those are the state courts.

12      Q.  And how long have you been doing sex offender

13   risk assessments?

14      A.  Since 1986.

15      Q.  I'm gonna ask you, in the binder in front of you,

16   turn to Respondent's Exhibit 4, which is the second 4.

17      A.  Yes.

18      Q.  What is that?

19      A.  This is a copy of my CV, or my resume.

20      Q.  Okay.  And I'm gonna ask you, does it appear to

21   be accurate?

22      A.  It does.

23      Q.  I'm gonna ask you to turn to one exhibit forward

24   to Respondent's Exhibit 3.  What were you asked to do in

25   this case?

         A.  I was asked to conduct a forensic psychological

evaluation of Mr. Kozohorsky and to answer the questions

in the Adam Walsh Act that have been referred to

earlier.

         Q.  And did you ultimately reach an opinion?

         A.  I did.

         Q.  And does the document labeled Respondent's

Exhibit 3, is that a report that reflects your opinion?

         A.  It does.

         Q.  What is that opinion?

         A.  My ultimate opinion is that Mr. Kozohorsky is not

now a sexually dangerous person.

         Q.  And so I want to walk through each of the, quote,

prongs.  The respondent, we stipulated to the first

prong but I did want to ask you -- there's been a lot of

talk about five separate allegations.  For purposes of

your evaluation, which allegations or which offenses did

you rely on to satisfy the first prong?

         A.  I rely on the three separate convictions for

sexual offenses; I believe 1987, 1989, and 2006.

         Q.  Okay.  So I want to move directly into -- well,

let me ask you this:  Why did you not make a finding as

to the other two allegations?

         A.  I tend to rely on the most reliable information I

can when I conduct any forensic psychological

evaluation. A conviction, to me, is a reliable indication that the individual has either pled guilty or has been found to have committed a sexual offense.

Allegations are allegations, and I don't credit them unless the individual has acknowledged them. Charges that do not result in convictions are a little more problematic in general. But my training is that I am supposed to rely on the most certain information, the most conclusive information, whenever I do evaluations.

Q. Okay. So I want to move to the second prong, whether Mr. Kozohorsky suffers from a serious mental illness, abnormality, or disorder. In your opinion, does he have a serious mental illness, abnormality, or disorder?

A. No.

Q. Did you diagnose a paraphilic disorder?

A. I did not.

Q. You note on page 9 of your report that Drs. Hastings and Graney diagnose other specified paraphilic disorder (nonconsent). Can you sort of summarize why you did not offer that diagnosis?

A. There are many reasons why I did not. I think the first and foremost is that it is not a legitimate and accepted diagnosis. It is not part of the Diagnostic and Statistical Manual Version 5, or actually

any other one before that, that is accepted by
psychiatrists, psychologists, social workers,
psychiatric persons, and other mental health
professionals.

In fact, it was specifically rejected by the
DSM-5 in 2013, not only from the Manual itself but from
the appendix which lists conditions for further study.
It was totally rejected, period.  And to say that this
is a legitimate diagnosis, when it is exactly the same
thing that was rejected by the APA, the American
Psychiatric Association, to me, raises a lot of
questions.

The other major issue, and I have many issues
with this, is that there are no criteria.  You can't
diagnose something that doesn't have criteria.  If I
think a patient comes to my office and is depressed, I'm
going to look in the Diagnostic Manual to see if they
meet the specific criteria for a diagnosis of a major
depressive disorder or a dysthymic disorder or a bipolar
disorder because all of those are in play.

We don't have that here.  We have nothing.  There
is not a single empirically validated indication of a
paraphilia that involves nonconsent, period.

Q.  So I want to draw your attention to pages 9 and
10 of your report.  You list out there, sort of, five

1  factors, and I want to walk you through them.

2      At the top of that page, you write -- it's the

3  second full sentence on page 9.  You write:  In my

4  opinion, such a diagnosis of other specified paraphilic

5  disorder (nonconsent) is both unreliable and

6  inappropriate both in general and specifically.

7      So I want to sort of walk you through these

8  factors.  In the third paragraph on page 9 you begin by

9  stating that, quote, the other specified category in the

10  DSM-5 has less construct and discriminative validity

11  than diagnostic categories for other psychiatric

12  disorders.  Can you explain what that means?

13  A.  Well, as I indicated afterwards, this has to do

14  with the lack of any clear diagnostic indicators.  There

15  are no criteria here.  So when I talk about the absence

16  of reliability, reliability means that two independent

17  examiners looking at the same set of facts, same data,

18  should come to the same conclusions.

19      There's actually been some research that has been

20  done in the SVP world that has looked at this, quote,

21  diagnosis, and the reliability coefficient, which is

22  called kappa, for this was something in the .3 range, as

23  opposed to, for example, pedophilia, which is much more

24  easily diagnosed, which is in the .7 range.

25      Now, rather than bogging this down with numbers,

basically what that means is that people can't agree on

what this is.  And if you can't agree on what this is,

then you can't diagnose it reliably because, again,

there are no specific criteria.

Going back to the depression example, if the

individual says they have symptoms of hopelessness and

helplessness and loss of interest in activities and

suicidal ideation, we know that those are -- those have

been associated with the diagnosis of depression.

We have no criteria that have been found to be

associated with the nonconsent diagnosis, the paraphilic

coercive disorder, whatever we want to call it.  There

is still no criteria, which makes diagnosing it both

unreliable and invalid.

Q.  So when you talk about validity in the last

sentence of that third paragraph, you note that the

diagnosis lacks the reliability and also the validity

that indicates that it is actually measuring a genuine

construct.  Can you explain what that means?

A.  Right.  Because there's no criteria, why can't we

say that every rapist who commits multiple sexual

offenses has this paraphilia?  Rape, by definition, is a

nonconsenting event.  So anyone who commits this and who

is able to maintain an erection and ejaculate

automatically shows arousal to, quote, nonconsent.

1           Well, unfortunately, that's what rape is, and

2    unfortunately it's out there.  And I simply have no idea

3    after 35 years of doing this what would differentiate

4    your, quote -- I apologize -- typical rapist or

5    nonparaphilic rapist from this paraphilic rapist.

6    There's no way of distinguishing it.

7       Q.  So I want to move into the second of your -- the

8    problems you list with the diagnosis, and that's on the

9    last paragraph there on page 9.  It says, "Second, given

10   the above problems with both reliability and validity,

11   the notion of a nonconsent paraphilia cannot be utilized

12   to differentiate among various sexual offenders."  What

13   do you mean by that?

14      A.  Well, as I said -- I think I already talked about

15   that before you asked me.  This really has to do with

16   how do we know, how do we differentiate.  I mean, how do

17   we know that all offenders are not paraphilic?  Because

18   again, if you can commit a rape, then you are showing

19   arousal to what is clearly a nonconsenting act.

20          But to say that this represents a paraphilia,

21   which has never been found in the research and never

22   been found in the Diagnostic Manual, is really a reach

23   and really is not supported anywhere.

24      Q.  And you go on in that paragraph to note that all

25   victims of sexual offenses are nonconsenting by

1   definition.  Is that an important point to your

2   analysis?

3       A.  Exactly.  As I indicated, rape is a nonconsensual

4   act, and the victims are not consenting.  If the victims

5   consent, then it isn't rape.  So I don't want to keep

6   saying the same things but, you know, this is what

7   rapists do.

8       Q.  Are you aware of any empirically validated way to

9   determine if a person is specifically aroused to

10  nonconsent?

11      A.  The only way that I am aware of is via statements

12  that the individual has made toward that or behaviors

13  that would clearly be indicative of that.  The problem

14  is, again, just become someone commits rapes, that

15  doesn't mean that they did it for a paraphilic reason.

16  We know that individuals rape for a variety of different

17  reasons.

18          And, in fact, if I can talk about this for a

19  little bit now, we were actually involved at the

20  Massachusetts Treatment Center many years ago in

21  research that looked at subtypes of sexual offending.

22  We were trying -- this was very early on, there was not

23  much research that was done at the time -- trying to

24  understand why offenders offended.  And we came up with

25  various subtypes, and other groups have also looked at

1   subtyping.

2        In all the research that I'm aware of on

3   subtyping that looked at issues like control and power

4   and anger and sadism, there's never been a specific

5   subtype postulated that is nonconsent.

6   Q.  And when you say "subtypes," you mean subtypes of

7   rapists?

8   A.  Subtypes of rapists; basically trying to

9   understand why offenders offend.  And again, some do it

10  because they seek control or seek power or displacing

11  anger.  Some are impulsive and opportunistic, but

12  there's never been a subtype that's been proposed that

13  is, quote, nonconsent.  And I think that's because

14  they're all nonconsent, because rape is nonconsent.

15           THE COURT:  I'm gonna interject a question

16  here because I think it fits here.

17           There are translation problems between the

18  legal discourse and the psychological discourse.  But is

19  this problematic because it proves too much?  That is,

20  anybody who is a serial rapist has something wrong with

21  them.  That is, they engage in serial rape.  Right?

22  There is a problem with somebody who's going to engage

23  in serial rape, and whatever the subtype is doesn't

24  matter legally.  If that person is dangerous because

25  they have a mental defect, that gives them a propensity

1   to repeatedly engage in rape.

2              So my question is, while the paraphilia --

3   that is, I am specifically aroused by the act of

4   nonconsent -- might be a subdivision, isn't serial rape

5   itself, while not clinical, sufficiently a problem that

6   we might look at it as a mental disease or defect?

7              THE WITNESS:  It is an enormous problem and

8   it is a criminal act, but no, sir, it is not a

9   paraphilia.  It's never been identified as a paraphilia.

10             THE COURT:  I understand that, and that's

11  within the psychological discourse, and they're not the

12  same thing.  I think the two disciplines are orthogonal;

13  they touch at points but they're not trying to solve the

14  same problem.

15             Thank you.  I understand your answer, and

16  I'll move on.  I'll allow you to move on.

17  BY MS. COSTELLO:

18     Q.  So on page 10 you talk about the fact that

19  there's very little support in the scholarly literature

20  for the existence of a paraphilia that postulates sexual

21  arousal to the nonconsent of victims in a sexual

22  assault, and you mentioned two articles in that

23  paragraph.  Can you explain, sort of, what this

24  scholarly literature says about sexual arousal to

25  nonconsenting victims?

1    A.  What the research has shown is that there really

2  is no empirical research that supports the finding that

3  there is a subtype of offenders that are specifically

4  aroused to nonconsent.  As I indicated earlier, rape is

5  a nonconsenting offense and -- but we have never been

6  able to find individuals who are specifically aroused to

7  that.  The research that Dr. Hastings talked about, the

8  PPG research, one, it's 20 years old and it hasn't been

9  replicated, and it did find arousal to, basically, rape

10  scenes.  But arousal to rape scenes is found in normal

11  men and women.  That by itself does not tell us anything

12  about a specific group of offenders who are more aroused

13  to nonconsent or less aroused to nonconsent.  You know,

14  again, we come to the same problem.  How do you

15  differentiate a nonparaphilic rapist from a paraphilic

16  rapist?  Because rape is unfortunately very frequent, I

17  mean, and clearly, based on laws like this, the number

18  of rapists with mental diseases, defects, disorders, is

19  very low.

20         So how do we find those individuals?  And I know

21  we've talked about those signs that Dr. Doren have, you

22  know, postulated.  But here again, that's speculation on

23  his part in a book that was not peer-reviewed in 2002.

24  And there simply has been no further research that has

25  been done.  As Your Honor said, you could come up with

similar things today. I could. I could sit here and
name four other things that might be related, and
they're just as useless as the other nine because I
could -- because I have experience in this field but I
don't have the ability to say positively that this is
what is related here. It takes time, it takes research,
it takes effort to ground a theory, let's call it, in
research, in research findings.

Q. So have you read that book by Dr. Dennis Doren?

A. Yes.

Q. And are you familiar with the factors that were
testified to by Drs. Graney and Hastings that can be
considered when determining whether a person is
specifically attracted to nonconsent?

A. Yes.

Q. Are you aware of whether Mr. Doren cites any
research or studies in support of each of those nine
factors?

A. As far as I can recall, Dr. Doren does not cite
any empirical research. This is his way -- and he's
fairly open about it -- he is making up a disorder to
account for the fact that there's no paraphilic rape
disorder in the Diagnostic Manual. He was very upfront
about that.

Q. Are you aware of whether any research has been

1  done on those criteria since the publication of that

2  book?

3     A.  I am not aware of any research that has been done

4  to validate any of those nine factors in terms of trying

5  to predict a or to identify a paraphilic rape diagnosis.

6     Q.  And so I'm gonna ask you specifically about each

7  factor.  Are you aware of any research that demonstrates

8  a link between signs of sexual arousal during a rape,

9  such as ejaculation and attraction to nonconsent?

10    A.  No.

11    Q.  Do you think that signs of sexual arousal during

12  a rape, like ejaculation, provides evidence of a

13  specific attraction to nonconsent?

14    A.  Virtually every rapist I've ever evaluated has

15  shown signs of sexual arousal during the commission of

16  that rape.  Therefore, it becomes a meaningless factor

17  because if everybody has it, it doesn't discriminate.

18    Q.  Are you aware of any research that demonstrates

19  that a repetitive action across rapes is evidence of an

20  attraction to nonconsent?

21    A.  No.

22    Q.  Do you think that repetitive patterns of action

23  across rapes are compelling evidence of an attraction to

24  nonconsent?

25    A.  The only research that has been done, or the only

findings that have to do with that, have to do with

sexual sadism.  Sexual sadists tend to create scripts or

certain scenarios that they continually act out; might

be abducting a victim into a certain place or having

them wear certain clothing.  Those are the kinds of

repetitive scripts that we've seen in this field.  But

in terms of nonconsent, no.

Q.  Dr. Hastings talked about, sort of, the agnostic

continuum between a nonconsent paraphilia and sexual

sadism.  Do you recall that?

A.  Yes.

Q.  And he testified that that idea came from Ray

Knight, right?

A.  Yes.

Q.  Are you familiar with Ray Knight?

A.  Yes.  I know him well.

Q.  How?

A.  He was my advisor in college.  I did my senior

honors thesis with him.  I have published with him.

Q.  And can you sort of explain whether that -- how

that idea of an agnostic continuum fits or doesn't fit

with this case?

A.  Well, Dr. Knight has done incredible research in

this field, but he will be the first to tell you, as he

has told me and other courts, that a paraphilia with

nonconsent does not exist.  He testified in a hearing in
-- actually, in two hearings in -- I'm sorry -- in New
York, arguing against the general acceptance of OSPD
nonconsent.  I was involved in both of those cases.  We
both testified.  And in both cases the Courts found that
nonconsent was not -- it did not reach a level of
general acceptance and would not allow it in.

So Ray Knight has been very clear all along about
the problems with any nonconsent diagnosis.

Q.  So you just sort of testified to this.  Is there
controversy over the diagnosis within the specific field
of sex offender risk assessment?

A.  Yes and no.  Yes, because clearly here my
colleagues have opined that this is a legitimate
diagnosis; no, because it's been rejected already ten
years ago by APA, American Psychiatric Association.  It
has been rejected in various jurisdictions as not
reaching a level of general acceptance.

Q.  You might have just mentioned this, but is the
diagnosis accepted in other jurisdictions in which you
practice?  You talk about this in your report as well.

A.  The two jurisdictions in which I practice the
most, New York and Massachusetts, in New York it is not
accepted.  It is not allowed in.  In Massachusetts it
is -- I can't remember the last time anyone actually

1   diagnosed that.  I don't think it's ever been

2   specifically excluded, but I think that's because nobody

3   uses it.

4       Q.  So moving back to the Doren factors, are you

5   aware of whether there's any research that indicates

6   that a person's criminal history being virtually all

7   sexual in nature is evidence of an attraction to

8   nonconsent?

9       A.  No.

10      Q.  Do you think that a person's criminal history

11  being all sexual in nature demonstrates that the person

12  or provides evidence that the person is attracted to

13  nonconsensual sex?

14      A.  No.

15      Q.  Why not?

16      A.  Because again, someone's criminal history could

17  involve a number of different sexual types of offending.

18  So if someone commits numerous exhibitionistic offenses,

19  that certainly doesn't mean that they're attracted to

20  nonconsent.  Someone offends against a child, an adult,

21  that doesn't mean that they're attracted to nonconsent.

22          Again, what we know is that people offend for

23  different reasons, and you can't generalize all those

24  things and lump them into this one nonconsent category.

25      Q.  Are you aware of any research that demonstrates

1   that an individual raping when the victim was willing to

2   have consensual sex is evidence of an attraction to

3   nonconsent?

4       A.  No.

5       Q.  Do you think that that scenario, that a person

6   raping when the victim was willing to have consensual

7   sex, provides evidence of a person being attracted to

8   nonconsent?

9       A.  I think out of all of the factors, that's the one

10  that makes the most sense.  But unfortunately, just

11  because something may make sense doesn't mean it's

12  valid.  When I was learning this field in the '80s, we

13  were being taught that denial is a risk factor because

14  it made sense.  If you deny your offenses, if you

15  minimize your offenses, you have to be at higher risk.

16  It made sense.  Turns out the research has shown "not

17  true."  The correlation is pretty much zero, which means

18  it's not for or against.  So while this might make

19  sense, until there's research that says if someone does

20  that, that means they have an attraction to nonconsent,

21  I would just say I don't know.

22      Q.  Are you aware of any research that demonstrates

23  that a short time period after consequences before

24  raping again is evidence of an attraction to nonconsent?

25      A.  No.

1     Q.  Are you aware of any definition that's provided

2  of "a short time period"?

3     A.  No.

4     Q.  Do you believe that a short time period after

5  consequences before raping again demonstrates that a

6  person is attracted to nonconsent?

7     A.  No, not at all.

8     Q.  Why not?

9     A.  Because again, and I apologize for repeating

10  myself, people rape for different reasons.  You could

11  have someone -- and I have had someone who is so angry

12  at everybody that he has repeatedly raped even after

13  being incarcerated, he gets out and he rapes again, and

14  it's clearly a function of anger because the rapes would

15  be precipitated by arguments with family members.  So

16  even though he raped repetitively, it had nothing to do

17  with nonconsent.  And this individual, for example,

18  could not maintain an erection because it was not a

19  sexual -- the sexual drive was not what was driving his

20  offense.  It was the anger.

21        So again, we try not to generalize about these

22  things because there's such a heterogeneity in this

23  field.

24     Q.  Are you aware of any research that demonstrates

25  that an individual raping under circumstances with a

 1  high likelihood for being caught is evidence of an

 2  attraction to nonconsent?

 3      A.  No.

 4      Q.  Are you aware of any definition or criteria for

 5  determining what is a high likelihood or what is a

 6  circumstance with a high likelihood of being caught?

 7      A.  No.

 8      Q.  And do you believe that raping someone under

 9  circumstances with a high likelihood for being caught

10  provides compelling evidence that a person is

11  specifically attracted to nonconsensual sex?

12      A.  No.

13      Q.  Are you aware of any research that demonstrates

14  that an individual raping when he had a concomitant

15  cooperative sexual partner is evidence of an attraction

16  to nonconsent?

17      A.  No.

18      Q.  Do you believe that it provides specific evidence

19  that a person is attracted to nonconsent?

20      A.  No.

21      Q.  Why not?

22      A.  Because here, again, people rape for different

23  reasons.  You try to understand what drove a particular

24  offender at a particular time.  It may have been anger,

25  it may have been control, that the person had a sexual

1   partner and he was being mocked or made fun of, that

2   might fuel anger.  It could be lots of different

3   reasons.  And again, it does nothing specifically to do

4   with the issue of nonconsent, and even more to a

5   paraphilia involving that.

6       Q.  Are you aware of research indicating that an

7   individual having various victims is evidence of an

8   attraction to nonconsent?

9       A.  No, absolutely not.

10      Q.  Do you know what is meant by "various victims"?

11      A.  I don't.  I think Doren talked about having child

12  victims and teen victims and adult victims; but even so,

13  that doesn't tell us anything about the individual.

14      Q.  There was some testimony about Mr. Kozohorsky

15  having victims of various ages.  Do you recall how old

16  he was when he had teenage victims?

17      A.  He was 22.

18      Q.  Is that relevant to you at all in determining

19  whether he had -- I mean, what the significance, if any,

20  of teenage victims is?

21      A.  It would seem to be more of a peer-aged thing

22  than targeting teens.  If he was truly targeting teens,

23  then you would expect all of his offenses would involve

24  teenagers.

25      Q.  Just one last question about these.  Are you

1  aware of any reliable way that exists for an evaluator

2  to measure these nine factors?

3      A.  No.

4      Q.  So we've sort of talked about why it's generally

5  inappropriate.  I want to talk briefly about your

6  conclusion that the diagnosis is not specifically

7  appropriate for Mr. Kozohorsky.  Can you explain why you

8  don't think -- do you believe that there's evidence that

9  Mr. Kozohorsky is specifically attracted to

10 nonconsensual sex?

11     A.  No.

12     Q.  Can you explain that?

13     A.  Here again, I think it stems from my opinion that

14 such a paraphilia doesn't really exist.  Mr. Kozohorsky

15 has given various explanations and versions of events

16 that are not consistent with those of his victims in

17 each of the offenses.  Even though he accepts

18 responsibility for the sexual assault of his first

19 victim, his version of events is not the same in terms

20 of their prior relationships and things like that.

21         It just does not -- the idea that what drove him

22 was some specific arousal to nonconsent really doesn't

23 make a lot of sense.  We obviously don't know exactly

24 what happened in each of the offenses.  There are some

25 that are particularly problematic in terms of the

sentence that he received for the incredibly serious

charges.  I don't know, obviously, and I will not claim

to know.  But even if I accept the victim's version in

every one of those convictions, and even if I accept the

allegations that have been made earlier, it does not hit

me as this is a pattern of offending that's driven by

anything but an antisocial "I want to do what I want

when I want it" kind of thing.

What we know about sexual offenders is that they

come to be sexual offenders in one of two different

ways.  One is from the sexual deviancy range, and one is

the antisocial hostile range.  And looking at his

behavior, he definitely would fall much more on the

antisocial hostility toward women kind of thing.  It's

not that Mr. Kozohorsky should get credit for not having

a paraphilia.  He certainly did horrendous things.  But

it doesn't seem to me that there's any indication that

whatever we want to call it, paraphilic coercive

disorder or arousal to nonconsent, was involved here.

Q.  You testified earlier about statements of

arousal to nonconsent.  Do you see that anywhere in

Mr. Kozohorsky --

A.  I'm sorry, I couldn't hear.

Q.  You testified earlier about statements indicating

arousal to nonconsent.  Do you see that anywhere in

1   Mr. Kozohorsky's -- in the record, that he --

2       A.  No, I don't.

3       Q.  And when looking at whether an attraction to

4   nonconsensual sex is present, did you consider at all

5   the number of consenting victims that he has had over

6   the years?

7       A.  Well, if you are going to opine that a nonconsent

8   paraphilia exists, one of the things in the Diagnostic

9   Manual, it says that the paraphilia needs to be intense

10  or recurrent.  And when you don't have evidence to show

11  that, it should be considered to be the primary means --

12  I'm blanking on the word, I apologize -- oh, the

13  preferential way of the individual obtaining

14  gratification.

15          If we believe Mr. Kozohorsky engaged in multiple

16  consenting sexual partners in his lifetime, multiple

17  prostitutes whom he paid, then he clearly has many more

18  instances of consenting sexual activity than illegal

19  predatory behavior.

20          I don't think that's the be-all and the end-all,

21  but I think that's an important thing.  If someone was

22  only committing offenses and did not have any consenting

23  sexual outlets, you might have an argument that this is

24  the only way that this person can get some sort of

25  sexual or emotional gratification.  When you see sexual

sadists who tend to repeat the sadistic action because that's the specific arousal to violence that they enjoy, you can make some assumptions based on this.  But for someone like Mr. Kozohorsky who, for the past three, four years in the community, by his account, used prostitutes almost exclusively, which by definition is a consenting sexual encounter, would certainly argue against any preferential arousal to nonconsent.

Q.  We've talked a lot about nonconsent.  I want to talk about the other two diagnoses that you mention in your report.  One is an other specified personality disorder with antisocial features.  Did you offer this diagnosis?

A.  I did not.

Q.  Why not?

A.  I did not for two reasons.  First, I clearly believe that Mr. Kozohorsky's past actions, both sexual and nonsexual, are mediated primarily by his antisocial patterns of behavior.  He clearly violated the rules, didn't care about the harm he was causing.  I think that's obvious.

I didn't diagnose it at the present time because the diagnosis of a personality disorder, as was indicated earlier, has to be an ongoing current pattern.  You can't say that Mr. Kozohorsky committed all these

offenses and was clearly antisocial but hasn't shown a
pattern of antisocial behavior for the past 12, 12 to 15
years.  That is consistent with the findings of the
Diagnostic Manual that say for antisocial people, their
symptoms and their behaviors tend to burn out after the
age of 40.  It's not coincidental, I think, in this case
that Mr. Kozohorsky's last conviction for a sexual
offense occurred when he was 41.  And in the 17 years
since, he has not been convicted of a sexual offense.
Obviously he's not been in the community for a majority
of that, but antisocial people still find ways to act
antisocially whether they're incarcerated or not.  I've
seen numerous individuals over my years of doing this
who find ways to manipulate the system and manipulate
lower-functioning individuals in prisons or try to
create false tax returns or have money sent in or sent
out.  There are lots of ways.

        Mr. Kozohorsky hasn't done any of those.  He has
no tickets for the last 12 years.  And moreover, his
current age of 58 argues against that kind of pattern
going forward.  Antisocial people tend to burn out, and
Mr. Kozohorsky seems to be someone who was certainly
that way in the past but is not at the present time; so
therefore, I didn't offer that diagnosis because all
diagnoses have to reflect current patterns.

1     Q.   And so on page 11 of your report, you write

2     "Personality disorders are considered to be inflexible

3     and pervasive across a broad range of personal and

4     social situations.  So one would expect to see that same

5     pattern of antisocial behavior in different situation

6     and environments, including in the community, while

7     incarcerated, at work, and in relationships with

8     others."  Do we see that here?

9     A.   No.  I think we've seen that in the past, but we

10    don't have it now.  In the past, his relationships were

11    clearly problematic.  His criminal behavior was both

12    sexual and nonsexual.  His employment was probably the

13    only solid thing in his life.  But there was certainly

14    problems in the past.  But you know, here again, we

15    can't just say because he had it in the past, that means

16    that he has it now.

17    Q.   Did you offer any diagnosis in Mr. Kozohorsky's

18    case?

19    A.   I did.  I diagnosed him with an alcohol use

20    disorder.

21    Q.   Why don't you believe that this disorder

22    qualifies as a serious mental illness, abnormality, or

23    disorder under the purposes of the Adam Walsh Act?

24    A.   Because alcohol abuse by itself does not

25    predispose anyone to the commission of sexual offenses.

It can certainly serve as a disinhibiting factor, and in combination with other disorders can certainly be more of a problem. But by itself, alcohol abuse does not, in my opinion, conform to what this law talks about, a mental illness, disorder, or abnormality.

Q. I want to move on to the third prong, the serious difficulty prong. So let's assume for purposes of these questions that the Court finds that prong 2, the serious mental illness, abnormality, or disorder is met. What is your opinion on whether Mr. Kozohorsky would have serious difficulty refraining from future acts of sexual violence?

A. My opinion is that he would not.

Q. So before we get into the specifics of your opinion, is there something unique about the federal law in terms of the third prong when you compare it to the state laws in the jurisdictions in which you often work?

A. Yes.

Q. What is that?

A. The federal court talks about an offender who would have, quote, serious difficulty in refraining from sexually violent conduct or child molestation. The states where I have been doing these evaluations don't -- also talk about serious difficulty but in terms of the mental abnormality piece. In the risk piece they

1    talk about a likelihood of someone committing a sexual

2    offense.

3           The reason that that's important is because many

4    of the actuarial tools that others have talked about

5    have to do with a risk prediction, not whether or not

6    someone can show an ability or a serious difficulty in

7    managing their behavior.  They talk about the risk of

8    committing a sexual offense or the likelihood.

9    Q.   I notice that you did score the Static-99.

10   A.   I did.

11   Q.   What score did you attribute to Mr. Kozohorsky?

12   A.   A 4.

13   Q.   And what are the estimated recidivism rates of

14   people who are similarly situated to him?

15   A.   A score of 4 places Mr. Kozohorsky in a group

16   that recidivated at a rate of 9.2 percent over five

17   years.  That is not his risk.  We don't know his risk,

18   obviously.  All the actuarials can ever tell us is what

19   group he falls into and the recidivism rate of that

20   group.  What the 9.2 percent means is that if you follow

21   100 individuals who score a 4 and you follow them for

22   five years, after five years approximately nine of the

23   100 will either be charged or convicted of a sexual

24   offense and 91 of those 100 will not.

25          If we knew which group he would fall into, this

would be easy, but we don't and we can't.  So all we can

say is that he falls in a group that recidivated at a

certain rate, period.  That is all it can ever tell us.

Q.  And what will happen to those recidivism rates as

Mr. Kozohorsky ages?  What generally happens to

recidivism rates as a person ages?

A.  Age has been found to be negatively correlated

with risk.  So as individuals get older, their risk to

recidivating goes down.

Q.  Is there sort of an age at which it's widely

considered to be -- is there support for the idea that

there's a certain age at which recidivism rates, sort

of, are extremely low?

A.  Yes.  For individuals who are released after the

age of 60, the recidivism rate goes down significantly.

The base rate in the research for individuals who have

been released after the age of 60 is approximately 2

percent.

Q.  And, I mean, obviously people are sometimes

released, sort of, not at a magical age, right?

A.  Right.

Q.  Does the literature indicate that risk sort of

generally goes down over time?

A.  It does.  There's actually research that has

shown that there's a 2 to 5 percent decrease per year

over time.  And again, after 60 it tends to drop off
more substantially, particularly for adult rapists as
opposed to pedophiles.

Q.  On page 13 of your report, you talk about
Mr. Kozohorsky's ability to manage his sexual impulses
living in -- either while incarcerated over the past 12
years or in the three years in the community prior to
his federal conviction.  Is it important to you that
there are no allegations of sexual misconduct while he's
been in custody?

A.  Yes.

Q.  Why?

A.  Because if there were allegations, or even more
than that, convictions or proven episodes of sexual
misconduct, then that would indicate to me that
Mr. Kozohorsky continues to have significant problems
managing his sexual urges or impulses, even in a
confined setting.

So not having those and not having any tickets
for any misconduct, sexual, violent, or otherwise, is
certainly a positive prognostic sign.

Q.  What evidence, if any, do you see of the presence
of continued deviant thoughts or present deviant
thoughts?

A.  I don't see any evidence of that.  The problem is

1  we -- other than basing it on his behavior or on things

2  he has said -- we really cannot read minds.  So all we

3  can do is look at his behavior.  And his behavior while

4  incarcerated certainly indicates that he does not -- has

5  not engaged in any deviant conduct.  And for the years

6  before he was incarcerated after his -- the 2006

7  suspended sentence or probation, he certainly also --

8  there were no indications of any convictions or even

9  charges.  I know there was an allegation, but again,

10  that is as -- it's tough to put much credence there.

11      Q.  So I did want to ask you about that.  In that

12  paragraph you talk about him not demonstrating any

13  difficulties managing his sexual impulses in the three

14  years prior to his failure to register conviction.  Did

15  you consider that 2010 allegation of sexual assault?

16      A.  I saw it, but did I consider it as a meaningful

17  thing?  No.

18      Q.  Does it change your opinion at all?

19      A.  No.

20      Q.  Why did you not rely on it?

21      A.  Because there's never been a charge, there's

22  never been a conviction.  Just having an allegation

23  doesn't give me enough information to take this into

24  account in any way.  The fact that he was investigated

25  for other things and not that again argues against it as

1   being a meaningful factor.  I can't say it did not occur

2   because I simply don't know.  But there's no evidence

3   that it did occur, and there was no indication that he

4   was ever charged.

5       Q.  On pages 13 and 14 of your report, you discussed

6   dynamic risk factors.  What is a dynamic risk factor?

7       A.  Risk factors can be divided into two different

8   things.  Static risk factors, things that do not change,

9   those are usually incorporated into the actuarial.  So

10  whether or not Mr. Kozohorsky had an unrelated victim,

11  which he did, or a male victim, which he did not, that

12  is a static risk factor.  That will not change.

13          A dynamic risk factor is a factor that was

14  involved in his offending that contributed to his

15  offending in some way that can change over time.  And I

16  think that's a crucial thing to look at.  But you have

17  to look at it both in terms of what he did then and

18  where he is now; because that's the whole key to a

19  dynamic risk is that it changes over time.

20      Q.  And were you present in the courtroom for the

21  testimony of Dr. Hastings and Dr. Graney?

22      A.  Yes.

23      Q.  Did you hear them discuss dynamic risk factors?

24      A.  I did.

25      Q.  Do you agree or disagree with their analysis of

1   the dynamic risk factors?

2      A.   I agree that some of those dynamic risk factors

3   were important in the past.  But the problem is, from

4   what I heard, they were focused only on the past of

5   those factors and not where he is now.

6         So when someone says resistance to rules or poor

7   cooperation with supervision, he certainly showed that

8   in the past.  He was an antisocial guy, rules didn't

9   matter to him, he did what he wanted to.  But where is

10  he now?  And what we have, and albeit it's not the same

11  as being in the community, we have 12 years of behavior

12  where he's been monitored virtually all the time and he

13  has gotten zero tickets.  So he's certainly able to

14  cooperate with supervision, with officers, with staff.

15  He has not acted out.  It's very easy to get a ticket in

16  federal prison, in state prison.  You can do it by

17  talking back to officers, by not standing for count, by

18  a variety of things.  And the fact that Mr. Kozohorsky

19  has been able to manage those impulses and those

20  behaviors says that he indeed has made significant

21  changes over time.

22     Q.   You also note that he has not endorsed any

23  cognitive distortions relating to his offending

24  behavior.  You were present in court today for his

25  testimony, right?

1    A.  Yes.

2    Q.  And do you consider his denial of the offenses,

3 other than the 1987 rape of Rhonda Horner, to be a

4 cognitive distortion?

5    A.  I don't consider denial to be a cognitive

6 distortion.  He is simply saying the offense did not

7 occur as it was charged.

8    Q.  Other experts note that Mr. Kozohorsky seems to

9 engage in grievance thinking or victim blaming.  Do you

10 agree that those are cognitive distortions?

11    A.  I think if he blames his victims, then yes, that

12 is a cognitive distortion.  Grievance thinking is a

13 vague, not well-defined term that again came from that

14 same meta-analysis that was talked about earlier.  But

15 it's never been validated.  It does not have a high

16 correlation with risk.  In fact, most of the things in

17 the Mann and Hanson meta-analysis do not correlate

18 highly, so I have a problem with that.

19    Q.  So let's say that his grievance thinking and

20 victim blaming are cognitive distortions.  Would the

21 presence of that change your ultimate opinion?

22    A.  No.

23    Q.  You mentioned the 2010 meta-analysis done by Mann

24 and Hanson.

25    A.  Yes.

1    Q.   What did that study find?  What was, sort of, the

2    ultimate takeaway from it?

3    A.   It sought to identify dynamic risk factors in the

4    literature that could be predictive of sex offender

5    recidivism.  The authors caution in that article that

6    this is preliminary and it's subject to further

7    validation.  Unfortunately, they have not published

8    anything after that.  It's been 13 years.  So what we

9    are left with is a set of factors that may be valid, may

10   not be valid, but no one really knows because there

11   hasn't been any follow-up.

12   Q.   There was a lot of testimony about a letter

13   mailed in 1995.  It's at Government's Exhibit 22.

14   A.   Yes.

15   Q.   Do you know the letter I'm talking about?

16   A.   I do.

17   Q.   Does that change your opinion or play a role in

18   your opinion at all?

19   A.   I received that letter after I wrote my report.

20   I had a hard time actually reading it.  It's not very

21   clear.  But no, I certainly don't think it affects my

22   opinion as to whether or not he has a nonconsent

23   paraphilia.  As was noted earlier, a lot of the things

24   in there, while they are graphic and horrible, do not

25   indicate that he was aroused to that.  A lot of the

         things that he wrote, as was said earlier, was his
         belief that his partner was enjoying that.  Maybe they
         were, maybe they weren't.  Maybe it was all in his head.
         I don't know.  But again, that doesn't show anything in
         terms of a nonconsent paraphilia.
             Q.  Do you view Mr. Kozohorsky's lifetime
         registration as a helpful factor in terms of his
         volitional control?
             A.  Yes.
             Q.  Why?
             A.  Because there is research that shows for sex
         offenders in specific and for offenders in general, that
         the presence of supervised probation, supervised
         release, reduces risk.  It allows for an external set of
         controls over individuals who may have some difficulty
         there and allows them to transition more easily into the
         community.  In my experience, the transition is often
         more problematic than it seems, and the more structure
         that an offender has when they leave incarceration, the
         better it is.
             Q.  Does the fact that he was on probation for the
         2006 offense at the time of his 2010 arrest change your
         mind about the helpfulness of the lifetime supervision?
             A.  If he had committed a sexual offense, yes, it
         would change my mind.  But no.  The failure to register

1    is a federal offense, but it's not the kind of offense

2    that gets you to a place like this by itself.

3        Q.   When you were assessing the case, you testified

4    earlier that you assumed or you believed that he

5    committed the offenses to which he pleaded guilty,

6    right?

7        A.   It's not that I believe it.  My beliefs are

8    irrelevant here.  This is not what I think.  I base my

9    evaluation on as many factual details as I can.

10   Mr. Kozohorsky was convicted of those offenses.

11   Therefore, when I do my evaluation, it is based on the

12   assumption, I guess, that he offended at those times.

13       Q.   He has obviously denied many of the offenses, and

14   so I wanted to ask, you know, how the 2006 offense

15   specifically played into your analysis.  Is there

16   anything that you saw in the materials that you reviewed

17   that made you question what happened in that case?

18       A.   It's a complicated issue.  Yes, obviously.  The

19   things I read and the things I saw did make me question

20   what actually happened.  And ultimately I have no idea

21   what actually happened.  But the fact that he was

22   charged with four counts of rape and walked out of court

23   that day is unusual.  Highly improbable, let's just say,

24   in my experience.

25           So it does raise questions, but it's a conviction

1    for a sexual offense.  I'm not discounting that.  I am

2    considering it as a sexual offense.

3        Q.  Did you, when you were analyzing the case, come

4    to a determination as to whether you believed that there

5    were tapes that corroborated Mr. Kozohorsky's account of

6    that offense?

7        A.  Based on everything I read, not only what

8    Mr. Kozohorsky told me, yes, it seems that there were

9    tapes.  What is on those tapes, I don't know.

10            MS. COSTELLO:  Nothing further, Your Honor.

11            THE COURT:  All right.  We're gonna take a

12   ten-minute afternoon recess for comfort, and we will

13   return at five minutes till for cross-examination.

14            (Proceedings recessed at 3:43 p.m.)

15            (Proceedings recommenced at 3:57 p.m.)

16            THE COURT:  All right.  Back on the record.

17   Cross-examination by the United States.

18            MR. BREDENBERG:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. BREDENBERG:

21       Q.  Good afternoon, Dr. Bard.

22       A.  Good afternoon.

23       Q.  You testified on direct that there's a

24   difference, in your opinion, between federal and state

25   laws regarding sexually violent predators, correct?

1    A.  Correct.

2    Q.  And have you ever found someone to be sexually

3    dangerous in federal court?

4    A.  Yes.

5    Q.  How many people?

6    A.  I've only done about 15 to 20 of these.  My best

7    estimate is three or four.

8    Q.  Okay.  Now, the 15 to 20, that has not occurred

9    in the past few years, has it?

10   A.  No.  I haven't done -- I've been retained on one

11   case in the past four years before this one.

12   Q.  Now, with regard to Mr. Kozohorsky, you do accept

13   that he has engaged in sexually violent conduct in the

14   past, correct?

15   A.  Yes.

16   Q.  And on your direct testimony, that was based on

17   three people?

18   A.  Yes.

19   Q.  Did you consider the Sandra, which was connected

20   or done around the same time as the Rhonda back in 1987?

21   A.  In terms of whether he met the first prong?  He

22   already had three others, so I did not really concern

23   myself in terms of whether or not that met the criteria

24   because it was already met.

25   Q.  Would one have been enough for you for whether it

1    met prong 1?

2       A.  Yes.

3       Q.  If there was a -- if you were to agree with the

4    diagnosis, which we can get to in a minute, would it

5    matter how many victims he had?

6       A.  In terms of the third prong, yes.

7       Q.  Okay.  And do you have a particular number?

8       A.  No.

9       Q.  Okay.  Did you consider anyone other than those

10   three for prong 3?

11      A.  I'm sorry?

12      Q.  Sorry.  Did you consider any more than Rhonda,

13   Nadine, and Linda when you considered prong 3?

14      A.  No.

15      Q.  Okay.  All right.  Let's talk about prong 2,

16   which is the diagnosis that you testified for a while on

17   direct.  You don't agree that Mr. Kozohorsky has a

18   serious mental illness, abnormality, or disorder,

19   correct?

20      A.  I do not.

21      Q.  And that's because you don't believe that the

22   diagnosis of paraphilia not otherwise specified or other

23   specified paraphilia, not otherwise specified, is not a

24   legitimate diagnosis, right?

25      A.  Correct.

Q.   Okay.  And you don't believe that that diagnosis
would be applicable in any Adam Walsh or sexually
violent predator case, correct?

A.   I do not believe that that is a legitimate
diagnosis in any case.  Right.

Q.   And you've called it a hypothesized diagnosis,
correct?

A.   I've called it a lot of things, yes.

Q.   But in this case you -- one of the things you
called it was hypothesized, right?

A.   Yes.

Q.   Okay.  And one of the reasons that you disagree
with it is because you say that it's not listed in the
DSM-5, correct?

A.   It's not listed because it was specifically
rejected, yes.

Q.   Okay.  But you're saying, just so we're clear,
you're saying that you don't use it because it's not
specifically listed in the DSM-5, right?

A.   I'm gonna repeat myself -- because that specific
diagnosis was rejected from inclusion, yes.

Q.   Okay.  And I'm repeating myself because I'm
asking you a slightly different question.  You don't
believe that that diagnosis is in the DSM-5, correct?

A.   Correct.

1    Q.  Okay.  And you testified on direct that one of

2    your other concerns is that it doesn't have any

3    criteria, correct?

4    A.  Correct.

5    Q.  Okay.  But actually there is criteria for other

6    specified paraphilic disorder, isn't there?

7    A.  No.

8    Q.  Listen to the question.  There is criteria for

9    the diagnosis of other specified paraphilic disorder,

10   correct?

11   A.  No.

12   Q.  Okay.  Do you utilize the DSM-5?

13   A.  I do.

14   Q.  Okay.  So are you familiar with it?

15   A.  I believe I am.

16   Q.  All right.  And I don't know how to do this

17   exactly without -- I mean, if you're familiar with it,

18   do you recognize a diagnosis in the paraphilia section

19   called other specified paraphilic disorder?

20   A.  I do recognize that it is in there, yes.

21   Q.  Okay.  And specifically, it's on page 705 and it

22   specifically has one of the numbers that they give it,

23   302.89.

24   A.  Okay.

25   Q.  Okay.  So are you agreeing that there's a

          diagnosis of other specified paraphilic disorder in the

          DSM-5, or you still say there isn't?

              A.  It is in there.  You were asking me about

          criteria, I believe.

              Q.  Okay.

              A.  So if I misheard that, I apologize.

              Q.  I apologize if I said that.

              A.  But yes, that diagnosis, other specified

          paraphilic disorder, is in the DSM.  Yes.

              Q.  Okay.  And do you know what that is?  The one

          that is in here?

              A.  I don't know what you're asking me.

              Q.  Do you know -- can you explain what that

          diagnosis is?

              A.  Yes.  That is used for rarely encountered

          paraphilias, and they give examples of those things like

          zoophilia, which is arousal to animals, or arousal to

          enemas, or arousal to urine, things that are rarely seen

          as opposed to the eight specified paraphilic disorders,

          which are more commonly observed.

              Q.  So the examples that are given in that section do

          include necrophilia, right?

              A.  Yes.

              Q.  Scatologia?

              A.  Yes.

1    Q.  Zoophilia, like you said.

2    A.  Yes.

3    Q.  Coprophilia?

4    A.  Yes.

5    Q.  Klismaphilia?

6    A.  Yes.

7    Q.  So these are some of the examples that are in

8    here that they actually identify, correct?

9    A.  Right.

10   Q.  Okay.  But the example section, does it not say

11   examples of presentations that can be specified using

12   the other specified designation include but are not

13   limited to, and then it gives the examples?

14   A.  Yes.

15   Q.  Okay.  And when it gives those other, what you're

16   calling rare, rarely used examples, does it give

17   criteria for those?

18   A.  No.

19   Q.  No.  But it does give criteria for the paraphilic

20   disorder (not otherwise specified) more broadly,

21   correct?

22   A.  Can you define "more broadly"?

23   Q.  Well, I mean, just as that disorder.  There's

24   criteria for that, is there not?

25   A.  Well, I don't have the DSM in front of me, so I

        can't tell you exactly what it says.  But there are no

        criteria like with the other disorders that say A, B,

        and C, and you have to have those.  It is just

        paraphilias that are less commonly seen and are the

        focus of -- again, I don't know the terms -- clinical

        concern, or whatever.

            Q.  So you recognize that the other specified

        paraphilic disorder category is used in situations in

        which the clinician chooses to communicate the specific

        reason that the presentation does not meet the criteria

        for any specific paraphilic disorder, correct?

            A.  Correct.

            Q.  Okay.  And then the examples that they list

        include but are not limited to some of those things,

        right?

            A.  Correct.

            Q.  Okay.  Now, you kept saying on direct that there

        are multiple reasons why people rape.  Is that an

        accurate explanation of your testimony?

            A.  Yes.

            Q.  Okay.  And in your opinion, you would agree that

        some rapes can be for a paraphilic reason, correct?

            A.  Some rapes are paraphilic, yes.

            Q.  Okay.  And on direct, you said that there's no

        way to tell if a person is more aroused to nonconsensual

1   sex than consensual sex.  Is that accurate?

2       A.  I don't know if I said it in that way, so I just

3   don't know.

4       Q.  Okay.  How would you explain it?  How would you

5   tell if a rape was paraphilic?

6       A.  Sexual sadism is a paraphilia.  If there's an

7   indication that the offender was sexually aroused by the

8   infliction of violence, pain, or suffering, then I

9   would -- over a period of six months and all of that, I

10  would diagnose that individual with sexual sadism.

11      Q.  That's a totally different diagnosis, though,

12  right?

13      A.  It's a paraphilic diagnosis.  You asked me about

14  that.

15      Q.  Right.

16      A.  This is not a nonconsent diagnosis.  But you

17  asked me are there paraphilias that involve rape.  Yes,

18  a sexual sadism paraphilia oftentimes, not 100 percent,

19  involves rape and violence.

20      Q.  Okay.  So I have to be careful how I ask you the

21  questions because I see how you're parsing the words,

22  but what I'm asking you is can there be a paraphilic

23  reason that someone would be aroused by nonconsent?

24      A.  No.

25      Q.  Okay.  So you're saying that there's no way that

1  a person can be aroused by nonconsent so that they would

2  go and rape someone.

3      A.  No, that's not what you just asked me.  You said

4  a paraphilic reason.  Paraphilia implies that there is

5  some sort of mental disorder that involves specific

6  arousal to nonconsent.  That is what I'm saying does not

7  exist.  Do offenders become aroused to nonconsent?

8  Every rapist is aroused to the nonconsenting act of

9  rape.

10     Q.  Okay.  And that's what, I guess, what I'm trying

11  to find out.  So if that's your answer, that's fine.

12  But you said that there are multiple reasons why people

13  rape, correct?

14     A.  Correct.

15     Q.  All right.  Let me give you a hypothetical.  So

16  hypothetically, if a person was only aroused by someone

17  not consenting, that's the only reason -- not a power

18  thing or not a being mad at women or anything like that,

19  but he's aroused to the idea of someone saying no and

20  going after them, that's the arousal and that's the

21  paraphilia, do you believe that that can happen?

22     A.  The answer is I don't know because I've never

23  seen it.  I have never seen an offender, in my almost 40

24  years of doing this, that has told me that "I am

25  specifically aroused to the nonconsent" that does not

1    involve any other factor.  So I guess, hypothetically,

2    anything is possible, but I haven't seen it.  And I've

3    been doing this for an awful long time.

4        Q.  Okay, but it's possible.  And you may not have

5    seen everything, right?

6        A.  I probably have not seen everything, but I've

7    seen a lot.  And if I haven't seen it in 35 years or 40

8    years of doing these exact kind of evaluations, it makes

9    me think it doesn't exist as a genuine diagnosis.

10       Q.  Okay.  All right.  Well, I'm not asking you about

11   whether you believe it to be a genuine diagnosis because

12   I already know your position on that.  What I'm asking

13   is is it possible that someone can be driven by a

14   paraphilic interest in nonconsent.

15       A.  And again, it could be one of the factors, but I

16   don't believe that someone -- that there exists a pure

17   type of offender who only commits a rape because of

18   arousal to nonconsent.

19       Q.  Okay.  Now, have you ever used PPGs, penile

20   plethysmograph?

21       A.  I have not.

22       Q.  Do you know what they're used for?

23       A.  Oh, yes.

24       Q.  Okay.  And what are they used for?

25       A.  They are used to measure arousal.

Q.  And is it possible, if you know, that someone could use a PPG and show a particular individual a nonconsensual rape scenario, and would the PPG be able to tell whether that showed arousal?

A.  As far as I know, and this is based on my experience in Massachusetts, primarily, you don't show anybody anything, it's based on audiotapes because you can't really show people child molestation or rapes, so it would be audio involved.  And that raises a lot of questions about how well you can generalize that.

Q.  Did you ever do sex offender treatment?

A.  I did.

Q.  Is it possible that someone in treatment or even just general therapy could come to you as a clinician and treatment provider and complain of ongoing sexual fantasies of raping, fantasies that bothered the person so much that he felt that he had a lack of control?

A.  Yes.

Q.  So you believe that that's possible.

A.  Sure.

Q.  Okay.  And what if it was for the nonconsent?

A.  Rape fantasies are not unusual.  People -- as I said, research has shown that both males and females have rape fantasies.  That doesn't mean that they are specifically aroused to nonconsent.  They might be

1    aroused to being dominated or being submissive or any of

2    those things.  So no, I don't think that equates to the

3    same thing.

4        Q.  Okay.  Again, my question -- again, I recognize

5    I'm giving you a hypothetical, but the hypothetical

6    situation is limited to a person comes to you and says,

7    "This is my ongoing fantasy of raping," and in this

8    particular situation the person acted on it.  But he

9    explains to you "My fantasy of raping, that it bothered

10   me so much that that's," you know, "that's my problem."

11   And that's it.  There's no domination, there's no anger,

12   there's no other -- these other reasons for the rape,

13   but he says, "That's my reason."  You still don't

14   believe that that person could have a paraphilia that

15   could be considered based on nonconsent?

16       A.  I would have to ask that individual many more

17   questions and obtain much more information about what's

18   driving them, the nature of the fantasy, all of those

19   things before I could even hazard a guess.

20       Q.  Okay.  Fair enough.  Now, you heard that

21   Dr. Graney and Dr. Hastings's testimony about their

22   belief that he does, in fact, meet the criteria for a

23   nonconsent diagnosis, right?

24       A.  Yes.

25       Q.  And you also heard them say that in their minds,

1   it's a rare diagnosis as well, right?

2       A.  Relatively rare, yes.

3       Q.  Well, but their testimony was that they did not

4   diagnose it very often.  Is that what you recall?

5       A.  Yes.

6       Q.  Okay.  So in their mind -- I mean, would you

7   agree that it's a rare diagnosis?  If you were to accept

8   it -- sorry.  Withdrawn.  If you were to accept that as

9   a diagnosis, would you agree that it was rare?

10      A.  It's a hypothetical.  I can't answer because I

11  just don't accept that this exists.  And if there was

12  specific criteria that was shown, I might be able to

13  answer that.

14      Q.  Okay.  I understand your position, so we'll move

15  on from that.  But would you at least acknowledge that

16  some people in the field of sexually violent predator

17  evaluations do, in fact, apply that diagnosis?

18      A.  Yes, obviously.

19      Q.  And you would acknowledge that at the very least,

20  there is obviously a debate with that particular

21  diagnosis, right?

22      A.  Yes.

23      Q.  Now, you testified that you've done a few Adam

24  Walsh cases over the years, right?

25      A.  Yes.

1     Q.   But haven't done any in the last few years,

2   right?

3     A.   Right.

4     Q.   In fact, all of yours in the last three years

5   have been in Massachusetts and New York State, correct?

6     A.   Last three years, yes.

7     Q.   Okay.  Now, you do stay apprised of the

8   applicable federal law in this area, correct?

9     A.   I try to, yes.

10    Q.   All right.  So is it your understanding that the

11  federal law does, in fact, allow for this diagnosis and

12  does, in fact, accept this diagnosis?

13    A.   I know that there have been cases where this

14  diagnosis has been accepted, yes.

15    Q.   All right.  In fact, you were in a case in

16  Massachusetts where this diagnosis was ultimately

17  accepted, correct?

18    A.   I don't know.

19    Q.   You don't know?

20    A.   I don't recall any Massachusetts cases, so --

21    Q.   Do you remember a case back in 2010 called United

22  States versus Carta?

23    A.   Yes.

24    Q.   And that was a case where you testified in the

25  district court, correct?

1    A.   It was a federal case, yes.

2    Q.   Correct.

3    A.   Yes.

4    Q.   Federal district court.

5    A.   I remember it well.

6    Q.   Okay.  And in that case, the district court

7 actually agreed with you that that diagnosis was not

8 appropriate in that case, correct?  Do you remember

9 that?

10   A.   I know that the judge agreed that -- my memory --

11 and I may be wrong, and I apologize if I am -- was not a

12 nonconsent case.  It was a hebephilia case.

13   Q.   Okay.  And do you recognize that they -- that

14 Carta in that -- in the district court, Carta -- agreed

15 with you that that paraphilia not otherwise specified

16 was not a legitimate diagnosis?

17   A.   Yes.

18   Q.   And then do you also know that that case was

19 appealed to the First Circuit?

20   A.   I do.

21   Q.   And do you know that the First Circuit overturned

22 that and, in fact, found that paraphilia not otherwise

23 specified is, in fact, a good, legitimate diagnosis?

24   A.   Yes.

25   Q.   Okay.  And are you also familiar with the Seventh

     1   Circuit case finding the same thing?

     2       A.   You would have to tell me more about it.

     3       Q.   That's all right.  I'll move on from that.

     4            One of the reasons that the Court found in the

     5   First Circuit, the Carta case, that -- was that the

     6   definition of sexually dangerous person in the statute

     7   of section 4248 did not limit the definition of a

     8   sexually dangerous person to things that are found in

     9   the DSM --

    10            THE COURT:  The Court's gonna sustain

    11   objection to his legal opinion.

    12            MR. BREDENBERG:  Pardon?  Oh.  Okay.  Thank

    13   you, Your Honor.

    14   BY MR. BREDENBERG:

    15       Q.   Are you also aware of cases out of the Fourth

    16   Circuit on this issue?

    17            THE COURT:  Same objection; same sustained.

    18   I'll happily accept supplemental briefing on the legal

    19   validity of the category later.

    20            MR. BREDENBERG:  Okay.  I'll move on.  Thank

    21   you, Your Honor.

    22   BY MR. BREDENBERG:

    23       Q.   Dr. Bard, with regard to the other diagnosis, or

    24   one of the other diagnoses, the personality disorder not

    25   otherwise specified, you've talked a little bit about

1   that on direct examination as well, correct?

2     A.  Correct.

3     Q.  And you do acknowledge that Mr. Kozohorsky could,

4   in fact, have been diagnosed with that in the past,

5   right?

6     A.  Yes.  Absolutely.

7     Q.  And in the past, he clearly demonstrated a

8   pattern of violating the rights of others, primary as a

9   result of his sexual offending, correct?

10     A.  Yes.

11     Q.  But you don't believe that he can be diagnosed

12   with that now, right?

13     A.  As I indicated, because there's no indication of

14   any current pattern.  But other than that, yes.

15     Q.  Well, current pattern in prison, correct?

16     A.  Current pattern for the past 15 years.

17     Q.  Well, in prison.  He's been in prison since 2010.

18   Is that your understanding?

19     A.  Yes.

20     Q.  Okay.  And so he hasn't had any sexually violent

21   acts in prison, right?

22     A.  It isn't a matter of sexually violent acts.  He

23   hasn't shown an antisocial pattern of behavior.  If he

24   had shown fights every other week, I would have said

25   that he still meets it.  He doesn't have to show

sexually violent acts for a diagnosis of antisocial.  He

just needs to show a pattern of antisocial behavior.

Q.  So with Mr. Kozohorsky, one of the reasons that

you diagnose or said that he could have been properly

diagnosed with antisocial personality disorder in the

past, or personality disorder not otherwise specified in

the past, was because he hadn't clearly demonstrated a

pattern of violating the rights of others, right?

A.  I'm sorry.  I lost that along the way.  I'm

sorry.

Q.  Was Mr. Kozohorsky, the way that he presented his

antisocial features, it was mostly focused on raping

people, was it not?

A.  No.  He had patterns of committing nonsexual

offenses also.

Q.  But that was much before, wasn't it?

A.  You don't look only at now.  If you're trying to

diagnose a personality disorder, you're looking at a

lifelong pattern.  And he clearly had, in my opinion,

that pattern, including both nonsexual and sexual

misconduct.

Q.  So now you said something that just sounds

contradictory to me.  It sounds like you're saying at

some point it stopped, he no longer has any antisocial

features, maybe let's call it 2010.  Then you just said

1  it's lifelong and it goes back the whole time.  So which

2  is it?

3      A.  A personality disorder is the habitual way that

4  an individual deals with the world around them.  In

5  order to diagnose it, it has to begin in adolescence.

6  That's why you look back.  So if Mr. Kozohorsky or

7  anybody had no juvenile offending and nothing until he

8  was 30, and then he committed five assaults and six

9  sexual assaults, he wouldn't get the antisocial

10 diagnosis because the general criteria for personality

11 disorder says it begins in adolescence as opposed to

12 just being a bad guy who does bad things.

13      So that's why I go back.  But it has to be

14 ongoing.  So when it appears to stop, it doesn't just

15 stop.  It goes down.  Hardly anyone just stops.  But you

16 have to have an ongoing pattern now in order to say he

17 continues to show a violation of the rights of others,

18 and he doesn't.

19     Q.  Let's move on to your prong 3 opinion.  You use

20 what you call an adjusted actuarial approach, correct?

21     A.  Well, in general I do.  But there are problems

22 with that now, because again, the actuarials talk about

23 likelihood of committing a sexual offense and not the

24 serious difficulty.

25     Q.  So did you use any tools in this particular case?

1    A.   I did.

2    Q.   Okay.  And what did you use?

3    A.   I used the Static-99R.

4    Q.   Okay.  And then did you also consider dynamic

5    risk factors or not?

6    A.   Yes.

7    Q.   Which dynamic risk factors did you consider?

8    A.   I considered things like general self-regulation,

9    sexual self-regulation.  I usually consider things like

10   intimacy deficits, things like that, cognitive

11   distortions.  I consider participation in treatment, and

12   I consider the presence or absence of any probation or

13   supervision.

14   Q.   He hasn't had any significant sex offender

15   treatment, has he?

16   A.   No.

17   Q.   In fact, he told you in your interview that he

18   doesn't even need sex offender treatment because in his

19   mind he hasn't committed a sex offense in over 33 years,

20   right?

21   A.   That's right.

22   Q.   And you heard him testify today, right?

23   A.   Yes.

24   Q.   And you read his deposition transcript.

25   A.   I did.

1    Q.  And he still continues to deny virtually all of

2  it but for one of his rapes, correct?

3    A.  Correct.

4    Q.  And you would say -- would you agree that some of

5  his testimony and some of his presentation is that he,

6  in fact, still blames his victims?

7    A.  He certainly blames his victims for reporting

8  sexual offenses that he considers were not sexual

9  offenses.

10    Q.  And that he believes that he's the victim of

11  these -- what he called vindictive women, correct?

12    A.  For two of them, yes.

13    Q.  Two of the convictions.

14    A.  Yes.

15    Q.  Okay.  Now, you heard testimony today from

16  Mr. Kozohorsky about his previous use of audiotapes to

17  record sexual encounters, right?

18    A.  Correct.

19    Q.  And you also heard testimony about his potential

20  future plans to use body cams and videotapes in the

21  future as his own protection?

22    A.  He said that he had thought about that, yes.

23    Q.  Okay.  He thought about using videotapes and body

24  cams, right?

25    A.  Yes.

1    Q.  He also thought about using consent forms?

2    A.  Yes.

3    Q.  And possibility of maybe paying for sex and using

4    prostitutes, correct?

5    A.  Yes.

6    Q.  Do you consider those to be cognitive

7    distortions?

8    A.  No.  I would not classify them as cognitive

9    distortions.

10   Q.  Have you ever -- you testified earlier that

11   you've kind of been around doing these things for a long

12   time.  Have you ever seen anybody else take this kind of

13   defensive posture towards sexual activity?

14   A.  I can't recall any other case that has had this

15   kind of precautions that he was talking about.

16   Q.  Now, you've reviewed Mr. Kozohorsky's CTP

17   treatment records in the Bureau of Prisons, correct?

18   A.  Yes.

19   Q.  And you'd agree that he isn't fully invested in

20   sex offender treatment, right?

21   A.  I think it's still very early and he's not fully

22   invested, right.

23   Q.  And you also agree that he really hasn't shown

24   any evidence of learning anything from sex offender

25   treatment at this point, correct?

1    A.  I think -- I think Dr. Graney talked about that,

2 that he showed a little bit of involvement and some

3 preliminary work but certainly not the kind of

4 investment that you would, you know, hope for for

5 someone who has been involved in a long time.  But it's

6 also fairly new.

7    Q.  Fairly...

8    A.  "New."

9    Q.  Okay.  You'd also agree that Mr. Kozohorsky has

10 shown irresponsibility in the past cooperating with

11 supervision and sex offender registration, correct?

12    A.  Registration, I don't know if I'd consider it

13 lack of cooperation or not, but yes, he certainly has

14 violated that.

15    Q.  And his instant federal offense was actually

16 failure to register, correct?

17    A.  Right.

18    Q.  And do you recognize, even though he never got --

19 or he hadn't gotten written up, I think you called it

20 tickets, you recognize from some of the records that he

21 still violates a lot of the prison rules even though

22 he's actually not being disciplined for that?

23    A.  You'd have to be more specific.

24    Q.  Did you notice anything in the records that

25 indicated that Mr. Kozohorsky was not following all of

1  the prison rules?

2     A.  I don't recall anything offhand, so that's why

3  I'm asking you if --

4     Q.  Oh, okay.  Do you see anything in the records

5  dealing with him collecting contraband, for example?

6     A.  Again, nothing comes to mind offhand, but I

7  reviewed the records a long time ago.

8     Q.  Okay.  You recognize that Mr. Kozohorsky has had

9  infidelity in his past, correct?

10     A.  Yes.

11     Q.  And that he's raped women when he had other

12  willing partners available to him, correct?

13     A.  Yes.

14     Q.  And that he's stated that at least one of his

15  relationships was toxic, correct?

16     A.  I believe he called two of them toxic.

17     Q.  Okay.  And that he's had sex with prostitutes.

18     A.  Yes, he has.

19     Q.  Okay.  Now, in your report you concluded that

20  he's not demonstrated any intimacy deficits.  Is that

21  right?

22     A.  Yes, I did.  I wrote that.

23     Q.  Does that -- is that an accurate -- is that still

24  your opinion?

25     A.  Well, the way I look at that has more to do with

whether or not he was able to manage adult relationships

as opposed to individuals who offend against children.

I tend not to comment about the quality of his

relationships, which have obviously been not

particularly good, but I think he's able to achieve

that.

Q.   Ms. Costello asked you about his 2010 offense,

correct?  Or the allegations in 2010.

A.   Yes.

Q.   Related to Christine?

A.   Yes.

Q.   And if it were true that Mr. Kozohorsky did

commit a sex offense against Christine in 2010, you

indicated that that would change your mind, correct?

A.   In terms of the third prong --

Q.   Correct.

A.   It would certainly affect my opinion more, yes.

Q.   Okay.  And so it would affect -- again, assuming

that there was an appropriate diagnosis, it would affect

your opinion to suggest that there was more volitional

control problem for Mr. Kozohorsky?

A.   Yes.

            MR. BREDENBERG:  Okay.  No further

questions, Your Honor.

            THE COURT:  Redirect.

         MS. COSTELLO:  None, Your Honor.

         THE COURT:  Thank you, sir.

         THE WITNESS:  Thank you, Judge.

         MS. SHEA:  At this time, we call Dr. Plaud.

         THE CLERK:  Please place your left hand on
the Bible, raise your right hand, and state your name
for the record.

         THE WITNESS:  Joseph J. Plaud, P-L-A-U-D.

         (The witness was placed under oath.)

         THE COURT:  Dr. Plaud, welcome back.

         THE WITNESS:  Thank you, Judge.

         THE COURT:  You've previously testified
before this Court and been accepted as a expert.  You
will so testify.

         THE WITNESS:  Thank you.

         THE COURT:  Your witness.

         MS. SHEA:  Thank you, Your Honor.

                    DIRECT EXAMINATION
BY MS. SHEA:

    Q.  Good afternoon, Dr. Plaud.

    A.  Good afternoon.

    Q.  What were you asked to do in this case?

    A.  I was asked to evaluate Mr. Kozohorsky in
connection with the petition alleging that he is a
sexually dangerous person according to federal law, and

to make judgments, professional judgments to a
reasonable degree of psychological certainty that
Mr. Kozohorsky, firstly, has engaged in or attempted to
engage in sexually violent conduct or child molestation;
whether at this time he suffers from a serious mental
illness, abnormality, or disorder; and thirdly, along
those lines, the presence of any such disorders would
cause him to have serious difficulty in refraining from
further acts of either child molestation or sexually
violent conduct.

     Q.  Did you reach an opinion?

     A.  I did.

     Q.  And what is your opinion?

     A.  My opinion is yes, no, and no.  That he does meet
the first criterion; he, however, does not suffer from a
serious mental illness, abnormality, or disorder; and
that he does not at this time have serious difficulty in
refraining.

     Q.  So let's just jump right into the second prong.

     A.  Okay.

     Q.  Why do you opine that he does not have a serious
mental illness, abnormality, or disorder?

     A.  Well, he has -- and certainly I'm not the first
witness here, so there's been some testimony to this,
and I don't want to duplicate it.  But I do want to say

1  that I evaluated whether or not he suffered from any

2  diagnosable condition, paying particular attention to

3  paraphilias on the one hand and personality disorders on

4  the other.

5       It is my professional judgment that he would not

6  be clinically diagnosed with any paraphilic sexual

7  condition nor would he have a personality disorder

8  diagnosis.  So I did not give him a diagnosis.  However,

9  I did also note and did diagnose with a substance use

10 disorder.

11 Q.  Let's focus first on the paraphilic disorder.

12 Why did you decline to offer a paraphilic disorder

13 diagnosis?

14 A.  Okay.  Paraphilias generally speak to recurrent

15 or intense sexually arousing fantasies, urges, behavior,

16 involving sexual activity that basically goes beyond the

17 bounds of normal human experience.  That's the common

18 theme.

19      And in this case, Mr. Kozohorsky is a rapist.  He

20 has several victims, adjudicated for sexual criminal

21 activity.  The question is does this behavior, or did

22 this behavior historically, rely on a psychological

23 foundation in which he had recurrent or intense sexually

24 arousing fantasies, urges, or behaviors involving

25 certain sexually aberrant -- "sexually aberrant" --

behavior.

My judgment is he did not.  He engaged in illegal sexual contact, but it was not fueled or driven, which is the central requirement for the second tier for prong 2, by an underlying sexual deviance.

And that is a critical, critical issue in this case.  And it gets into the whole issue of why do rapists rape?  Now, the way I will present it to you, Judge, and for the vast majority of cases, and I think Mr. Kozohorsky's history fits in with this, is to consider it this way:  Rape is an act of violence.  Sex is a weapon.  Like in other acts of violence that are not topographically sexual, you use knives and guns and coercion and tie people -- do terrible things.  These are all violent acts where you use weapons.

For rapists, sex becomes a weapon.  And so what drives the vast, vast majority of rapists who are not sexual sadists is issues of power and control over women, hostility towards women.  This is what drives rapists to commit the act.  They use violence, nonconsent, as a weapon to inflict what they're doing criminally.

So if we want to make it a diagnostic issue that they're driven by an underlying condition to engage in this that is sexually deviant, that is a paraphilia,

1 then what has to happen is there has to be a

2 demonstration in their sexual history that goes far

3 beyond just what we know about their sexual criminal

4 history to the infliction of pain, suffering, and

5 humiliation on victims as a prerequisite, as a

6 foundational element for them to become sexually aroused

7 and then commit the sexually violent conduct.

8      We have that diagnosis.  It's called sexual

9 sadism.  And guess what?  Nobody sitting here with all

10 the initials after their names has given Mr. Kozohorsky

11 a sexual sadism clinical diagnosis.  Nobody.

12      So don't take my word for it.  The government's

13 experts that testified earlier do not give a sexual

14 sadism diagnosis.  So there is no valid clinical

15 diagnosis in this case.

16 Q.  What about a paraphilic interest in nonconsent?

17 A.  Well, look.  There are two ways to look at it, I

18 think.  There is a catchall paraphilia called -- what

19 used to be called paraphilia not otherwise specified

20 under the DSM-5 and DSM-5-TR.  It's called an other

21 specified paraphilic disorder.  But what the key is --

22 it is a valid diagnosis.  I don't know about argument --

23 it's in there.  I think Mr. Bredenberg pointed out the

24 page in the DSM-5-TR that it's in.  It's in there as a

25 diagnosis.  But it's a misapplication in a case like

 1    this to say paraphilia not otherwise specified in the
 2    old edition, or other specified paraphilic disorder
 3    (nonconsent).  Why?  Because that particular clinical
 4    paraphilia diagnosis is meant, as Dr. Bard correctly
 5    pointed out, meant for low frequency sexual aberrations,
 6    low frequency deviations, that there's only eight
 7    paraphilia clinical diagnoses in the DSM.  Well, there
 8    are clearly more than eight ways to be sexually aroused
 9    to things that are deviant.
10          This is what that's for.  And if anybody's
11    telling me that rape is a low frequency behavior in our
12    culture, well, they're -- I don't think they can count
13    because that's not the case.  It's a high frequency.
14    That's why, Judge, for years, over a decade and a half,
15    it's been considered by psychologists and psychiatrists
16    whether or not it should be included as a ninth
17    paraphilia, because it is a -- in terms of it being
18    something that happens, namely rape in America or rape
19    anywhere in the world, it's a high frequency --
20    unfortunately, it's a high frequency behavior.
21          So if anything was a paraphilia that deserved its
22    own diagnostic criteria, a paraphilic coercive disorder
23    would be that.  And it has been resoundingly rejected
24    time and time again, including in the DSM-5-TR, which is
25    pretty brand new.  And that's the reason, because most

1   rapists, the vast, vast majority of rapists, even ones

2   you can describe as serial rapists, engage in the

3   behavior for reasons that have nothing to do with sexual

4   deviance.  It has to do with other, more transient

5   psychological phenomena such as, like I was saying,

6   power and control issues at that time, using sex as a

7   weapon during that period of time.

8         And that is the key in this case.  So then to

9   backtrack and give it this other specified paraphilia

10  (nonconsent) is -- it's not supported by science.  It's

11  not supported by -- the whole tradition of what clinical

12  diagnoses are meant to be and what they are meant to

13  communicate to both -- within the professional community

14  and outside of the professional community.

15        So that is why I did not give that clinical

16  diagnosis in this case.  There were other dynamics

17  psychologically going on for Mr. Kozohorsky when he was

18  a younger man that are not explained by this type of

19  clinical diagnosis.

20     Q.  Do you think that the diagnosis of nonconsent

21  paraphilia is widely accepted in the field of

22  psychology?

23     A.  No.  It's widely rejected.

24        You know, Judge, I think if you read the DSM,

25  which, unfortunately, I've had the opportunity many

1    times over the years, you know, in the paraphilia,

2    nonconsenting -- consent is used.  Nonconsent is used.

3    But not -- for a different reason.  When you read --

4    it's in there a number of times if you read the

5    paraphilia section.  But it's referring to most -- to

6    exhibitionists, to people who engage mostly in

7    exhibitionism, frotteurism, those -- that's what they

8    mean by nonconsent, not overpowering a person and

9    engaging in sexually violent conduct with them.

10          So the term is actually specifically used in the

11   paraphilia section multiple times.  You'll see

12   nonconsenting, nonconsent, but never once to refer to

13   men who rape.

14      Q.  Have you discovered or are you aware of a way to

15   determine if a rapist is specifically aroused to

16   nonconsent?

17      A.  Well -- yeah, I mean -- look.  There is a subset,

18   and it's probably less than 10 percent of rapists, who

19   are sexual sadists.  That is one of the eight

20   paraphilias.  Again, nobody gave that diagnosis in this

21   case.  So, you know, I guess the question is if somebody

22   gave Mr. Kozohorsky -- if one of the experts in this

23   case gave him that diagnosis, then we could argue does

24   it meet -- you know, is it -- that would be a serious

25   mental illness, abnormality, or disorder.  But does it

cause him today to have serious difficulty, that would
be the focus.  It wouldn't be the second criteria, it
would be the third we'd be arguing about more.  But
nobody's given him that diagnosis, so we  don't -- we
don't have to go there, I don't think.

        But there are some rapists -- and I have treated
sexual sadists over the years.  There are some who are
driven very strongly by an underlying deviance in which
the pain, the suffering, the humiliation of a victim is
a prerequisite for them to become sexually aroused and
engaged sexually.

        But that is not Mr. Kozohorsky.  That's not what
we have in his history, and certainly not today.

     Q.  Let me ask you this question:  Is being a serial
rapist alone enough to meet the second prong of the Adam
Walsh Act?

     A.  No.  No, because it's not -- the second prong
specifically refers to in the definition of what a
serious mental illness, abnormality, or disorder is.
We're talking about a congenital or acquired condition,
a condition of the person, an underlying psychiatric
condition that then has such grip strength over their
sexual functioning in the present today that it would
cause that person to have serious difficulty in
refraining.

So here we have a big disconnect.  If you're
starting to commit people because of things with "other"
in the title, it should get you thinking right away.  If
I'm gonna testify to a reasonable degree of scientific
and psychological certainty, diagnostically in this
case, and I'm relying on a misapplication of a
paraphilia that is supposed to be reserved for low
frequency types of sexual aberration, and that you can't
really -- and which, by the way, has been specifically
rejected time and time again by the professional
community, you're not going on -- you know, "clear and
convincing" I know is a legal term, but it refers to
highly and substantially more likely than not.  Highly
and substantially.  There's nothing high or substantial
about any of this stuff.

Q.  Are you aware if any PPG studies have confirmed
the presence of a nonconsent attraction?

A.  Okay.  The short answer is -- and I have done
PPGs, Judge, for many, many years in my profession.
I've published studies.  I've just -- here's one.  "The
Relationship of Male Self Report of Rape Supportive
Attitudes, Sexual Fantasies, Social Desirability, and
Physiological Arousal as to PPG to Sexually Coercive
Stimuli."  This is an article, peer-reviewed article I
published a number of years ago in the Journal of

1  Clinical Psychology, coauthored with my coauthor Scott

2  Bigwood.

3      So there is a way we've tried to measure -- can

4  we parse -- can we identify men who do physiologically,

5  physiological arousal specifically to acts of nonconsent

6  against women.  And what the research, my research, and

7  certainly the much larger body of research over the

8  years, is this is where we talk about sexual sadism

9  again; that, yes, if this is a prerequisite

10 physiologically for them to become aroused, then it can

11 become a problem.  And nonconsent obviously is involved

12 in that.  But it's not the primary thing.  It's kind of

13 like what you can describe as the consequence.  Because

14 if you have to inflict pain on someone, there's a very

15 small amount of people out there who want that, right?

16 And there is a diagnosis for that too, by the way.

17 There is sexual masochism, as well, as a clinical

18 diagnosis.

19      So, but no.  Other than that, no, you can't do

20 it.  And it's not shown to be reliable.

21   Q.  And so -- sorry.  Just going back to the

22 question -- and I recognize your article.  But are you

23 aware of whether any PPG study has confirmed or

24 established a way to show who was attracted to

25 nonconsent?

1    A.   No.  No, it has not, because there's too much

2  variability in the data.  And I hate to say it again,

3  but normal men, for example, who go and go to church on

4  Sundays and don't do anything bad, never think -- my

5  research kind of got a window into this as well.  They

6  kind of show some interest sometimes in that too.  Now,

7  it doesn't mean they're gonna do anything about it.

8         But they still show it.  And that's the problem

9  with this, is that there is a wide range, even above

10 normative people who don't break the law, who never

11 engage in coercive sexual behavior under any

12 circumstances also can show some arousal to this kind of

13 thing, and that's just the -- you know, it's not a neat

14 box, the way life was created.  And this is a part of

15 that.

16   Q.  Are you aware of any ways for psychologists to

17 differentiate a typical rapist versus someone who is

18 specifically aroused to nonconsent?

19   A.   Well, that's where -- again, that's where an

20 analysis and a credible clinical diagnosis of sexual

21 sadism comes into play.  So in the cases where rapists

22 are involved, we don't have a child -- we don't have

23 child molestation in this case, right?  We don't have

24 pedophilia in this case, which is clearly the disorder

25 most -- you know, the vast, vast majority in these cases

1  we're talking about.  The answer is no, we can't, absent

2  a bona fide clinical diagnosis of sexual sadism

3  disorder.  Then we're going down that path.  But that's

4  not this case.

5      Q.  I know.  Putting aside the sexual sadism, though,

6  are you aware of any empirically validated ways to

7  differentiate a typical rapist from someone who's --

8      A.  No, not at all.  Absolutely not.  That's the

9  issue.

10     Q.  And so Drs. Hastings and Graney testified about a

11 list of factors --

12     A.  Yeah.

13     Q.  -- that they used to --

14     A.  Yeah.

15     Q.  -- that they used to determine a presence of

16 nonconsent attraction deviance.

17     A.  The Doren factors.

18     Q.  Exactly.

19     A.  Yeah.

20     Q.  So are you familiar with that book?

21     A.  I'm very familiar with it.  For a couple years

22 there, Dennis Doren and I had a lot of communication

23 back and forth.

24     Q.  Do you adopt these guidelines for determining --

25 Doren's guidelines for determining the presence of an

1  attraction to nonconsent?

2      A.  No.

3      Q.  And why not?

4      A.  Okay.  I think other than what I've been

5  testifying about and talking about from a physiological,

6  psychological, diagnostic perspective, Judge, I think

7  history helps here, to learn where did these things come

8  from.  Where did the Doren criteria come from?  What's

9  the context?

10         And I will say this whole issue of this

11  paraphilic coercive disorder or, you know, paraphilia

12  NOS nonconsent back then, didn't exist at all even in

13  the minds of anybody until probably like the 1980s.

14  There was a psychologist whose name was John Money, and

15  he created a term, it was called -- biastophilic rapism

16  was the term.  And that was kind of the first really

17  go-around at this whole thing.  And it kind of was an

18  academic debate in the 1980s.

19         Well, then what happened at the end of the 1980s?

20  You had the second phase of the civil commitment, the

21  sexually dangerous person/sexually violent predators.

22  The State of Washington in 1990 was the first to adopt

23  the second wave because by the 1980s all the old MDSO,

24  the mentally disordered sex offender laws that a number

25  of states had had that was a precursor to these laws

1    today, they were all repealed.  Every state.

2          Well, then in 1990, Washington came back with one

3    after a terrible -- a couple terrible situations.  So

4    this is where it came from.  It's historical.  Dennis

5    Doren, in my judgment, and I've told this to his face,

6    he created this thing out of whole cloth, specifically

7    because we had civil commitment and we had rapists and

8    how are we gonna include them.  Pedophilia, this is how

9    we get the child molesters in.  We already have a

10   diagnosis, pedophilia.  Nobody's arguing whether that

11   exists or not, right?  Now we argue about fringes of it

12   like hebephilia, ephebophilia, pedohebephilia, on that

13   domain.

14          But for the rapists, they're a very different

15   group of sex offenders than your pedophiles.  This is

16   where this came from.  It came from civil commitment.

17   It's not like it existed like pedophilia existed.  Then

18   you had these legal things that change, and then you're

19   applying a pre-existing clinical diagnosis like

20   pedophilia to a law, right?  A set of laws now.  No,

21   that's not what happened here.

22          What happened here was the opposite.  You had not

23   even a discussion, really, outside of Money's kind of

24   stuff like this which was, like I said, more an academic

25   debate, never accepted diagnostically still to this day,

1  but even then.

2        Then you have the civil commitment laws in the

3  1990s.  All of a sudden, now, Doren comes out with this

4  book.  It was 2002 when the book came out, but he had --

5  this had gone into it several years beforehand -- called

6  Evaluating Sex Offenders.  And he creates these nine

7  criteria specifically so you could use this law, which

8  is incredible, I think, and totally not valid, I think

9  unethical.  It's just wrong.  It's just wrong.

10        Again, if we're taking out the sexual sadists,

11  because the vast, vast majority of rapists, men who

12  attack women, who perpetrate sexual violence against

13  women, do so for reasons that are not sexual deviance

14  reasons but for other psychological reasons based on

15  power, control, attitudes towards women, hostility

16  towards women, et cetera, that are more transient, that

17  are more situationally bound.

18        I mean, look at the case with Mr. Kozohorsky.

19  We've been talking about his victims, how many does he

20  have, he denies some.  But he knew them.  He wasn't

21  hanging out in the woods at night abducting strangers

22  and assaulting them, right?  It's a different kind of

23  thing.

24  Q.  So I'm gonna take you through the factors, and

25  these were the factors, again, that Drs. Hastings and

1    Graney used to diagnose a paraphilia nonconsent.

2        The first factor that Dr. Doren lists is

3    ejaculation or other clear signs of sexual arousal

4    during events that are nonconsensual.  Are you aware of

5    any empirical support or research or data or anything

6    that shows a link between that, the presence of this,

7    and an attraction to nonconsent?

8        A.  No, and let me say this:  What men who are able

9    to complete a rape physiologically to the point of

10   ejaculation and orgasm, what they're reacting to

11   sexually is the normative.  They're attracted to women.

12   That's what the -- so what's the nonconsent part of it?

13   Well, they're overpowering the women, they're inflicting

14   violence.  Why?  To gain consent.  You see?  And some

15   rapists -- actually, a percentage of rapists -- even

16   though they're still trying to engage in rape and sexual

17   violence, they lose the ability to complete the act

18   because of issues surrounding, you know, the fact that

19   it's -- there's a struggle, there's other violence going

20   on that's sort of -- I say distracting, but it goes away

21   from just the primary focus on the sexual aspects of the

22   act.

23       So the fact that men can get aroused and do get

24   aroused when they're committing rapes, what they're

25   reacting to is the normative part of it in the sense

1   that they're attracted, they're heterosexual, they're

2   attracted to adult women, and that's what they're

3   reacting to.  The nonconsent part is the weapon they're

4   using to perpetrate the act.

5       Q.  The next guideline or factor that Dr. Doren lists

6   is repetitive patterns of actions, as if scripts.  Are

7   you aware of any research or data or studies that show

8   that the presence of repetitive patterns of actions, as

9   if scripts, is proof of an attraction to nonconsent?

10      A.  No, because -- put sexual violence completely

11  aside for one second.  We all have -- everybody who has

12  sexual experiences has certain likes, things they like

13  to do, techniques, things they think they're good at,

14  not good at, fantasies they have around what kind of

15  things make them -- that applies to everybody, not just

16  rapists.  So to somehow cull it out and say when it

17  happens in an act of rape, it's different in the sense

18  that you're not following -- what does that mean?  If

19  you're not a rapist you engage in random acts of

20  sexuality that are always spontaneous and don't follow

21  certain patterns and things of that -- that's patently

22  ridiculous.

23      Q.  The third guideline is where virtually all of the

24  person's criminal behavior is sexual.  Are you aware of

25  any research or data or studies that show that the

```
 1    presence of that is an indication or confirms the
 2    presence of an attraction to nonconsent?
 3        A.   No.
 4        Q.   And also, is Mr. Kozohorsky's criminal record
 5    entirely sexual in nature?
 6        A.   It is not.
 7        Q.   The next factor is raping when the victim had
 8    already been willing to have consensual sex.
 9        A.   Yeah.
10        Q.   Are you aware of any studies or research or
11    evidence to show that the presence of this is an
12    indication or proof of an attraction to nonconsent?
13        A.   No.  And it gets around, again, the function that
14    I was talking about.  The vast majority of rapists, it's
15    not the nonconsent part that's causing them arousal.
16    Again, that's what -- that could be for sexual sadists.
17    But what is is that the person is controlling the
18    situation.  The person is using power and influence --
19    sex -- that's why I use that metaphor -- sex as a
20    weapon, sex as power.  That's what's going on.
21        Q.   The next factor that Dr. Doren lists is a short
22    time period after consequence before raping again.  Are
23    you aware of any research to support that the presence
24    of that factor --
25        A.   No.
```

1    Q.  -- is proof of someone's --

2    A.  If it's the same psychological dynamic, then it's

3    a meaningless factor.

4    Q.  What about the next guideline, the sixth

5    guideline, which is raping under circumstance with high

6    likelihood for being caught?

7    A.  Yeah.

8    Q.  And are you aware of any --

9    A.  No.

10   Q.  -- research that shows that the presence of that

11   is proof of someone's attraction to nonconsent?

12   A.  No, and I will say this:  Because of the nature

13   in many cases where rape occurs and the circumstances

14   occurs, naturally speaking, where there isn't a lot of

15   planning going on, generally speaking, that is going to

16   be a byproduct of it.

17        In this case, however, again, it's -- in his

18   history, Mr. Kozohorsky's history of engaging in this

19   behavior, he wasn't, like I said earlier, hanging out in

20   parks or at dark at night in places, you know, where he

21   meets strangers or try to abduct strangers and do things

22   like that.  It's a very different dynamic for him, even,

23   in that context.

24   Q.  The seventh guideline is having concomitant

25   cooperative sexual partners.  Are you aware of any

1  research that shows that the presence of having

2  concomitant cooperative sexual partners --

3      A.  No.

4      Q.  -- is proof of someone's attraction --

5      A.  No.

6      Q.  -- to nonconsent?

7      A.  Concomitant partners -- and we see this too

8  sometimes suggested.  I've been asked this mostly on

9  cross-examination for many years for pedophiles, like

10 the fact that, you know, if a person was married and

11 still engaged in sexual activity with children, because

12 they had access to an adult does that make them

13 inherently more risky.  And generally speaking, no, it

14 does not, because there's an underlying deviance in

15 pedophilia driving them to do what they were doing that

16 way.  We don't have that here.

17     Q.  The next guideline is various types of victims in

18 purely sex offenders.  Are you aware of any research or

19 data or studies that show that the presence of this

20 guideline is proof that someone is attracted to

21 nonconsent?

22     A.  No.

23     Q.  The final factor is maintenance of a rape kit.

24 Are you aware of any studies or research that shows the

25 maintenance of a rape kit is evidence of an attraction

1  to nonconsent?

2    A.  I do not.

3    Q.  If the Court were to find that this is a valid

4  diagnosis, do you think that Mr. Kozohorsky's offenses

5  support a deviant attraction to nonconsent?

6    A.  I do not.  I do not believe in 2023

7  Mr. Kozohorsky has a serious difficulty in refraining

8  from further acts of sexual violence going forward under

9  the terms of a lifetime supervised release, no.

10   Q.  Are the facts that he has had consensual sexual

11  partners and prostitutes, how does that factor into

12  whether he may have any sort of deviant arousal to

13  nonconsent?

14   A.  Well, I think in all the cases of the sexual

15  criminal conduct that we know about and documented and

16  have specific allegations and specific legal outcomes,

17  there was something else going on with him at the time

18  that pertained in a very specific way to the person who

19  became his victim.  And I think that's important.  I

20  think that is what was going on at the time with him.

21       I think today, moving forward in time, those same

22  dynamics are not, you know -- they're not present like

23  they were when he was a younger person.  I think there

24  was a -- he had a lot of psychological issues going on.

25  And the fact that he had, you know, he was married and

he had and admits to having prostitutes and other
consenting partners does not take away from what the
dynamics were back then that have zero percent chance,
basically, of being recreated moving forward in time
under supervised release.

THE COURT:  Counsel, would y'all approach
the bench?  Actually, we can do this from where you are.
There's no need to move.

It's 5:00.  I'm trying to figure out where
we are.  Without prejudice, I just want to know where we
are in terms of how much longer you think you have on
direct.  If you think there's a chance we allow this
witness to finish today, we can run a little bit over
but not extensively, so I want to know where we are.

MS. SHEA:  I do have -- I do have a
significant bit left, Your Honor.

THE COURT:  All right.  We will -- it's
after 5:00.  We will stop here.  I think that last
question, I think, was appropriately a breaking point.
So we will stop and resume tomorrow at 9:00 a.m. --
actually, tomorrow morning at 9:30 a.m.

MS. COSTELLO:  Your Honor, may I be heard on
an issue?

THE COURT:  You may.

MS. COSTELLO:  Dr. Plaud is the

1  court-appointed respondent-selected examiner, which
2  means that we are not able to talk to him.  There's been
3  a lot of testimony today about exhibits that were
4  received in 2023, which is recently.  And so I wondered
5  if the Court might entertain lifting the ban on
6  communication in order that we could discuss those with
7  him prior to resuming testimony tomorrow.

8          THE COURT:  I'll hear from United States.

9          MR. BREDENBERG:  I don't think the reason,
10  Your Honor, would be the appropriate cause for that.  We
11  would object to that.  The rule is that there's no
12  communication.  Just because they happen to have
13  different evidence that -- theoretically, they haven't
14  been able to communicate with Dr. Plaud at all about any
15  of the evidence, so any new evidence wouldn't really be
16  a good reason for lifting the communication ban.

17          THE COURT:  Well, I guess my question -- the
18  question is the discussion part and the providing the
19  materials part.  Have those materials all been
20  previously provided in discovery?  That is, is he aware
21  of what we're talking about as he's sitting in the
22  courtroom?

23          MS. COSTELLO:  I mean, he was sitting in the
24  courtroom during --

25          THE COURT:  I understand.

1          MS. COSTELLO:  -- testimony.

2          THE COURT:  But has he seen the documents?

3    I'm happy for him to have the documents but have no

4    conversation about them overnight, is where I think --

5          MS. COSTELLO:  I believe he has them, Your

6    Honor.  The point I was trying to make is that, you

7    know, we would have been able to depose him -- had we

8    received the documents during the discovery period, we

9    could have deposed him on them even though we're not

10   able to talk to him, but we don't have the opportunity

11   for that because they were received outside the

12   discovery period.

13         THE COURT:  All right.  It seems to me that

14   this -- I'm not gonna create an error for us.  This

15   defendant's liberty is at stake.  Dr. Plaud is a repeat

16   participant in these proceedings.  I don't think that

17   there's a significant risk that he will change or tailor

18   his testimony as a result of having an opportunity to

19   confer with the defendant.  I will -- let's see.  So

20   he's been -- has he been deposed in this case by either

21   side?

22         MS. COSTELLO:  He has not, Your Honor.

23         THE COURT:  The defendant's liberty is at

24   stake.  I'll permit him to meet -- I'll permit defense

25   counsel to talk overnight with Dr. Plaud.

1          MS. COSTELLO:  Thank you, Your Honor.

2          THE COURT:  I'm not happy about it but I'll

3  permit it.  This is his life, this is his hearing.  We

4  will give him the opportunity to have his best showing.

5  And we won't have any reversible error -- well, maybe

6  not.

7          Anything further we need to take up?

8          MS. COSTELLO:  No, Your Honor, not from the

9  respondent.

10          MR. BREDENBERG:  No, Your Honor.

11          THE COURT:  All right.  Thank you,

12  everybody.

13          (Proceedings recessed at 5:06 p.m.)

14

15

16

17

18                  **C E R T I F I C A T E**

19

20      I certify that the foregoing is a correct

21  transcript from the record of proceedings in the

22  above-entitled matter.

23

24  /s/Risa A. Kramer                    4/3/2023

25  Risa A. Kramer, RMR, CRR                  Date