IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:21-HC-002164-M

UNITED STATES OF AMERICA,          )
                                   )
        Petitioner,                )
                                   )
v.                                 )          ORDER
                                   )
JAMES KOZOHORSKY,                  )
                                   )
        Respondent.                )

This matter is before the court on the government's certificate of a sexually dangerous person and petition to commit Respondent James Kozohorsky pursuant to 18 U.S.C. § 4248. [DE 1]. Under the Adam Walsh Child Protection and Safety Act of 2006 (the "Act"), Pub. L. No. 109–248, 120 Stat. 587, the government may civilly commit a "sexually dangerous person" to the custody of the Attorney General upon the expiration of the person's prison sentence if the government proves by clear and convincing evidence that the person: (1) "has engaged or attempted to engage in sexually violent conduct or child molestation"; (2) "suffers from a serious mental illness, abnormality, or disorder"; and (3) as a result, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5), (a)(6).

The parties agree element one is proven but dispute elements two and three. The government argues Mr. Kozohorsky suffers from other specified paraphilic disorder (non-consent) and other specified personality disorder (antisocial features). It contends as a result of these diagnoses that he would have serious difficulty refraining from sexually violent conduct if

released. Mr. Kozohorsky argues these diagnoses are improper generally and as applied to him. He also contends that even if he has a serious mental illness, abnormality, or disorder, he would not have serious difficulty refraining from sexually violent conduct if released.

For the reasons stated herein, the court finds that the government has not met its burden on elements two or three. It has not shown by clear and convincing evidence that Mr. Kozohorsky presently suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty refraining from sexually violent conduct if released. In reaching its decision, the court recognizes it is "serious business" to refuse "to release a person who has served a criminal sentence based on a prediction that" their release "would be too dangerous." *United States v. Williams*, 53 F.4th 825, 832 (4th Cir. 2022); *United States v. Perkins*, No. 20-7024, 2023 WL 3244373, at *1 (4th Cir. May 4, 2023). Mr. Kozohorsky has served his sentence. The court denies the government's petition for civil commitment.

## I.     Statement of the Case

On July 28, 2021, Petitioner United States of America filed a certification that Mr. Kozohorsky is a "sexually dangerous person," which stayed Mr. Kozohorsky's release from the custody of the Federal Bureau of Prisons ("BOP"). *See* DE 1; *see also* 18 U.S.C. § 4248(a). At the time of certification, Mr. Kozohorsky was serving a 120-month term of imprisonment following a conviction for Failure to Register as a Sex Offender in violation of 18 U.S.C. § 2250A, Case No. 1:11-CR-17 (E.D. Mo.). His projected release date was March 24, 2022. DE 1-1 at ¶ 2.

Following certification, the parties filed expert reports as follows: (1) Dr. Dawn Graney's precertification report [DE 7], (2) Dr. Mark Hastings's forensic report [DE 21], (3) Dr. Joseph Plaud's forensic report [DE 24], (4) Dr. Amy Phenix's forensic report [DE 35], (5) Dr. Leonard Bard's forensic report [DE 37].

2

The court held a civil commitment hearing on March 27–28, 2023. DE 59. Prior to the commencement of the hearing, the government gave notice that it did not intend to call Dr. Phenix as a witness. DE 64. Mr. Kozohorsky, his counsel, and the government's counsel appeared for the hearing on March 27, 2023. The parties stipulated that each examiner, other than Dr. Phenix, qualified as an expert witness under Federal Rule of Evidence 702, and that Mr. Kozohorsky has a prior conviction for rape that qualifies as a sexually violent act. The court admitted all exhibits submitted by both parties. The court heard testimony from Mr. Kozohorsky, Dr. Hastings, Dr. Graney, Dr. Bard, and Dr. Plaud on the first day of trial. It then finished hearing from Dr. Plaud and accepted closing arguments on the second day. The parties filed proposed findings of fact and conclusions of law on April 27, 2023.

## II.    Findings of Fact

James Kozohorsky was born in 1964 in Benton Harbor, Michigan. *United States v. James D. Kozohorsky*, Presentence Investigation Report ("PSR"), Govt. Ex. 7 at Bates 1537. His father died when Mr. Kozohorsky was 10 years old from a work-related accident. *Id.* Following his father's death, Mr. Kozohorsky moved to Arkansas. He attended Jonesboro Arkansas High School until the tenth grade. *Id.* at 1539. When he dropped out in 1979. *Id.* He married Mary Elizabeth Ragan in 1987. *Id.* at 1537. The couple divorced in 1994. *Id.* From 1982 until 2010, Mr. Kozohorsky was self-employed doing heating and air conditioning services and electrical work. *Id.* at 1540. Mr. Kozohorsky's mother committed suicide in 1994, and he does not have a relationship with any of his siblings. *Id.* at 1537.

Mr. Kozohorsky has three significant convictions involving sexually violent conduct. *Id.* at 1534–35. On January 15, 1987, Mr. Kozohorsky was arrested and charged with rape and aggravated assault. *Id.* at 1534. The rape charge was based on a January 15, 1987, allegation by

3

Rhonda Horner that Mr. Kozohorsky forcibly raped her in the bathroom of the Bargains Unlimited store in Osceola, Arkansas. *See* Govt. Ex. 16. The aggravated assault charge was based on a January 12, 1987, allegation by Sandra Lancaster that on January 4, 1987, Mr. Kozohorsky threatened her with a knife and attempted to feel her under her clothes. *See* Govt. Exs. 17, 18. Mr. Kozohorsky pleaded guilty to the rape charge involving Rhonda Horner on March 7, 1988 and received a sentence of ten (10) years in the Arkansas Department of Corrections of which seven (7) years was suspended. Govt Ex. 15. The aggravated assault charge involving Sandra Lancaster was *nolle prossed*. *Id.* at 1537. Mr. Kozohorsky's sentence was completed on March 17, 1989. *Id.* at 1534.

At the commitment hearing, Mr. Kozohorsky admitted to raping Rhonda Horner. He testified that he had been in a sexual relationship with her and that on January 15, 1987, he asked her to have sex with him in the bathroom of her workplace, Bargains Unlimited. When she said no, he forced himself on her. He testified "I thought I had an entitlement because we dated. I thought that once we got started she would like it like any other time, and I was incorrect on both accounts." Tr. Day 1 [DE 77] at 58:7–10. When asked what kind of impact he believed his actions had on her, Mr. Kozohorsky responded "She probably never trusted nobody again. I definitely hurt her. And I just can't imagine all the stuff that she might have went through." *Id.* at 59:1–5. Mr. Kozohorsky testified that he did not know Sandra Lancaster and denied ever assaulting her or being in her home. *Id.* at 19–21. The court finds as a fact that Mr. Kozohorsky raped Rhonda Horner. The court also finds as a fact that the government has not proven by clear and convincing evidence that Mr. Kozohorsky raped, attempted to rape, or assaulted Sandra Lancaster. Ms. Lancaster did not testify at the hearing, Mr. Kozohorsky did not admit to the offense, and the charge was *nolle prossed*.

4

On November 15, 1989, Mr. Kozohorsky was arrested in Osceola County and charged with rape. Govt. Ex. 7 at Bates 1534. This charge stemmed from an allegation by Nadine Davis that Mr. Kozohorsky forcibly raped her at her home and threatened to kill her. Govt. Ex. 14. The victim alleged that Mr. Kozohorsky said, "he had been wanting her for years and if he had to rape her he would." *Id.* On June 10, 1991, Mr. Kozohorsky pleaded guilty to one count of rape and received a sentence of 40 years in the Arkansas Department of Correction of which 15 years was suspended. Govt. Ex. 13. He also pleaded guilty to burglary, terroristic threatening, and intimidating a witness on the same date, and received a concurrent sentence. Govt. Ex. 7 at Bates 1535. These charges related to his going to Ms. Davis' house prior to trial and allegedly threatening her. *Id.* He was released from these sentences on December 29, 2003. *Id.* at Bates 1534.

At the commitment hearing, Mr. Kozohorsky denied raping Ms. Davis. Tr. Day 1 at 26–27. He testified that he was in a consensual sexual relationship with her. *Id.* at 61:9–10. He testified that, even though he had not raped her, his understanding was that he would serve about five years with the plea, whereas he faced a life sentence if he went to trial. *Id.* at 61–62. Mr. Kozohorsky testified that he discussed the decision with his wife and his lawyer, who both advised him to take the plea deal. *Id.* at 62. The court finds that Mr. Kozohorsky committed the rape of Nadine Davis.

On January 7, 2006, Mr. Kozohorsky was arrested and charged with rape in Pointsett County, Arkansas. Govt. Ex. 7 at Bates 1535. The rape charges were based on a January 3, 2006, allegation by Linda Burnsett that Mr. Kozohorsky anally raped her four times the previous night. Govt. Ex. 12 at Bates 2131. Ms. Burnsett gave a lengthy statement that detailed their prior sexual relationship, which included prior consensual anal sex. Govt. Ex. 12 at Bates 2136. On March

5

13, 2007, Mr. Kozohorsky pleaded guilty or nolo contendere to one count of attempted rape, received a suspended sentence of 120 months, and was placed on probation. Govt. Ex. 11.

At trial, Mr. Kozohorsky denied raping Linda Burnsett. Tr. Day 1 at 28–30. He testified that the two had been in a relationship, but he wanted to break up with her. *Id.* at 68–69. He testified that he brought an audio recording device to her house to record the breakup, but that Ms. Burnsett asked if they could have sex one last time, which they did. *Id.* at 70:9–20. Mr. Kozohorsky testified that when Ms. Burnsett then accused him of rape, he was able to use tapes to negotiate the noncustodial sentence. *Id.* at 86. He testified that he would not have agreed to a custodial sentence. *Id.* at 71:20–24.

Further, a suspended sentence for a twice-convicted rapist is unusual. There is additional evidence in the record corroborating the existence and contents of the tapes, though the tapes themselves were not provided in evidence. Resp. Exs. 6–8. In sum, it is impossible to divine exactly what occurred between Mr. Kozohorsky and Ms. Burnsett, particularly given that Ms. Burnsett did not testify. Thus, the court finds as a fact that Mr. Kozohorsky was convicted of attempted rape. However, the court does not fully accept the version of events set forth either in the police reports or in Ms. Burnsett's statement given the outcome of the case, Mr. Kozohorsky's denial, and the absence of testimony from Ms. Burnsett.

In 2010, Mr. Kozohorsky's probation for the attempted rape conviction was revoked, and he received a 36-month sentence to be served in the Arkansas Department of Corrections followed by 36 months of suspended imposition of sentence. Govt. Ex. 9 at 185. His probation violation was not for a sex offense. Govt Ex. 7 at Bates 1535–1536.

At the commitment hearing, the court also heard testimony and accepted evidence regarding an uncharged 2010 sexual assault allegation by a victim named Christine Harvey. Govt.

6

Ex. 10 at Bates 2399; Govt. Ex. 7 at Bates 1529. The PSR in Mr. Kozohorsky's federal case recommended a 6-level increase to his offense level for committing a sex offense against someone other than a minor while in failure-to-register status based on this allegation. Govt. Ex. 7 at 1529, 1531. At Mr. Kozohorsky's sentencing, the government conceded this 6-level enhancement. Resp. Ex. 5 at Bates 1442. No charges were ever filed against Mr. Kozohorsky based on this allegation. The court notes that the police report regarding the offense focuses on a physical, rather than sexual, assault. Govt. Ex. 10 at 2399.

The court finds as a fact that the government has not proved by clear and convincing evidence that this sexual assault occurred. Ms. Harvey did not testify at the hearing, Mr. Kozohorsky did not admit to the offense, the government conceded that he did not commit a sex offense while in failure-to-register status, he was never charged with a crime related to this incident, and the police report indicates he was not investigated for sexual assault.

Mr. Kozohorsky has other, non-sexual, criminal convictions that are detailed in his PSR, including 2008 and 2009 charges for driving while intoxicated, and a 2009 charge for failure of a sex offender to report. Govt. Ex. 7 at Bates 1536. He also has four convictions for burglary and theft of property from 1980 in Craighead County, Arkansas, and a set of convictions for breaking and entering, theft of property, and possession of a firearm in Greene County, Arkansas from 1982. *Id.* at 1532–33.

Mr. Kozohorsky's federal offense involved failure to register as a sex offender under federal law in the Eastern District of Missouri. He went to trial and was found guilty by a jury on January 6, 2012. Govt. Ex. 7 at 1529. Mr. Kozohorsky received a sentence of 10 years' imprisonment followed by a lifetime term of supervised release. Govt. Ex. 6. The terms of his lifetime supervision include, *inter alia*, participation in both alcohol abuse treatment and sex

7

offender treatment, abstaining from the use of alcohol, registration as a sex offender, a prohibition on possessing obscene material, and consent to warrantless searches. *Id.* at Bates 6.

Mr. Kozohorsky's federal period of incarceration has been unremarkable. He has not received any infractions. In January 2016, Mr. Kozohorsky received a memorandum stating that a recent picture order, though non-pornographic, "can be seen as risk-relevant." Govt. Ex 21 at Bates 1076. No further information was provided. In May 2016, Mr. Kozohorsky received a second memorandum stating that picture brochures, though non-pornographic, "have been deemed risk-relevant to you due to the preponderance of pictures depicting models posing as adolescent females and/or bondage." *Id.* at Bates 1074. The May 17, 2016 correctional plan note states that "[s]even of the pictures depicted models posing as adolescent females and/or depicted nudity." *Id.* at Bates 1224. The note did not mention bondage. *Id.* He did not receive any institutional punishment for either of these incidents.

Mr. Kozohorsky did not participate in any type of sex offender treatment while in custody until March 2022, when he began participation in the Commitment and Treatment Program ("CTP"). Govt. Ex. 23 at 1965. Mr. Kozohorsky testified that he joined the CTP "[t]o show the court that I'm willing to do whatever needs to be done. I have treatment that's assigned to me when I'm released, so I was gonna show the court that I'm willing to, you know go to sex offender treatment, whatever it takes." Tr. Day 1 at 80:1–6.

Mr. Kozohorsky testified as previously discussed about his prior criminal history. He denied the rapes of all but Rhonda Horner. He testified that he divorced his wife while serving his sentence for the rape of Nadine Turner so that his wife could live her life without worrying about him. Tr. Day 1 at 63:12–18. Mr. Kozohorsky denied an attraction to nonconsensual sex. *Id.* at 83:22–25. He testified that when he was out in the community from 2003 until 2006, he was never

8

accused of failing to register. *Id.* at 65:10–17. He testified that he had consensual sexual relations with roughly 20 women during that period of time. *Id.* at 66:2–4. During that time, he recorded all of his sexual encounters to protect against future rape charges. *Id.* at 66. Mr. Kozohorsky also testified that he planned to comply with all terms of his lifetime supervised release and that if he had any concerns about how to register in the future, he would contact his US Probation Officer. Tr. Day 1 at 81:4–5 and 82:3–6. Mr. Kozohorsky testified that he planned to "go to work for Marshall Ghant and his son" doing heat and air and electrical repair work if released. *Id.* at 82:7–10. He further testified that he spoke to Mr. Ghant weekly and that Mr. Ghant had agreed to employ him and provide housing. *Id.* at 82:11–20.

The four experts who testified at the hearing testified consistent with their respective reports. The experts gave conflicting opinions. They also had different views of the facts.

The court appointed expert, Dr. Hastings, opined "with a reasonable degree of psychological certainty that Mr. Kozohorsky does suffer from a serious mental disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct if released." Govt. Ex. 4 at 26. Dr. Hastings offered diagnoses of Other Specified Paraphilic Disorder (nonconsensual/coercive sexual activity), and Other Specified Personality Disorder (antisocial features), which he opined were serious for purposes of the Adam Walsh Act. *Id.* at 25. In support of his diagnosis of Other Specified Paraphilic Disorder (nonconsensual/coercive sexual activity), he cited a number of "factors and behavioral indicators [that] point to the presence of a paraphilic disorder related to coerced/nonconsensual sexual activity." *Id.* at 16. Dr. Hastings testified that these factors came from a book titled "Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond" by Dr. Dennis Doren and published in 2002 ("the Doren factors"). *Id.* The factors cited included "ejaculation or other clear signs of arousal during events that are clearly

9

non-consensual; repetitive patterns of actions across the rapes; a significant portion of his criminal behavior/history is sexual; a short period of time after consequence before raping again; raping under circumstances with a high likelihood of being caught; having access to consensual sex partners at the time of his rapes; and having various victim types." *Id.* Dr. Hastings also noticed that there was an "absence of contradictory indicators" such as "evidence he stopped when the victim cried or screamed" or "loss of erection when the victim complains or otherwise resists." *Id.*

He further found that Mr. Kozohorsky's Other Specified Paraphilic Disorder (nonconsensual/coercive sexual activity) and Other Specified Personality Disorder (antisocial features) would cause him serious difficulty refraining from sexually violent conduct if released. *Id.* at 25. In support of his opinion, Dr. Hastings cited the BOP's Rules and Regulations regarding civil commitment of sexually dangerous persons. *Id.* He noted that Mr. Kozohorsky "has engaged in repeated sexually violent conduct/rape over a period of 20+ years and some of his victims reported repeated assaults," his actuarial scores reflected above average risk, "and he was alleged to have physically and sexually assaulted a woman who was staying with him when he was arrested for the current offense in August 2010." *Id.* Dr. Hastings also noted that Mr. Kozohorsky had "engaged in sexual violent conduct while under supervision and in situations with a high likelihood of detection." *Id.* "There is also indication in the records that he may have an even greater history of sexual assault." *Id.* at 26.

Dr. Graney, the government's expert, also found that Mr. Kozohorsky met the criteria for civil commitment. Dr. Graney offered both Other Specified Paraphilic Disorder (non-consent) and Other Specified Personality Disorder (antisocial features) as serious mental illnesses, abnormalities, or disorders for purposes of civil commitment. Govt. Ex 2 at 27. Her report stated that OSPD-nonconsent was "the primary driving force" behind Mr. Kozohorsky's sexually violent

10

acts, but the Other Specified Personality Disorder (antisocial features) was "arguably a contributing factor as well." *Id.* During her testimony, Dr. Graney clarified that the primary diagnosis supporting her opinion was OSPD-nonconsent. Tr. Day 1 at 208 lines 9–12. Like Dr. Hastings, Dr. Graney also relied on the Doren factors to support her diagnosis of OSPD-nonconsent. Govt. Ex. 2 at 17 n.1. She testified that she did not know of any empirical support to support the conclusion that the Doren factors led to the diagnosis of OSPD-nonconsent or that there were any tools to measure those factors. Tr. Day 1 at 209. Dr. Graney also relied on a "2004 assessment conducted by Dr. Simon in the ADC [which] noted that 'credible documentation' showed the inmate's history of "violent, carefully planned sexual assaults [was] much greater than his extensive official record reflects." Govt. Ex. 2. at 17. Dr. Graney further noted that during that assessment Mr. Kozohorsky had also "admitted to forcing his wife to have sex with him against her will." *Id.*

In support of her opinion that Mr. Kozohorsky would have serious difficulty refraining from sexually violent conduct if released, Dr. Graney noted that "[t]here was some documentation to suggest that he engaged in sexually violent conduct with additional victims as well" and that "[i]n some cases, he sexually reoffended shortly after serving periods of incarceration for rape convictions." *Id.* at 28. Dr. Graney noted Mr. Kozohorsky's score on the STATIC-99 of 4 and his dynamic risk factors, specifically stating that "it is highly concerning that the inmate failed to follow registration requirements and apparently committed another sexual assault while in failure to register status." *Id.* Dr. Graney also considered the absence of protective factors. *Id.* at 28–29.

Dr. Bard, Respondent's expert, opined that Mr. Kozohorsky was not sexually dangerous. Dr. Bard found that Mr. Kozohorsky did not have a mental illness, abnormality, or disorder. Resp. Ex. 3 at 14–15. He considered OSPD-nonconsent but opined that it was not a valid or reliable

11

diagnosis. He testified that the diagnosis has been rejected from inclusion in every iteration of the Diagnostic and Statistical Manual for Mental Disorders ("DSM"), which is the seminal text in the field of psychology that is used to make diagnoses. *Id.* at 9–10. Dr. Bard also rejected OSPD-nonconsent because there is a lack of scientific support in the literature for a specific attraction to nonconsensual sexual behavior. *Id.* at 10. Dr. Bard also considered the diagnosis of Other Specified Personality Disorder with antisocial features but declined to offer it. He found no present-day manifestations of antisocial behavior and had not identified any since approximately 2006. *Id.* at 11.

In the alternative, Dr. Bard opined that even if the court determined that Mr. Kozohorsky did have a serious mental illness, abnormality, or disorder, it would not cause him serious difficulty refraining from sexually violent conduct if released. *Id.* at 14. Dr. Bard went on to consider Prong 3 in the alternative. He noted that Mr. Kozohorsky's STATIC-99 score of 4 is associated with an estimated recidivism rate of 9.2% over five years. *Id.* at 13. Dr. Bard also noted that "Mr. Kozohorsky has not acted out sexually while in prison and has not made any statements that could be interpreted as indicating a desire to re-offend or an inability to control his sexual urges." *Id.* Dr. Bard went on to note that "[w]hile in the community after his 2006 conviction, he did not manifest significant problems in managing his sexual urges and was only convicted of a Failure to Register charge." *Id.* at 14. Also critical to Dr. Bard's opinion was Mr. Kozohorsky's lifetime term of supervised release. *Id.*

Dr. Plaud, Respondent's court-appointed expert, also opined that Mr. Kozohorsky did not meet the criteria for civil commitment. Dr. Plaud agreed with Dr. Bard that there was no qualifying mental illness, abnormality, or disorder. Resp. Ex. 1 at 2. He considered a diagnosis of sexual sadism but opined that Mr. Kozohorsky did not meet the criteria. *Id.* at 3. Dr. Plaud testified that

he did not use the diagnosis of Other Specified Paraphilic Disorder (nonconsent), for the same reasons as Dr. Bard, but Dr. Plaud also explained that he did not see evidence of specific attraction to nonconsent in Mr. Kozohorsky's offenses. Dr. Plaud opined that Mr. Kozohorsky would not have serious difficulty refraining from sexually violent conduct in the future. *Id.* at 2. In support of his opinion, Dr. Plaud cited Mr. Kozohorsky's age, the absence of empirical support for the proposition that he lacks any volitional capacity over his sexual impulses, his ongoing behavior stability, and his lifetime term of supervised release. *Id.* at 3.

## III.    Legal Standards

The Adam Walsh Child Protection and Safety Act governs the civil commitment of sexually dangerous persons. 18 U.S.C. § 4248. Civil commitment proceedings begin when the Attorney General certifies that a person in the custody of the BOP "is a sexually dangerous person, and transmit[s] the certificate to the clerk of the court for the district in which the person is confined." *Id.* § 4248(a). When the certificate is filed, it stays the release of the person pending the completion of § 4248's procedures. *Id.* The court then holds a hearing to determine if the person is sexually dangerous. *Id.* Before the hearing, the court may order a psychiatric or psychological examination of the defendant and have a report filed with the court. *Id.* § 4248(b). At the hearing, "[t]he person shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *Id.* § 4247(d).

At the hearing, the government must prove by clear and convincing evidence that the person is a sexually dangerous person. If the court finds by clear and convincing evidence that the person is sexually dangerous, then the court shall commit the person to the custody of the Attorney General. *Id.* § 4248(d). The Attorney General must attempt to place the person in the custody of

13

an appropriate State, but if no State will assume responsibility, the Attorney General must place "the person for treatment in a suitable facility, until—(1) such a State will assume such responsibility; or (2) the person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment; whichever is earlier." *Id.*

At this stage, the court is charged with determining if the government has met its burden of showing by clear and convincing evidence that Mr. Kozohorsky is a sexually dangerous person under § 4248(d). The Act defines a sexually dangerous person as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." *Id.* § 4247(a)(5). A person is "sexually dangerous to others" if "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id.* § 4247(a)(6).

Under these statutory definitions, to obtain a civil commitment order against Mr. Kozohorsky, the government must establish three elements by clear and convincing evidence. First, that Mr. Kozohorsky "engaged or attempted to engage in sexually violent conduct or child molestation" in the past (the "prior conduct" element). 18 U.S.C. § 4247(a)(5); *see also United States v. Antone*, 742 F.3d 151, 158 (4th Cir. 2014). Second, Mr. Kozohorsky "suffers from a serious mental illness, abnormality, or disorder" (the "serious illness" element). 18 U.S.C. § 4247(a)(6); *see also Antone*, 742 F.3d at 158. Third, as a result of the illness, abnormality, or disorder, Mr. Kozohorsky "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" (the "serious difficulty" or "volitional impairment" element). 18 U.S.C. § 4247(a)(6); *see also Antone*, 742 F.3d at 158. The clear and convincing

14

evidence standard "has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." *United States v. Hall*, 664 F.3d 456, 461 (4th Cir. 2012).

## IV. Conclusions of Law

At issue in this case are the second and third elements. All experts agree and Mr. Kozohorsky concedes that, at a minimum, his 1987 and 1989 rape convictions qualify as acts of sexual violence that satisfy the first element of the Act. *See* DE 68 at 2. The court thus finds that Mr. Kozohorsky has engaged in or attempted to engage in sexually violent conduct and the government has proven the first element by clear and convincing evidence. Mr. Kozohorsky denies, however, that he currently suffers from a serious mental illness, abnormality, or disorder and denies that he would have serious difficulty refraining from illegal conduct due to any illness or disorder. The court holds that the government has not proven by clear and convincing evidence that Mr. Kozohorsky currently suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct if released and therefore denies the government's motion.

### 1. Serious Illness, Abnormality, or Disorder.

#### a. OSPD-Nonconsent as a Serious Mental Illness Abnormality or Disorder.

The second prong of the Section 4248 commitment test requires evaluation by a mental health professional. *United States v. Francis*, 686 F.3d 265, 275 (4th Cir. 2012). "Expert opinion is 'critical' to determining whether [an individual] suffers from a mental illness." *United States v. Castrejon-Alvarez*, 549 F. App'x 162, 164 (4th Cir. 2013) (citing *Addington v. Texas*, 441 U.S. 418, 429 (1979)). "Whether [an] individual is mentally ill and dangerous to either himself or others

and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *United States v. Bolander*, 722 F.3d 199, 207–08 (4th Cir. 2013) (quoting *Addington*, 441 U.S. at 429).

In this case, as discussed *supra*, four experts both evaluated Mr. Kozohorsky and testified as to whether they believed he currently suffers from a serious mental illness or disorder within the meaning of the Act. Drs. Graney and Hastings opined that Mr. Kozohorsky currently suffers from a serious mental illness or disorder, i.e., OSPD-nonconsent, and Other Specified Personality Disorder (antisocial features). However, Drs. Bard and Plaud testified that he does not.

The two sets of doctors have a twofold disagreement. First, they disagree as to whether OSPD-nonconsent, a disorder characterized by an abnormal attraction to nonconsensual sex, is a mental disorder, abnormality, or illness. Second, they disagree as to whether Mr. Kozohorsky exhibits a paraphilic sexual interest in nonconsensual sex.

The Fourth Circuit has explained that a DSM diagnosis is neither sufficient nor necessary for a positive finding on the second element. *United States v. Caporale*, 701 F.3d 128, 136–137 (4th Cir. 2012) *see also id.* at 137 n.4 ("A diagnosis of hebephilia (or pedophilia, or other mental disorder) is merely the starting point for the court to consider the true thrust of the § 4247(a)(6) inquiry—whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment."). *Caporale* thus instructs that an attraction to nonconsensual sex can, in theory, serve as a basis for civil commitment under § 4248's second element. Accordingly, the court does not rely on Drs. Bard and Plaud's analyses based on the absence of a nonconsent diagnosis in the DSM.

The testimony by Drs. Bard and Plaud creates sufficient doubt regarding a paraphilia that is difficult to identify and measure such that the court finds the government cannot meet its burden

16

of proof. As Dr. Bard testified, there are no accepted criteria for a nonconsent paraphilia. Tr. Day 1 at 220:13–18. This makes it is difficult to measure and unreliable to diagnose or identify. *Id.* at 220:16–24, 221:1–4. Dr. Bard further explained that rape is, by definition, a nonconsenting act, thus there is no empirically valid way to distinguish a paraphilic rapist from a nonparaphilic rapist. *Id.* at 221:20–25, 222:1–6. Dr. Bard further testified that there "is no empirical research that supports the finding that there is a subtype of offender that are specifically aroused to nonconsent." *Id.* at 226:1–4.

Dr. Bard discussed the Doren factors at length. He noted that the book itself was not peer reviewed, it cited no research or studies in support of each of the nine factors, and no further research has been done on the factors since its publication. *Id.* at 226–27. Dr. Graney conceded on cross-examination that she was unaware of any empirical evidence supporting a finding that the specific factors set forth by Dr. Doren lead to a diagnosis of attraction to nonconsent. *Id.* at 209:12–16. Both Drs. Bard and Plaud testified that, for each of the factors, they were unaware of any research that had been done to support the proposition that any specific factor provided evidence of an attraction to nonconsent. *Id.* at 228–36, 295–300. Dr. Graney testified that there are no tools to use to determine whether the Doren factors are present. *Id.* at 209:17–19. Dr. Hastings agreed that there were no tools other than a penile plethysmograph (PPG) that could measure nonconsent. He also conceded he had never seen a PPG that was conducted on Mr. Kozohorsky. *Id.* at 145:6–14.

The court also found illuminating Dr. Plaud's explanation during cross-examination that a person who is truly attracted to nonconsent is attracted to the arousal of the psychological pain, humiliation, or suffering of another person, which would then satisfy the DSM definition of Sexual Sadism. Tr. Day 2 [DE 79] at 44–46. The court agrees. Therefore, the absence of a Sexual Sadism

17

diagnosis by any expert in this case further weighs against a positive finding on element two, given that the DSM definition of Sexual Sadism overlaps significantly with the concept of an attraction to nonconsent.

The court recognizes that there have been cases in the Eastern District of North Carolina in which a nonconsent paraphilia was at issue. *See, e.g., United States v. King,* 5:10-HC-2009-FL, 2012 WL 4447451, at *1 (E.D.N.C. Sept. 25, 2012); *United States v. Antone,* 5:07-HC-2042-FL, 2012 WL 4450846 (E.D.N.C. Sept. 25, 2012); *United States v. Ofarrit-Figueroa,* 5:10-HC-2022-BO, 2012 WL 12877642 (E.D.N.C. Apr. 6, 2012). Those cases all significantly differ from this one.

In *King,* the Respondent affirmatively admitted his attraction to forced sex and desire to control and humiliate his victims. Dr. Graney testified for the government in that case and expressed concern that someone with a history of rape might be given the diagnosis solely on the basis of having engaged in rape behavior, and that the diagnosis should only be offered if "there is clear evidence of the urges and fantasies that support the arousal to the coercive nature of the acts." *United States v. King,* Memorandum and Recommendation, No. 5:10-HC-2009-FL, 2012 WL 4447577, at *19 (E.D.N.C. Mar. 1, 2012). *King* differs from this case because Mr. Kozohorsky has not admitted to such an attraction.

In *Antone,* the district court found that although an attraction to nonconsent might exist, the government failed to prove "that respondent suffers from a paraphilic disorder characterized by arousal to nonconsenting sexual encounters." *Antone,* 2012 WL 4450846, at *4; *see also Antone,* 742 F.3d at 164 ("Notably, the district court found that Antone suffered from polysubstance dependence and that he did not suffer from paraphilia NOS, nonconsent."). In addition, in both *King* and *Antone,* the court found that the government failed to prove that

18

Paraphilia Not Otherwise Specified ("NOS")—the precursor to Other Specified Paraphilic Disorder—is a disorder found among the general population. *King*, 2012 WL 4447577, at *34; *Antone*, 2012 WL 4450846, at *3–4.

In *Ofarrit*, the district court also relied on an expert who offered the diagnosis of Paraphilia NOS. *Ofarrit-Figueroa*, 2012 WL 12877642, *3. The court specifically noted, however, that the expert had two separate bases for the diagnosis: one involved meeting some, but not all, criteria for exhibitionism, and one involved nonconsent. *Id.* The district court did "not express an opinion on the 'nonconsent' specifier applied" but "reiterate[d] its concern that diagnoses that pathologize criminal behavior and are not accepted by the DSM-IV-TR provide precarious justification for civil commitment." *Id.*

In *United States v. Graham*, the district court considered the propriety of OSPD-nonconsent. 683 F.Supp.2d. 129 (D. Mass 2010). The court in *Graham* did not make a ruling on the legitimacy of OSPD-nonconsent but held that it was "swayed by the dearth of persuasive evidence set forth to support a paraphilia diagnosis in this case." *Id.* at 141. Notably, the government's expert relied on the Doren factors, as do Drs. Hastings and Graney here. *Id.* at 144. In its analysis, the court noted that "it is far from clear" that Dr. Doren's approach is an appropriate means of establishing an OSPD-nonconsent diagnosis. *Id.*

In general, Dr. Bard's and Dr. Plaud's testimony as to the unreliability of the diagnosis as applied to Mr. Kozohorsky counterbalanced the testimony of Drs. Graney and Hastings. Thus, although OSPD-nonconsent is a permissible diagnosis under the law, the court finds it has not been established by clear and convincing evidence in this case.

19

**b. OSPD-nonconsent as applied to Mr. Kozohorsky.**

The court also considers whether the government has proven by clear and convincing evidence that a) Mr. Kozohorsky has an attraction to nonconsenting behavior and b) said attraction causes him a serious functional impairment. *Caporale*, 701 F.3d at 137 n.4. The court finds that the government has not met its burden.

Assuming the diagnoses are valid, the court finds the record does not contain clear and convincing evidence of the Doren factors or of attraction to nonconsent. The court credits Dr. Plaud's testimony regarding the specific facts of Mr. Kozohorsky's crimes. For example, he noted the records for the 1987 offense reveal that "it wasn't like just nonconsent at the beginning and that's [what] he wanted – there was a trail that led to that, which I think reasonably could be starting with a desire for consensual sex with her." Tr. Day 2 at 6:16–25; 7:1–15. Likewise, Dr. Plaud pointed out that, during the 1989 offense, the victim alleged that Mr. Kozohorsky stated he would "rape her if he had to." *Id.* at 8:4–5. This indicates his first choice would have been consensual, rather than nonconsensual sex. Dr. Plaud persuasively explained that it was impossible to know that Mr. Kozohorsky was specifically aroused by Ms. Burnsett's nonconsent in the 2006 offense due to the lack of evidence verifying what occurred. *Id.* at 8:16–19, 9:3–11. In addition, Dr. Bard noted that there were numerous instances in the record of Mr. Kozohorsky engaging in sexual activity with consenting sexual partners, which weighed against the idea that nonconsensual sexual activity was his preferential way of obtaining gratification. Tr. Day 1. at 238.

The court was not persuaded by the opinions of Drs. Graney and Hastings. Both doctors relied on evidence at odds with the record when providing support for the diagnosis. For example, Dr. Graney testified that there was a "good likelihood" that Mr. Kozohorsky had committed additional sex offenses. Tr. Day 1 at 198:25, 199:1. Dr. Graney also conceded at trial that,

20

although she mentioned the allegation of marital rape eight times in her report, it may have been based on "inaccurate information" and that she didn't know "if there's anything else that supports that" allegation other than the PSR. Tr. Day 1 page 197:3–9. Dr. Hastings also mentioned the allegation of marital rape, citing the PSR as the basis, but conceded that it was not mentioned anywhere in the document to which the PSR referred. Tr. Day 1 at 154:18. Neither expert mentioned when discussing the marital rape allegation that Mr. Kozohorsky had affirmatively objected to its inclusion in the PSR. Govt. Ex. 7 at 1545. It appeared that both Drs. Graney and Hastings affirmatively relied on hearsay contained in the PSR despite other evidence to the contrary. Govt. Ex. 20. Both doctors also relied upon "other credible allegations" but testified on cross-examination that they had not seen this credible documentation and instead relied upon a reference made to it in the PSR. Tr. Day 1 at 150–154. Dr. Graney conceded that she assumed that another clinician's assessment of credible evidence was valid without knowing what the clinician relied on. *Id.* at 200. Both Dr. Graney and Dr. Hastings also testified that they found Linda Burnsett's account of the 2006 rape credible. *Id.* at 206, 372. Both testified that his sentence was unusual for a thrice-convicted rapist if the allegations were true, yet both still accepted them. Tr. Day 1 at 149:16–18; 204:9–12. As discussed, the court cannot credit Burnsett's account of the offense in its entirety, given Burnsett did not testify. Both Drs. Hastings and Graney also relied upon the aggravated assault offense involving Lancaster, which was *nolle prossed*. Tr. Day 1 at 145:9–25; 165:23–24. On direct examination, Dr. Hastings testified that Mr. Kozohorsky had a modus operandi of using a knife. However, on cross-examination he conceded that there was only one incident where that occurred, and that was the 1987 incident that was *nolle prossed*. Tr. Day 1 at 146:9–25, 147:1–3. In sum, the government's experts relied on evidence which was either not supported in the record or which the court did not find credible.

21

Dr. Plaud and Dr. Bard provided a thoughtful and neutral view of the evidence. The court found their opinions to be credible and internally consistent. In sum, regardless of the specific nomenclature, the court finds that the government has failed to prove by clear and convincing evidence that Mr. Kozohorsky presently suffers from a serious mental illness, abnormality, or disorder marked by an attraction to nonconsenting sex.

### c. Other Specified Personality Disorder

Drs. Hastings and Graney also diagnosed Other Specified Personality Disorder (antisocial features). The court finds the government failed to prove by clear and convincing that Mr. Kozohorsky has this disorder. The government also failed to prove that it constitutes a serious functional impairment for Mr. Kozohorsky for purposes of the Adam Walsh Act. There is no persuasive evidence of antisociality during Mr. Kozohorsky's past 10 years in federal custody. While it is certainly true that some people behave better in custody, as Dr. Bard testified, a personality disorder has to be an "ongoing current pattern." Tr. Day 1 at 239:22–25; 240:1–3. One would expect to see some indicia of antisociality during the past 10 years were it truly causing Mr. Kozohorsky difficulty. One would also expect to see some persuasive indicia of antisociality at present. The court finds no evidence of either.

Further, as both Drs. Bard and Plaud testified, empirical evidence supports the conclusion that antisocial behavior decreases over time with age. Tr. Day 2 at 14:14–20. Mr. Kozohorsky's behavior fits this known pattern. Further, Dr. Graney opined that the personality was not the primary driving force behind Mr. Kozohorsky's sexually violent conduct, but that it was "arguably a contributing factor." Govt. Ex. 2 at 27. Even if the court were to find that Mr. Kozohorsky did suffer from Other Specified Personality Disorder (antisocial features), the court is not persuaded

22

that, in this case, it has a sufficient nexus with Mr. Kozohorsky's sex offenses to satisfy element two standing alone.

**2. Serious Difficulty Refraining from Sexually Violent Conduct.**

Even if the government had carried its burden as to the second element, it did not meet its burden on the third element. "[T]he serious difficulty prong of § 4248's certification proceeding refers to the degree of the person's volitional impairment, which impacts the person's ability to refrain from acting upon his deviant sexual interests." *United States v. Perez*, 752 F.3d 398, 407–08 (4th Cir. 2014) (quoting *Hall*, 664 F.3d at 463). This element is "more complicated" than the first two because "it requires the court to issue a predictive judgment: has the Government met its burden by presenting clear and convincing evidence that, in the uncertain future, the respondent will have 'serious difficulty in refraining from sexually violent conduct or child molestation'?" *Antone*, 742 F.3d at 159 (quoting 18 U.S.C. § 4247(a)(6)). "[T]he Government must demonstrate that the serious illness, as it has manifested in the particular respondent, has so significantly diminished his volitional capacity [ ] that he is distinguishable from the ordinary 'dangerous but typical recidivist.'" *Id.* (quoting *Kansas v. Crane*, 534 U.S. 407, 413 (2002)). Even if the government had met its burden on element two, it has not proven by clear and convincing evidence that Mr. Kozohorsky's mental illness is "so severe and controlling as to deprive him of his liberty for an indeterminate future." *Antone*, 742 F.3d at 169.

"When the question is whether an inmate suffering from pedophilia will have serious difficulty refraining from re-offending if released, consideration of the nature of his prior crimes provides a critical part of the answer." *Perez*, 752 F.3d at 408. "The question is whether those previous violations provide evidentiary support for the proposition that respondent is incapable of controlling himself." *United States v. Schmidt*, 295 F. Supp. 3d 586, 592 (E.D.N.C. 2018).

23

Importantly, there must also be "sufficient evidence of an ongoing volitional impairment." *Antone*, 742 F.3d at 168.

In determining whether the government has met its burden on element three, this court considers numerous factors. These factors include: (1) continued deviant thoughts; (2) cognitive distortions; (3) resistance to treatment; (4) actuarial risk assessments; (5) historical offenses; (6) failures while on supervision/institutional compliance; and (7) impulsiveness. *See Wooden*, 693 F.3d at 462; *see also United States v. Castle*, No. 5:17-HC-2204-FL, 2018 WL 3762990, at *13 (E.D.N.C. Aug. 8, 2018). The Court also considers whether respondent has prior experience in the community without committing a hands-on offense, respondent's ability to comply with institutional rules, experience with sex offender treatment, respondent's testimony regarding volitional control, and his supervised release conditions. *Hall*, 664 F.3d at 465–67. The Fourth Circuit has noted in the 4246 context "a rigid resort to factoring has become impracticable," therefore, "the district court's inquiry must have sufficient play in the joints." *United States v. Perkins*, No. 20-7024, 2023 WL 3244373, at *33 (4th Cir. May 4, 2023).

There is no evidence Mr. Kozohorsky has continued deviant thoughts nor significant evidence of cognitive distortions. The only cognitive distortion possibly present in Mr. Kozohorsky is denial. However, the court is not persuaded that Mr. Kozohorsky's "denial" of the 2006 and alleged 2010 offense is, in fact, a cognitive distortion nor that it increases any risk. As Dr. Bard testified, "[h]e is simply saying the offense did not occur as it was charged." Tr. Day 1 at 249:5–7. And, as Dr. Hastings conceded and Dr. Bard testified, denial is not an empirically validated risk factor for re-offense. Tr. Day 1 at 143:1–6; 232:12–17.

Mr. Kozohorsky is in a treatment program and statistically unlikely to recidivate. The court does not consider him presently resistant to treatment, although he previously declined treatment.

24

Although actuarial risk assessment scores place him in the above average range, as Dr. Bard testified, this corresponds with a non-recidivism rate of over 90% in five years. *Id*. at 243:15–17.

Although the court is concerned with the severity of Mr. Kozohorsky's past offenses, they are decades old and outweighed by more recent evidence of volitional control, sobriety, and maturity. His last sexually violent crime was in 2006, after which he was in the community for 4 years before his most recent arrest. That most recent arrest was not for a new hands-on offense. Moreover, as discussed above, the specific circumstances of the 2006 offense are unknown. Prior to that, his last sexual offense was in 1989.

The court acknowledges Mr. Kozohorsky has previously failed on supervision, but the failure during his most recent term was not for a sexual offense. The court is not persuaded that Mr. Kozohorsky's failures while on supervision accurately predict his behavior if released. Many years have passed. Moreover, Mr. Kozohorsky's current age and recent institutional record provide a timelier snapshot of his current behavior and counsel against finding by clear and convincing evidence that he will engage in sexual violence on supervised release.

Additionally, Mr. Kozohorsky has not been an institutional management problem. As Dr. Plaud testified, Mr. Kozohorsky has exhibited behavioral stability while in custody. Tr. Day 2 at 22:4–10. There is little evidence of impulsiveness in the record save for his prior offenses. In general, the court finds the recent evidence more persuasive. The court also considers that Mr. Kozohorsky was in the community for four years before his most recent incarceration without a hands-on offense, he was not arrested for a hands-on offense, he has complied with institutional rules, he testified to his volitional control, and he is subject to a lifetime of supervised release.

Both Drs. Graney and Hastings reached the opposite conclusion; however, their opinions failed to satisfy the government's evidentiary burden. Both doctors relied heavily on hearsay and

25

second-hand reports from other individuals without sufficient indicia of reliability, such as Mr. Kozohorsky's purported admission to raping his wife and the 2010 allegation against him. Such reliance reduces the court's confidence in their opinions. The court considers Dr. Graney's and Dr. Hastings's reports and testimonies in conjunction with the reports and testimonies of Dr. Plaud and Dr. Bard, who examined the current strength and salience of the relevant evidence during their analyses, especially Dr. Plaud's analysis of Mr. Kozohorsky's prior offenses. All four experts testified in good faith. Given the conflicting expert testimonies and an independent review of the evidence, the court must hold the government has not proven by clear and convincing evidence that Mr. Kozohorsky would have serious difficulty refraining from sexually violent conduct if released.

## V.    Conclusions of Law

The court reviewed the record and heard the testimony of the respondent, as well as the conflicting testimony of the four experts. The court finds that the government has not met its burden to prove Mr. Kozohorsky presently suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

The government's petition for civil commitment of Mr. Kozohorsky to the custody of the Attorney General pursuant to 18 U.S.C. § 4248(d) is DENIED.

SO ORDERED this ___11th___ day of May, 2023.

Richard E. Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

26